UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

Civil Action No. ______________________

BONNIE BRUNET
MARTIN RIST
JOSEPH GIBSON
J&D QUALITY ENTERPRISES LLC
BRADLEY P. SHELTON
BPS ENTERPRISES, INC.
MICHAEL J. CAMPBELL
PATTY CAMPBELL
FRESH PERSPECTIVES, INC.
THOMAS HAYWOOD
JASON HAYWOOD
JASON THOMAS, INC. D/B/A QUIZNOS SUB
DANIEL S. KESSELS
PHUONG T. NGUYEN
GRATEFUL D, INC.
JOHN MCCARTHY
JONATHON SEQUEIRA
MCJON LLC
JAMES M. TULLY
KIND OF BLUE, INC.
DAVID M. POLLOCK
TINA POLLOCK
NICHOLAS J. POLLOCK
WESTHAMPTON ENTERPRISES LLC
JOHN F. MERRY
THOMAS E. MERRY
MSQUARED 1, INC.
JOHN E. VIRGILI
UNIVERSAL FOODS, INC.
DAVID M. RONAN
TERRANCE M. CASEY
WAVE DANCER HOLDINGS LLC
CAROLYN PEDDY
MIKKI LUCAS F/K/A MIKKI PEDDY
CMC ENTERPRISE PARTNERS LLC
BRIAN L. CURL
BN&N ENTERPRISES LLC
ROBERT HAMPSHIRE
TWO WISCONSIN BOYS LLC
MATHEW HAAS
QP ENTERPRISES, INC.,

INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

vs.

THE QUIZNO'S FRANCHISE COMPANY LLC,
QUIZNO'S FRANCHISING LLC,
QUIZNO'S FRANCHISING II LLC,
THE QUIZNO'S MASTER LLC,
QFA ROYALTIES LLC,
QZ FINANCE LLC,
QIP HOLDER LLC,
TQSC LLC,
TQSC II LLC,
CERVANTES CAPITAL LLC,
RICHARD E. SCHADEN,
RICHARD F. SCHADEN,

Defendants.

---

**CLASS ACTION COMPLAINT**

---

The plaintiffs, individually and on behalf of all others similarly situated, allege, by and through their attorneys Marks & Klein, LLP and Kravit, Hovel & Krawczyk S.C., as follows:

**NATURE OF CASE**

1. This is a national class action brought by certain franchisees of the Quiznos toasted submarine sandwich shop restaurant chain arising from the illegal business scheme of Quiznos and its web of affiliated entities and individuals who control and operate the Quiznos franchise system.[1] Through this scheme, defendants fraudulently induced plaintiffs and the putative Class to purchase franchises and thereafter exploited their control and economic power

---

[1] This action does not presently seek class certification for franchisees located in Wisconsin, Michigan, and Illinois. Franchisees in those states have filed separate actions seeking class relief. *See Westerfield, et al. v. The Quiznos Franchise Company LLC, et al.*, Case No. 06-CV-0120 (United States District Court for the Eastern District of Wisconsin); *McDonald, et al. v. The Quizno's Franchise Company LLC, et al.*, Case No. 2:07-CV-10838-SFC-MKM (United States District Court for the Eastern District of Michigan); *Siemer, et al. v. The Quiznos Franchise*

in order to extract exorbitant and unjustifiable payments and expenditures from their franchisees. As a result, defendants reap grossly inflated sales and profits, creating an illusion of corporate growth and business prosperity while causing substantial financial harm to existing franchisees.

2. None of the plaintiffs have ever turned a profit as a Quiznos franchisee and under the current economic regime never will. In their cases, plaintiffs have invested their life savings only to face economic hail storms at the feet of Quiznos Corporation. The lucky ones have greater resources to sustain their losses or are fortunate enough to have a store in a geographic location that ensures a high enough volume to eke out a small wage. But nothing like what is represented as fact by Quiznos and even then only in an isolated minority of experience. The Court will learn how the typical Quiznos franchisee describes himself as having been placed in "indentured servitude." Having signed on the proverbial dotted line, the large majority of franchisees routinely pump money into the franchise from the beginning and do so until they are forced by market factors, their lender, their landlord or Quiznos itself to walk away from the astronomical losses achieved in a rigged and one-sided system. The result is a diminished franchisee who has felt day in and day out the psychological effects of Quiznos' stranglehold. It is not uncommon for a Quiznos franchisee to work 24-7 and 60-80 hours a week, only to make no money for their labor and, in fact, have to invest more money into it in order to stay open and thus avoid being sued by Quiznos. This lawsuit addresses a flawed system manipulated by those in complete control for their own self-serving gain.

3. Quiznos' illegal scheme consists of two primary components. First, defendants engage in a policy of fraudulently and deceptively inducing franchisees to purchase Quiznos franchises by intentionally misrepresenting the true nature of the contractual relationship as well as the financial prospects for the franchise and likelihood of success.

---

*Company LLC*, *et al.*, Case No. 07-CV-2170 (United States District Court for the Northern District of Illinois).

4. Second, Quiznos exploits its overwhelming economic power in the market or markets for products and services that Quiznos requires of its franchisees to begin and continue the operation of a Quiznos franchise. While concealing the full nature of its own relationships with suppliars from potential franchisees, Quiznos uses its economic power and its exclusive control over the franchise system to, among other things, force its franchisees to: (a) purchase unneeded goods and services; (b) purchase needed goods and services in amounts far greater than necessary to meet the operational needs of their franchises; (c) work with Quiznos-mandated suppliers and pay to those suppliers excessive prices for goods and services that bear no relation to those that could be achieved in arm's length transactions; (d) accept coupons from customers for free or highly-discounted food items for which franchisees receive no reimbursement from Quiznos and which therefore benefit Quiznos by increasing its sales while causing franchisees to purchase more food products for which they receive literally no compensation; and (e) pay an "advertising fee" (typically 4-5% of sales), which Quiznos, in violation of the terms of plaintiffs' Franchise Agreements and representations in its various Uniform Franchise Offering Circulars ("UFOCs"), uses for self-serving purposes, including selling more franchises to unwitting consumers and improperly allocating advertising funds for purposes outside the accepted and defined use of the fees. Quiznos' conduct inherently raises a conflict of interest that routinely results in it choosing its own interests over those of its franchisees. Defendants' day-to-day activities in furtherance of the schemes alleged in this Complaint violate the implied covenant of good faith and fair dealing inherent in plaintiffs' Franchise Agreements.

5. Quiznos furthers its schemes through other illegal, deceptive and fraudulent means, including but not limited to, its willful practices of: (a) saturating geographic areas with

more franchises than the areas could reasonably support; (b) selling franchises in defined "trade areas" which are in fact arbitrarily defined by Quiznos without it having conducted any reasonable research into whether such trade areas can support even one Quiznos franchise, let alone the multiple franchises that Quiznos sells in a given trade area; (c) enforcing biased and discriminatory policies, procedures and practices (not applied equitably to all franchisees) for inspections and alleged "operational standards" designed to deliberately decrease or eliminate Quiznos' obligations to compensate franchisees for their purchase of various mandated products, while concurrently creating an environment designed to keep outspoken franchisees "in-line" and "toeing the line" regarding Quiznos' unfair, unethical, and deceptive business practices; and (d) illegally obtaining releases for its past misconduct by requiring its franchisees to execute such releases in "ordinary course" business transactions or under situations where Quiznos uses its extraordinary control of the franchisee to economically compel the signature on the release.

6. The fraudulent intent underlying Quiznos' schemes of deceptively luring franchisees to participate in its system and thereafter extracting supracompetitive prices and kickbacks is perhaps best demonstrated by Quiznos' pattern of behavior when the inevitable franchise failures come to pass. Quiznos maintains a policy by which it manipulates its unfair agreements to administer the coup de grâce to franchisees when, after the franchisee can no longer bear the ruinous financial losses caused by Quiznos' exploitation, the franchisee goes out of business only to face the initial threat of a lawsuit by Quiznos to enforce provisions of the Franchise Agreement that purport to make franchisees legally liable for payment of royalties over the entire 15-year term of the agreement, even though the franchisee has been forced out of business due to Quiznos' fraudulent, deceptive and illegal scheme to increase its revenues and profits at the expense of its franchisees. While threatening the "stick" of a lawsuit to recover the present value of 15 years' worth of royalties, Quiznos then seeks a signed, unconditional waiver

of all rights from the franchisee, in effect to prevent the franchisee from later seeking any redress against Quiznos.

7. Quiznos does not limit its efforts to be exculpated from past misconduct to the defunct franchisee. In a systematic pattern of conduct throughout the United States, Quiznos also extracts releases from those franchisees lucky enough to find a third-party buyer for their failed stores, placing the franchisees between the proverbial "rock and a hard place" by having to choose between: (a) retaining their legal rights at the price of keeping their stores open in a system economically rigged against the franchisee; or (b) selling their stores to third-party buyers and being required by Quiznos to sign a "Consent to Transfer" that altogether eliminates the ability of the franchisees to sue Quiznos for the very conduct that forced the sale in the first place.

8. With the franchisees extricated from the system, Quiznos takes advantage of the failed store locations to facilitate the movement of a lengthy list of equally deceived franchisees awaiting store locations, into the same, now-vacant and bankrupt locations. In the process, they create second-generation (and, in some cases, third-generation and fourth-generation) franchisees with lower entry costs, as the new franchisees purchase the recovered equipment of the defunct franchisee, with Quiznos' assistance, from the lien-holding bank at pennies on the dollar. In this manner, Quiznos suffers no loss and only a short-term interruption in royalties, while also meeting its obligation to provide locations to the excessive backlog of franchisees. Then, having secured the store in the hands of a new and unwitting franchisee, Quiznos executes the same scheme against the new owner—actions geared to continue the illegal scheme of increasing revenues on the backs of those with no control.

9. Quiznos' economic control over its franchisees is uncompromising. After fraudulently locking its franchisees into the system through the methods outlined in this

Complaint, Quiznos and its agents in the field "work" with the franchisee to arrange for the appropriate commercial lease of the soon to be developed restaurant. What Quiznos and its representatives fail to tell the franchisee is that the agents selling the franchise have economic relationships with the landlord and that the leases have been engineered with economic incentives in mind for the salesman, the landlord and Quiznos. Quite often, it is these long-term lease (10 to 15 years) that result in the ultimate economic demise of the franchisee, because they are unable to make a profit as franchisees and, when prudently deciding to close their doors to end the losses being incurred, they are left with a landlord suing them for breach of their lease obligations. This is a bitter irony for the franchisee given that Quiznos promotes its franchisee assistance in developing the appropriate real estate relationship to ensure the long-term financial viability of the store.

10. Plaintiffs bring this action alleging claims for: (a) violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c); (b) violations of Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, by reason of defendants' violation of the Sherman Act, 15 U.S.C. §§ 1 and 2; (c) violations of the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104, *et al.*; (d) violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-105(1), *et al.*; (e) common law fraud; (f) breach of contract; (g) breach of the implied covenant of good faith and fair dealing; (h) economic duress; and (i) declaratory judgment. Plaintiffs seek declaratory and injunctive relief, as well as damages, to remedy defendants' unconscionable, fraudulent, unlawful and anticompetitive practices in connection with the operation of its franchising scheme. Plaintiffs further ask the Court to rescind plaintiffs' Franchise Agreements as induced by fraud and due to their unconscionable nature. Finally, they ask the Court to rescind any and all releases executed by certain of the plaintiffs as obtained through unconscionable business compulsion and economic duress.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which one or more of members of the putative Class are citizens of a state different from any one of the defendants. The Court also has subject matter jurisdiction over plaintiffs' federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

12. This Court has personal jurisdiction over each defendant because they transact business in the State of Colorado and have committed torts within this State. *See* Colo. Rev. Stat. § 13-1-124(1)(a)(b). In addition, each defendant has purposefully directed its activities at residents of the State of Colorado and this litigation results from injuries that arise out of and relate to those activities. Defendants also maintain continuous and systemic business contacts with the State of Colorado.

13. Venue is proper in this Court pursuant to the nationwide venue provisions of RICO. *See* 18 U.S.C. § 1965(a) and (b). Alternatively, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this judicial district.

## PARTIES

14. Plaintiffs Bonnie Brunet and Martin Rist (the "Brunet-Rists") are husband and wife and citizens of California. They reside at 181 Blessing Lane, Bonny Doon, California 95060. The Brunet-Rists operate a Quiznos franchise in Augusta, Maine, along with plaintiff Joseph Gibson, their business partner. The Brunet-Rists are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

15. Plaintiff Joseph Gibson ("Gibson") is a citizen of Maine. He resides at 393 Broadway, Rockland, Maine 04841. Gibson operates a Quiznos franchise in Augusta, Maine with the Brunet-Rists. Gibson is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

16. On or about June 25, 2004, the Brunet-Rists and Gibson formed a Maine limited liability company called J&D Quality Enterprises LLC ("J&D"), which has its principal place of business at 99 Bangor, Augusta, Maine 04330. On or about July 30, 2004, defendant Quizno's Franchising LLC and J&D executed a Franchise Agreement for the operation of Quiznos Store No. 7881, located at 99 Bangor Street, Augusta, Maine 04330. That day, these same parties executed a second Franchise Agreement for the operation of Quiznos Store No. 7882, which Quiznos and J&D agreed would be located in Rockland, Maine. This second store is still not open even though J&D paid the franchise fee to Quiznos. It constitutes what Quiznos internally refers to as a "SNO" (i.e. a "still not open" store).[2]

17. Plaintiff Bradley P. Shelton ("Shelton") is a citizen of Colorado. He resides at 858 Downing Street, Denver, Colorado 80218. On or about December 13, 2001, The Quizno's Franchise Company ("QFC"), a predecessor to defendant The Quizno's Franchise Company LLC, and Shelton executed a Franchise Agreement for the operation of Quiznos Store No. 3020, located at 8770 Wadsworth Blvd., Unit T, Arvada, Colorado 80003.

18. On or about February 7, 2002, Shelton formed a Colorado corporation called BPS Enterprises, Inc. ("BPS"), which has its principal place of business at 858 Downing Street,

---

[2] By Quizno's own estimates, there are presently 3,000 SNOs in the United States. The rights of the franchisees maintaining SNOs are being pursued in a separate class action in a matter pending in this judicial district captioned *Bonanno, et al. v. The Quiznos Franchise Company LLC, et al.*, Case No. 06-CV-02358-WYD-BNB (United States District Court for the District of Colorado) (the "SNO Litigation").

Denver, Colorado 80218. On or about April 26, 2002, Quiznos and Shelton entered into an agreement assigning Shelton's rights and obligations under the Franchise Agreement to BPS.

19. Plaintiffs Michael J. Campbell and Patty Campbell (the "Campbells") are husband and wife and citizens of Colorado. They reside at 20460 E. Costilla Avenue, Centennial, Colorado 80016. In or about March 2003, defendant Quizno's Franchising LLC and the Campbells executed a Franchise Agreement for the operation of Quiznos Store No. 5109, located at 16495 E. 40th Circle, Quiznos Suite B, Aurora, Colorado 80011.

20. In or about February 2003, the Campbells formed a Colorado corporation called Fresh Perspectives, Inc. ("Fresh Perspectives"), which has its principal place of business at 16495 E. 40th Circle, Quiznos Suite B, Aurora, Colorado 80011. The Campbells use Fresh Perspectives to operate the Quiznos restaurant referenced above. Fresh Perspectives is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

21. Plaintiffs Thomas Haywood and Jason Haywood (the "Haywoods") are father and son, respectively, and citizens of New York. They reside at 29 Ashworth Court, Amherst, New York 14228. On or about September 16, 2003, defendant Quizno's Franchising LLC and the Haywoods executed a Franchise Agreement for the operation of Quiznos Store No. 5826, located at 3868 E. Robinson Road, Amherst, New York 14228.

22. On or about October 3, 2003, the Haywoods formed a New York corporation called Jason Thomas, Inc. d/b/a Quiznos Sub ("Jason Thomas"), which has its principal place of business at 3868 E. Robinson Road, Amherst, New York 14228. The Haywoods use Jason Thomas to operate the Quiznos restaurant referenced above. Jason Thomas is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

23. On or about August 31, 2004, Jason Thomas executed a Franchise Agreement for the operation of Quiznos Store No. 7970. This store never opened and constituted a SNO. In or about April 2007, Jason Thomas and Quiznos reached a resolution of the issues related to the SNO through the execution of a "Termination and Release Agreement" and Quiznos' return of the $20,000 franchise fee paid for that store. In inducing the Haywoods and Jason Thomas to sign the termination agreement, Michael R. Daigle, the Executive Vice President-Development for Quiznos ("Daigle"), represented in a March 1, 2007 e-mail that the agreement "contains a release, but the release is limited to claims under this particular agreement." For these reasons, the Haywoods and Jason Thomas seek relief in this litigation solely in relation to Quiznos' conduct involving Store No. 5826.

24. Plaintiffs Daniel S. Kessels ("Kessels") and Phuong T. Nguyen ("Nguyen") (collectively "Kessels-Nguyen") are citizens of Colorado and business partners. Plaintiff Kessels resides at 3696 WCR 6, Erie, Colorado 80516. Plaintiff Nguyen resides at 2557 West 108th Place, Westminster, Colorado 80234. On or about March 20, 2002, QFC and Kessels-Nguyen executed a Franchise Agreement for the operation of Quiznos Store No. 3309, located at 3040 28th Street, Boulder, Colorado 80301.

25. On or about January 3, 2005, Kessels-Nguyen formed a Colorado corporation called Grateful D, Inc. ("Grateful D"), which has its principal place of business located at 3040 29th Street, Boulder, Colorado 80301. Kessels-Nguyen use Grateful D to operate the Quiznos restaurant referenced above. Grateful D is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

26. Plaintiffs John McCarthy ("McCarthy") and Jonathon Sequeira ("Sequeira") (collectively "McCarthy-Sequeira") are father-in-law and son-in-law, respectively, and citizens of Florida. McCarthy resides at 7305 S.E. Seagate Lane, Stuart, Florida 34997. Sequeira resides

at 1147 S.E. Kirk Street, Stuart, Florida 34997. On or about October 20, 2001, QFC and McCarthy-Sequeira, along with McCarthy's son Brian McCarthy, executed a Franchise Agreement for the operation of Quiznos Store No. 2714, eventually located at 101 U.S. Highway 1, North Palm Beach, Florida 33408. QFC's agent who sold the franchise (Charlotte Russell) falsely represented to McCarthy-Sequeira, in an effort to induce the sale, that they would be able to operate a store in Jupiter, Florida, which did not materialize because, as Russell knew at the time, Jupiter had placed a moratorium on fast food stores.

27. On or about September 11, 2003, McCarthy-Sequeira, along with their respective spouses, formed a Florida limited liability company called McJon LLC ("McJon"), which initially maintained its principal place of business at 300 A1A, Suite 0-306, Jupiter, Florida 33477 and later maintained it at 7305 S.E. Seagate Lane, Stuart, Florida 34997. Until they closed the store in October 2005, McCarthy-Sequeira used McJon to operate the Quiznos restaurant referenced above.

28. On or about March 30, 2004, defendant Quizno's Franchising LLC and McJon executed a Franchise Agreement for the operation of Quiznos Store No. 6973. This store has never opened and constitutes a SNO. When McCarthy formally requested a return of the $20,000 franchise fee paid by McJon, Quiznos refused to return the franchise fee in full and sought a voluntary termination of the Franchise Agreement and execution of a release that would purport to release Quiznos for all past conduct. Neither McJon nor McCarthy-Sequeira signed the release and they intend to pursue their legal interests in relation to the SNO as members of the putative class in the SNO Litigation.

29. Plaintiff James M. Tully ("Tully") is a citizen of Massachusetts. He resides at 203 6th Street, Apartment No. 3, Leominster, Massachusetts 01453. Tully is a proper party

plaintiff to this action because he has suffered losses as a result of the unlawful conduct as alleged herein.

30. On or about December 2, 2002, Tully formed a Massachusetts corporation called Kind of Blue, Inc. ("Kind of Blue"), which at all times relevant maintained its principal place of business at 89 Whalon Street, Fitchburg, Massachusetts 01420. On or about December 18, 2002, defendant Quizno's Franchising LLC and Kind of Blue executed a Franchise Agreement for the operation of Quiznos Store No. 4670, located at 89 Whalon Street, Fitchburg, Massachusetts 01420. Tully and Kind of Blue closed their store on or about February 2, 2007.

31. Plaintiffs David M. Pollock and Tina Pollock (the "Pollocks") are husband and wife and citizens of Missouri. They reside at 1344 Westhampton Woods Court, Chesterfield, Missouri 63005. Plaintiff Nicholas J. Pollock ("Nick Pollock") is their son; Nick Pollock is a citizen of Missouri. He resides at 1721 Marsha Lane, Maryland Heights, Missouri 63043. The Pollock Plaintiffs (e.g., the Pollocks and Nick Pollock) are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

32. On or about August 7, 2001, the Pollock Plaintiffs formed a Missouri limited liability company called Westhampton Enterprises LLC ("Westhampton"), which has its principal place of business at 1344 Westhampton Woods Court, Chesterfield, Missouri 63005. On or about October 26, 2001, defendant The Quizno's Franchise Company and Westhampton executed a Franchise Agreement for the operation of Quiznos Store No. 630, located at 12113 Manchester Road, Crystal Lake Park, Missouri 63131.

33. Plaintiffs Thomas Merry and John Merry (collectively the "Merry" Plaintiffs) are father and son, respectively, and are citizens of Washington. Thomas Merry resides at 7414 5th Avenue N.E., Seattle, Washington 98115. John Merry resides at 15223 14th Avenue N.W., Gig

Harbor, Washington 98332. On or about May 6, 2004, defendant Quizno's Franchising LLC and the Merry Plaintiffs executed a Franchise Agreement for the operation of Quiznos Store No. 7416, located at 412 N.E. 70th Street, Seattle, Washington 98115. The Merry Plaintiffs are proper party plaintiffs in this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

34. On or about April 29, 2004, the Merry Plaintiffs formed a Washington limited liability company called Msquared 1, Inc. ("Msquared"), which has a principal place of business of 7403 Lakewood Drive, Lakewood, Washington 98499. On or about July 23, 2004, Quiznos and the Merry Plaintiffs entered into an agreement assigning the Merry Plaintiffs' rights and obligations under the Franchise Agreement to Msquared. The Merry Plaintiffs sold their store to a third-party buyer on or about June 12, 2006 for $1.

35. Plaintiff John E. Virgili ("Virgili") is a citizen of Ohio who resides at 1023 Riviera Way, Macedonia, Ohio 44056. On or about October 22, 2003, defendant Quizno's Franchising LLC and Virgili, along with Virgili's business partner Greg Grandillo, executed a Franchise Agreement for the operation of Quiznos Store No. 5992, located at 34851 Euclid Avenue, Willoughby, Ohio 44094. That day, these same parties executed a second Franchise Agreement for the operation of Quiznos Store No. 5993. This second store is still not open and constitutes a SNO. Virgili intends to pursue his interests related to the SNO as a member of the putative class in the SNO Litigation.

36. On or about October 9, 2003, Virgili, along with Grandillo, formed an Ohio corporation called Universal Foods, Inc. ("Universal"), which had its principal place of business at 34851 Euclid Avenue, Willoughby, Ohio 44094. Virgili used Universal to operate the Quiznos restaurant referenced above. Universal is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

37. Plaintiffs David M. Ronan ("Ronan") and Terrance M. Casey ("Casey") (collectively "Ronan-Casey") are business partners and citizens of Texas. Ronan resides at 13204 Woodhaven Drive, Farmers Branch, Texas 75234. Casey resides at 13204 Woodhaven Drive, Farmers Branch, Texas 75234. On or about May 8, 2000, The Quizno's Corporation ("QC"), a predecessor to defendant The Quizno's Franchise Company LLC, and Casey executed a Franchise Agreement for the operation of Quiznos Store No. 1708. Shortly thereafter, Quiznos and Casey entered into an agreement assigning Casey's rights and obligations under the Franchise Agreement to plaintiff Wave Dancer Holdings LLC. Ronan-Casey are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

38. On or about May 19, 2000, Ronan-Casey formed a Texas limited liability company called Wave Dancer Holdings LLC ("Wave Dancer"), which has its principal place of business at 9205 Skillman Street, Suite 112, Dallas, Texas 75243. Ronan-Casey use Wave Dancer to operate the franchise restaurant referenced above and those identified elsewhere in this paragraph. On or about July 17, 2000, QC and Wave Dancer executed a Franchise Agreement for the operation of Quiznos Store No. 565, located at 1101 Melbourne Road, Hurst, Texas 76053. On or about October 1, 2001, QFC and Wave Dancer executed another Franchise Agreement for the operation of Quiznos Store No. 2747. This store never opened and constitutes a SNO. Wave Dancer and Ronan-Casey intend to pursue their interests related to the SNO as a member of the putative class in the SNO Litigation.

39. Plaintiffs Carolyn Peddy and Mikki Lucas f/k/a Mikki Peddy (collectively the "Peddy Plaintiffs") are mother and daughter, respectively, and citizens of Georgia. Carolyn Peddy resides at 3848 Welham Green Court, Douglasville Georgia, 30135. Mikki Lucas resides at 24 Honeysuckle Drive, Villa Rica, Georgia 30180. The Peddy Plaintiffs are proper party

plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

40. On or about May 28, 2003, the Peddy Plaintiffs formed a Georgia limited liability company called CMC Enterprise Partners LLC ("CMC"), which at all times relevant maintained a principal place of business at 3848 Welham Green Court, Douglasville, Georgia 30135. On or about May 22, 2003, defendant Quizno's Franchising LLC and CMC executed a Franchise Agreement for the operation of Quiznos Store No. 5348, located at 2495 East West Connector, Austell, Georgia 30106. The Peddy Plaintiffs and CMC closed their store on January 29, 2007.

41. Plaintiff Brian Curl ("Curl") is a citizen of Kentucky. He resides at 8103 Keira Ridge Court, Louisville, Kentucky 40291. On or about July 12, 2004, defendant Quizno's Franchising LLC and Curl executed a Franchise Agreement for the operation of Quiznos Store No. 7900, located at 10234 Westport Road, Louisville, Kentucky 40241.

42. On or about February 28, 2005, Curl formed a Kentucky limited liability company called BN&N Enterprises LLC ("BN&N"), which at all times relevant maintained a principal place of business at 8103 Keira Ridge Court, Louisville, Kentucky 40291. Until he sold the store on November 30, 2005, Curl used BN&N to operate the Quiznos restaurant referenced above. BN&N is a proper party plaintiff in this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

43. Plaintiff Robert Hampshire ("Hampshire") is a citizen of Florida. He resides at 2533 Ascot Court, Kissimmee, Florida 34744. On or about March 11, 2004, defendant Quizno's Franchising LLC and Hampshire, along with this brother Kenneth Hampshire, executed a Franchise Agreement for the operation of Quiznos Store No. 6980, located at 515 Kissimmee Park Road, St. Cloud, Florida 34769-1542. Hampshire is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

44. On or about March 25, 2004, Hampshire and his brother formed a Florida limited liability company called Two Wisconsin Boys LLC ("Two Wisconsin Boys"), which had its principal place of business at 515 Kissimmee Road, Saint Cloud, Florida 34769. On or about April 16, 2004, Quiznos and Hampshire, along with his brother, entered into an agreement assigning Hampshire's (and his brother's) rights and obligations under the Franchise Agreement to Two Wisconsin Boys. On or about March 25, 2005, Kenneth Hampshire transferred his interest in Quiznos Store No. 6980 to Hampshire. Until he sold the store on or about February 26, 2007, Hampshire used Two Wisconsin Boys to operate the Quiznos restaurant referenced above.

45. Plaintiff Matthew Haas is a citizen of Florida. He resides at 1525 S.W. 13th Court, Fort Lauderdale, Florida 33312. On or about July 2, 2004, defendant Quizno's Franchising LLC and Haas executed a Franchise Agreement for the operation of Quiznos Store No. 7865, located at 1211 North Federal Highway, Deerfield Beach, Florida 33441. Haas is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

46. On or about August 24, 2005, Haas, along with his wife, formed a Florida corporation called QP Enterprises, Inc. ("QP"), which at all times relevant maintained a principal place of business of 1326 S.E. 17th Street, Box 217, Fort Lauderdale, Florida 33316. In or about January 2006, Quiznos and Haas entered into an agreement assigning Haas' rights and obligations under the Franchise Agreement to QP. Until Haas closed his store on September 26, 2006, he used QP to operate the Quiznos restaurant referenced above.

47. Defendant The Quizno's Franchise Company LLC ("TQFC") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQFC, in its own right and as the successor to the rights and liabilities

of The Quizno's Corporation and The Quizno's Franchise Company was the franchisor for Quiznos franchises granted prior to July 2002. Defendant TQFC transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

48. Defendant Quizno's Franchising LLC ("QF") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QF was the franchisor for Quiznos franchises granted between July 2002 and February 2005. Defendant QF transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

49. Defendant Quizno's Franchising II LLC ("QFII") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QFII is the entity presently responsible for franchising the Quiznos brand and was the franchisor for Quiznos franchises granted in and after February 2005. Upon information and belief, QFII has succeeded to the majority, if not all, of the rights and obligations of the various Quiznos defendants identified in this Complaint, including, without limitation, TQFC, QF, TQM, QFA, QZF, QIP, TQSC and TQSCII. Defendant QFII transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

50. Defendant The Quizno's Master LLC ("TQM") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQM owns the Quiznos intellectual property, including, without limitation, trademarks, copyrights, and purportedly confidential information used by the various Quiznos entities in their operation and control of the Quiznos franchise system. TQM was at certain times material the parent of TQFC and an affiliate of QF. Defendant TQM transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

51. Defendant QFA Royalties LLC ("QFA") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005 the owners of the Quiznos entities identified in this Complaint, and certain other related or affiliated Quiznos entities, engaged in a series of transactions that, after the transactions were completed, left QFA as the franchisor for all Franchise Agreements entered into before February 2005. Defendant QFA transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

52. Defendant QZ Finance LLC ("QZF") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, QZF succeeded to various rights and liabilities of TQFC and QF in or about February 2005. Defendant QZF transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

53. Defendant QIP Holder LLC ("QIP") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005, QIP succeeded to certain rights and liabilities of TQFC, QF, TQM and/or QZF related to the franchises identified in this Complaint. Defendant QIP transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

54. Defendant TQSC LLC ("TQSC") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, QFII and QFA have delegated their rights, duties and obligations as franchisor under Quiznos Franchise Agreements in the United States to TQSC for performance. Defendant TQSC transacts business in Colorado and is amenable to personal jurisdiction in Colorado.

55. Defendant TQSC II LLC ("TQSCII") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQSCII owned TQSC and succeeded to its rights and obligations upon TQSC's dissolution on December 31, 2006. Defendant TQSCII transacts business in Colorado and is amenable to personal jurisdiction in Colorado.

56. Defendant Cervantes Capital LLC ("Cervantes") is a Colorado limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, 10th Floor, Denver, Colorado 80202. At certain times material, Cervantes maintained its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. The Registered Agent for Cervantes is Patrick E. Meyers, who, until very recently, served as General Counsel for Quiznos. Upon information and belief, Cervantes employs and pays defendants Richard E. and Richard F. Schaden, as well as other top executives involved in decision-making for the Quiznos franchise system and various Quiznos entities; in turn, these Quiznos entities pay fees to Cervantes to have Cervantes and its employees perform management services for the Quiznos franchise system. In addition, upon information and belief, Cervantes owns or controls American Food Distributors, LLC and/or various affiliates thereof; CLG Leasing LLC; and Source One Distribution, LLC ("Source One"), among other supply companies from whom plaintiffs and other Quiznos franchisees throughout the United States are required to purchase food products and other supplies for use in their franchised Quiznos restaurants, as well as other "captive" supply companies with which Quiznos requires plaintiffs and other Quiznos franchisees to do business. Cervantes transacts business within Colorado and is amenable to personal jurisdiction in Colorado.

57. Defendant Richard E. Schaden ("Rick Schaden") is a citizen of Colorado. He resides at 10563 E. Goosehaven Drive, Lafayette, Colorado 80026. Rick Schaden is, upon

information and belief, the Chief Executive Officer of QFII, and upon information and belief, holds officer and director positions with one or more of the other Quiznos entities named as defendants herein as well as various other predecessors, successors and parent corporations thereto.

58. Defendant Richard F. Schaden ("Dick Schaden") is a citizen of Colorado. He resides at 9596 Jeffco Airport Avenue, Westminster, Colorado 80021. Dick Schaden is, upon information and belief, an officer and/or director of one or more of the Quiznos entities named as defendants herein as well as various other predecessors, successors and parent corporations thereto.

59. In this Complaint, the term "Quiznos" refers to the web of affiliated companies, corporations and limited liability companies that, acting together or separately, control and manage the business of the Quiznos franchise system.

## GENERAL ALLEGATIONS

**Quiznos' Unsustainable Business Plan**

60. Quiznos has been in business since 1981. In 1991, it began operating a system of franchised toasted submarine sandwiches and offering franchises for sale to members of the public across the United States.

61. From 1994 through 2001, Quiznos operated as a publicly-traded entity. In 2001, Quiznos was taken private by Rick Schaden, Dick Schaden, certain other members of the Schaden Family, and others known and unknown (collectively the "Schaden Ownership Group"), who together owned a majority of the shares.

62. Although 95% of the non-Schaden "outsider" shareholders objected to the going-private transaction, the Schaden Ownership Group used its majority control to force the sale of the minority shareholder interests at $8.50 per share.

63. Dissenting minority shareholders brought a civil action in the District Court for the City and County of Denver, Colorado challenging the fairness of the price they received for their shares, and the court ultimately determined that the fair market value of the minority interests was $32.50 per share (almost four times more than the Schaden Ownership Group had paid for the shares). Having determined that Quiznos "acted in bad faith in its insistence that $8.50 a share was 'fair value'", District Judge Robert L. McGahey, Jr. found that Quiznos' proxy statement to its shareholders that outlined Quiznos' then-current status as well as its growth potential was "an exercise in obfuscation."

64. After the completion of the going-private transaction in 2001, Quiznos adopted a strategy of rapid growth of its franchise system, and at the same time adopted methods of increasing revenues by forcing franchisees to pay ever-higher costs for food supplies and other products from Quiznos-affiliated companies or Quiznos-approved suppliers. These measures were adopted to inflate Quiznos' profitability and make it more attractive to potential buyers and investors, toward the ultimate goal of allowing the Schadens and other Quiznos insiders to sell their ownership interest for billions of dollars.

65. In or about April 2006, Quiznos sold an undisclosed stake in the company to the investment firm J.P. Morgan Partners and/or an affiliate of J.P. Morgan Partners, including J.P. Morgan Partners Global Investors, L.P and J.P. Morgan Partners Global Investors (Selldown), L.P. (collectively "J.P. Morgan"). Upon information and belief, Quiznos sold J.P. Morgan a 49% share of Quiznos for approximately $585 million, with J.P. Morgan having the opportunity to purchase the remainder of the shares still held by the Schadens Ownership Group at a specified time and for a specified price if certain conditions are met.

66. For Quiznos to complete the sale of itself to J.P. Morgan, it must maintain and even improve the financial results, including substantial revenue growth, it has experienced over

the last several years. To that end, Quiznos has continued and even enhanced a number of deceptive and fraudulent practices with respect to its franchisees that allow it to extract millions upon millions of dollars from the franchisees, while simultaneously making it difficult if not impossible for most Quiznos franchisees to operate profitably.

**Quiznos' Fraudulent Misrepresentations to Franchisees**

67. At the same time Quiznos solicits new franchisees to enter into unconscionable and burdensome Franchise Agreements, it engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate a franchise that Quiznos knows, or should reasonably know, will in all likelihood fail.

68. Quiznos touts itself as one of the fastest-growing Quick-Service Restaurant ("QSR") franchise chains in the United States. Over the last several years, the number of franchised outlets claimed by Quiznos has risen dramatically, from approximately 1,500 at the beginning of 2003 to over 5,000 as of the filing of this action. A continued rapid increase in the number of Quiznos franchises sold is an important element in Quiznos' strategy of continuing to record substantial growth in revenues. The August 2007 issue of QSR Magazine places Quiznos at 19th in a survey of the top 50 QSR restaurants, with 2006 system-wide sales of $1.7 billion. These sales constitute a 13.3% improvement in revenue from 2005.

69. As franchisor, Quiznos has access to complete information regarding its franchise system that is far superior to the information it chooses to make available to its prospective and current franchisees or which is available to them through any other sources. Rather than disclose this information to franchisees, Quiznos utilizes this information gap to further its own interests at the franchisees' expense.

70. Upon information and belief, when dealing with prospective franchisees, Quiznos under-reports its closure rates, does not report its true turnover rates, and does not reveal that the

vast majority of its existing franchisees are single store owners, in a deliberate effort to conceal and prevent prospective franchisees from obtaining information that would educate them as to the true risks involved in this franchise venture, the potential for loss of a franchisee's invested capital, and the lack of opportunity to become a successful multi-store franchisee (the core of the concept of franchising from a franchisee perspective).

71. At the same time Quiznos was inducing plaintiffs and others to invest in its franchise system, it concealed the fact that the company was unable to support that system. For example, in a document dated December 12, 2003, prepared on Quiznos' behalf by its outside counsel Fredric Cohen, Esq., Quiznos claimed that "40% of Quiznos units are not breaking even (Meyers (5/5/03) 65:23-66:1)." This material fact was never (and has never been) disclosed to any of the plaintiffs despite Quiznos' knowledge of it. Moreover, as of December 31, 2006, the Quiznos system included 2,653 signed franchises that had not opened a location; 72.5% of those franchises (1,925 of them) had not opened within the required 12 months after signing and therefore, under Quiznos' standard protocols, may be terminated, even though it is Quiznos that caused the failure to open. During that same year, there were 571 transfers, 390 cancellations or terminations, and an additional 402 franchisees left the system. While not expressly stated in its UFOC, Quiznos' turnover rate in 2006 was an astounding 30%, which is more than three times the industry standard.

72. Further, during required corporate training for new franchisees, Quiznos represents through the use of inaccurate and deceptive graphs, charts and related calculations that within five years, a Quiznos location would be debt free and maintain a substantial resale value. Based upon these deceptive figures, Quiznos encourages and induces existing franchisees to purchase multiple locations, before they can become aware of the true lack of profitability resulting from Quiznos' fraudulent policies and practices.

**Quiznos' Unconscionable and Unenforceable Franchise Agreements**

73. As demonstrated by the alleged misrepresentations and omissions identified throughout this Complaint, Quiznos also exploits its overwhelming bargaining power to require its franchisees to sign unconscionably one-sided Franchise Agreements, without any potential for negotiation of their terms.

74. These misleading and deceptive Franchise Agreements are contracts of adhesion that purport, among many other things, to give Quiznos unilateral control over all significant aspects of franchisee operations, to unreasonably truncate any statutes of limitation that may apply to franchisees' legal claims, to disclaim any responsibility for the effect of Quiznos' decisions and actions on the franchisees' viability, and to restrict the ability of franchisees to litigate in their home states, to join with other franchisees to press claims, and to enjoy their constitutionally-guaranteed right to a jury trial.

75. The terms of the agreements, and the franchisees' "Operations Manual" (which Quiznos routinely updates and uses as an extension of the Franchise Agreement in order to expand upon the terms of the original agreement), are in combination so burdensome on franchisees and so one-sided in favor of Quiznos that they can only be regarded as unconscionable and unenforceable. The net effect on Quiznos' franchisees of its approach to franchising is to ensure unconscionably overbroad contracts that purport to circumvent meaningful legal rights belonging to the franchisees, impose impenetrable systemic barriers to economic success for the franchisees, and create negative incentives to pursue legal remedies to redress injuries caused by Quiznos' unlawful conduct.

**Quiznos' Policy of Extracting Unlawful Profits From Its Franchisees**

76. Once the franchisees are ensnared in the Quiznos' scheme, Quiznos defrauds them through tying the continuing operation of the franchise and the franchisees' use of the

Quiznos trademark and right to participate in the franchise system to the supply of food products, supplies, services, and other things necessary for operation of the franchised restaurants (the "Essential Goods").

77. The Franchise Agreements provide that the franchisee must "purchase all equipment, products, services, supplies and materials required for the operation of the Restaurant from manufacturers, suppliers or distributors designated by Franchisor or its affiliates." These products include, among other things, staple food items such as meat, cheese, and condiments, services such as Muzak, credit card processing services, cash register system leases, payroll services, accounting services, and paper products used in the stores.

78. Quiznos franchisees enter into their Franchise Agreements with limited, incomplete and deceptive information regarding the nature of these tying policies. Quiznos, for example, fails to inform the franchisees prior to the franchise sale that the franchisee will be forced to purchase supplies from Quiznos-owned supply companies. The Franchise Agreements contain a provision allowing the use of "undesignated" suppliers with Quiznos' approval, but this provision is meaningless and misleading because such approval is rarely, if ever, granted. Moreover, the very process for alternate-supplier approval is deliberately vague, complex and with no timelines for approval, and as a result Quiznos frequently never even responds to franchisees' requests for such approval, or fails to provide any reasonable explanation for disapprovals.

79. More often than not, Quiznos inhibits third-party suppliers from engaging in private transactions with the franchisees so as to maintain its lock on the "economic upstream" resulting from its contractually-mandated relationship with its franchisees. For example, in a November 3, 2003 letter addressed to "Dear Quiznos Purveyor", Quiznos National Produce Manager (Walter Hillery) stated that Quiznos had selected Freshpack Produce, Inc. as the sole

and exclusive provider of produce to the stores located in the Denver Metropolitan Area and ordered the letter's recipients to "not solicit nor accept any orders from stores that may call on you" for produce. Claiming that a "[f]ailure to comply will result in being removed as a potential future purveyor," Hillery asked that the letter's recipients advise what stores were seeking a third-party arrangement for produce so that he could address the issue directly with the franchisee. This heavy-handed and unilateral approach to the supply market demonstrates the toothless nature of the franchisees' purported right to work with their own supply chain.

80. After locking franchisees into the system, Quiznos exploits its power over the purchases that franchisees must make in two principal ways. First, with respect to Essential Goods that Quiznos or one of its affiliated corporations such as American Food Distributors LLC and Continental Leasing LLC sells directly and/or through their suppliers or distributors to franchisees, Quiznos charges prices for those Essential Goods that Quiznos knows to be higher than franchisees could obtain for products, materials and services of equal or even higher quality from independent third-party vendors in a competitive market or markets. This practice results in Quiznos and/or its affiliated companies reaping revenues and profits greatly in excess of what they would be if franchisees were not bound to buy from Quiznos at the peril of being deemed in default and losing their franchise if they do not. Second, Quiznos requires franchisees to purchase certain Essential Goods that are sold by Quiznos-approved and/or controlled vendors, in which Quiznos maintains a financial interest. It is Quiznos' policy in such cases to require that independent suppliers, as a condition of becoming an approved source of products, services or materials to Quiznos franchisees, pay kickbacks to Quiznos, which are euphemistically termed "rebates" by defendants. Quiznos requires approved vendors/distributors to pass along the cost of the kickbacks to its franchisees, resulting in the franchisees' being required, once again, to pay

prices for products, services and materials that are higher than franchisees could obtain from independent third-parties in a competitive market or markets.

81. Through its "rebate" scheme, Quiznos and companies and individuals affiliated with it reap substantial revenues and profits that come at the direct expense of its franchisees. This deliberate coercion, carried out using threats and intimidation, creates an environment where franchisees and their invested capital are preyed upon as the most important, immediate and dependable source of revenue and cash flow for the franchisor, with little concern demonstrated by the franchisor regarding the franchisees' positive cash flow generated through the sale of the franchisor's actual food products, even though these products are purported by the franchisor to be their primary business interest, but in fact are not. Moreover, once franchisees become aware of this fraudulent scheme, the sunken costs, onerous contractual provisions, and costs of switching to another brand make it economically prohibitive for franchisees to escape the 15-year Quiznos Franchise Agreement, and franchisees thus find themselves in long-term "indentured servitude."

82. Even after signing the Franchise Agreement, as a condition of franchisee ownership, Quiznos requires franchisees to sign supplemental contracts for franchisor-mandated services. These contracts are equally one-sided, favoring Quiznos, and designed to prevent the prospective franchisee from being able to comprehend the actual impact to the franchisee's bottom line. Quiznos promotes these mandated services as being critical to "the brand" when in fact they have no direct connection to the brand whatsoever, and no direct relation to quality standards. In fact, the true purpose of these mandated services is to provide kickbacks to Quiznos.

83. Defendants' practices of knowingly overcharging franchisees and requiring kickbacks from approved vendors are directly contrary to Quiznos' representations to franchisees

made in its various UFOCs, which provide, for example, in 2003 and 2004, that "[w]e and our affiliates negotiate purchase agreements with suppliers for the benefit of Franchisees." These practices as described herein are also directly contrary to statements routinely made by Quiznos' Area Directors (who supervise the franchisees regionally) and others involved in the process of inducing the public to purchase Quiznos franchises, to the effect that Quiznos uses its "buying power" created by the size of its franchise system to negotiate volume discounts from suppliers and pass those discounts on to franchisees. In fact, recently-appointed Chief Executive Officer Gregory D. Brenneman conceded in a February 24, 2007 article in the New York Times that franchisee profitability is a problem at Quiznos, claiming "it was clear [when he got involved with the company] that food costs, as a percent of revenue were, quite honestly out of line . . ." Despite rhetoric from Brenneman claiming that Quiznos has "seen the light" on food and supply costs such that help was on the way, Quiznos continues to overcharge its franchisees and effectuate its scheme. In the Summer of 2007, Quiznos threatened to take legal action against a third-party uniform supplier (previously the authorized uniform supplier for Quiznos) that maintained an inventory of Quiznos uniforms and that sought to sell those uniforms to Quiznos' franchisees at prices far less than those being offered by Quiznos' currently-mandated.

84. Quiznos and its affiliated entities receive substantial revenues from Quiznos' systematic and fraudulent overcharging on direct sales to franchisees and kickbacks on sales made by approved vendors to franchisees. For example, upon information and belief, the Cervantes-owned American Food Distributors LLC had $93,324,012 in 2005 revenues, in addition to $33,353,377 in kickbacks from approved food vendors. Upon information and belief, Cervantes-owned Source One Distribution LLC, which sells equipment directly and/or through suppliers and distributors to Quiznos franchisees for their stores, received kickbacks from

approved equipment vendors of $4,809,233 in addition to revenues of $60,365,204 in 2005.

**<u>Quiznos' Fraudulent Approach to Selling Franchises</u>**

85. Prior to Plaintiff J&D signing its Franchise Agreements, defendant QF and its representatives in Maine, including, without limitation, Larry McAllister ("McAllister") and Scott Warren ("Warren"), made the following fraudulent statements and omissions with the intent to deceive the Brunet-Rists, Gibson and J&D into signing the Franchise Agreements and operating a franchise business for Quiznos:

(a) In a telephone conversation between the Brunet-Rists, McAllister and Warren in January 2004, QF misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(b) In the same telephone call in January 2004, again in another telephone call with the Brunet-Rists from February 2004, and in various other communications between Gibson, McAllister and Warren prior to J&D's execution of the Franchise Agreements, QF provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) Prior to J&D signing the Franchise Agreements in July 2004, QF failed to disclose that Quiznos owned and/or controlled Source One, the Quiznos-mandated equipment supplier;

(d) QF misrepresented in the UFOC presented to the Brunet-Rists, Gibson and J&D prior to J&D signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees" when, in fact, they learned later that Quiznos "negotiates" solely for its own benefit;

(e) In a telephone conference in February 2004, McAllister and Warren misrepresented to the Brunet-Rists that the average revenues for a Quiznos store was $8,400 to $10,000 a week, when, in fact, they knew at the time of the representation that revenues in the Maine market were far below that amount;

(f) During the period between January 2004 and June 2004, QF failed to disclose that 40% of the franchisees in the United States and Canada were not profitable and, instead, painted a picture that Quiznos was an "up and coming" franchise business, affirmatively misrepresenting that the Brunet-Rists and Gibson should purchase a second franchise (which they did) because all franchise opportunities in Maine would soon be gone;

(g) In various telephone conferences and meetings between the Brunet-Rists, Gibson, McAllister and Warren prior to execution of the Franchise Agreements in July 2004, QF failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(h) QF misrepresented in the UFOC that it would use designated funds collected from the franchisees on a weekly basis for local and regional advertising, which Quiznos has failed to do; and

(i) Quiznos misrepresented in the UFOC, and through McAllister and Warren prior to selling the franchises, that Quiznos would provide franchisee assistance in the development of the store and ongoing franchise operations.

86. The Brunet-Rists, Gibson and J&D relied on the misrepresentations and omissions alleged in paragraph 85 to their detriment.

87. At all times material, McAllister and Warren acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These representations and omissions made to the Brunet-Rists, Gibson and J&D are

extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.[3]

88. Prior to Plaintiff Shelton signing his Franchise Agreement, defendant TQFC and its representatives in Colorado, including, without limitation, Joel Davis ("Davis") and Anthony Kruse ("Kruse"), made the following fraudulent statement and omissions with the intent to deceive Shelton and BPS into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) Prior to Shelton signing the Franchise Agreement on December 13, 2001, TQFC failed to disclose that Quiznos owned and/or controlled Source One, AFDL, and various other "affiliates," all of which are Quiznos-mandated food and supply providers;

(b) Prior to Shelton signing the Franchise Agreement on December 13, 2001, TQFC provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) TQFC misrepresented in the UFOC presented to Shelton prior to his signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;"

(d) In November 2001, Kruse misrepresented to Shelton that Quiznos would never let any store close, leading Shelton to believe that Quiznos would do everything possible to provide franchisee assistance, when, in fact, the exact opposite turned out to be true;

---

[3] In October, 2006, Brunet spoke by telephone with McAllister and confronted him with Quiznos' lies and omissions and the fact that the company's conduct had resulted in bankruptcies, suicides, and divorces among the franchisee population. McAllister admitted in the call that he had "resigned his position from Quiznos" and was "emotionally unwell" from the experience. When Brunet repeated the extent of the damage Quiznos had caused to so many people, McAllister said he was "close to a nervous breakdown and had to separate himself from Quiznos."

(e) Prior to signing the Franchise Agreement, TQFC failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(f) During the period between September 2001 and December 2001, TQFC failed to disclose that more than 30% of all Quiznos in the United States were failing to make a profit, a fact Shelton learned from defendant Rick Schaden in March 2003 after Shelton and BPS had opened their store;

(g) TQFC misrepresented in the UFOC that it would use designated funds collected from the franchisees on a weekly basis for local and regional advertising, which Quiznos has failed to do and, instead, has continued to escalate the percentage of money to be paid to Quiznos for advertising that is then used by Quiznos for other purposes;

(h) Prior to Shelton signing the Franchise Agreement, TQFC misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which TQFC and its representatives knew at the time was false and misleading; and

(i) In a sales seminar in September 2001, Kruse and Davis represented that two other markets – Kansas City and Dallas – "were already closed" to new franchisees and that the Denver market would be "closed out" by year end to new units, falsely leading Shelton to believe that he had to act with haste or lose out on the opportunity.

89. Shelton and BPS relied on the misrepresentations and omissions alleged in paragraph 88 to their detriment.

90. At all times material, Davis and Kruse acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to Shelton and BPS are extrinsic to

the Franchise Agreement. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

91. Prior to the Campbells signing their Franchise Agreement, defendant QF and its representatives in Colorado, including, without limitation, Davis made the following fraudulent statements and omission with the intent to deceive the Campells and Fresh Perspectives into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) Prior to the Campbells signing the Franchise Agreement, Plaintiff Michael J. Cambpell asked Davis whether Quiznos issued coupons and Davis affirmatively misrepresented that Quiznos did not do so and further indicated words to the effect that, "we wouldn't do anything that would hurt the franchisee like that;"

(b) Prior to signing the Franchise Agreement, QF provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) Prior to the Campbells signing the Franchise Agreement, QF misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3"), which QF and its representatives knew at the time was false and misleading;

(d) Davis failed to disclose to the Campbells that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost of franchisees of operating a Quiznos franchise;

(e) QF misrepresented in the UFOC presented to the Campbells and Fresh Perspectives prior to their signing the Franchise Agrement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;" and

(f) QF presented false and misleading data in its UFOC, including the number of transfers within the system and number of stores that had defaulted and failed.

92. The Campbells and Fresh Perspectives relied on the misrepresentations and omissions in paragraph 91 to their detriment.

93. At all times material, Davis acted as the authorized agent and representative of Quiznos, such that his conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to the Campbells and Fresh Perspectives are extrinsic to the Franchise Agreement. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

94. Prior to the Haywoods signing their Franchise Agreement for Quiznos Store No. 5826, defendant QF and its representatives in New York, including, without limitation, Andy Klie ("Klie") and other agents of Quiznos Area Director NOCO, including David Garagozzo, Charlie Riley, Justin Rokocki, and Michael Newman, made the following fraudulent statements and omissions with the intent to deceive the Haywoods and Jason Thomas into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) The day the Haywoods signed the Franchise Agreement for Quiznos Store No. 5826, Klie falsely represented that less than 4% of Quiznos stores go out of business, when in fact, the percentage of store closures and turnovers due to bankruptcy or financial insolvency was significantly higher at the time and Klie knew as much (or recklessly stated as such) but withheld that information;

(b) Prior to the Haywoods signing the Franchise Agreement, NOCO and QF misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3"), which QF and its representatives knew at the time was false and misleading;

(c) Prior to the Haywoods signing their Franchise Agreement, Klie and others at NOCO provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(d) QF never disclosed prior to the time the Haywoods signed their Franchise Agreement, that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(e) QF misrepresented in the UFOC presented to the Haywoods prior to their signing of the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;"

(f) Klie and others at NOCO misrepresented the options that existed for the execution of a commercial lease for a Quiznos operation in Buffalo, leading the Haywoods to believe that the only lease option was a 10-year agreement when, in fact, others in the Buffalo market had obtained more advantageous and shorter leases;

(g) Klie and others at NOCO misrepresented and otherwise failed to disclose all of the material facts regarding Quiznos' growth and expansion plans for the Buffalo market, which resulted in the Haywoods experiencing encroachment from competing stores that led to a loss of sales; and

(h) QF presented false and misleading information in the UFOC presented to the Haywoods related to the costs associated with lease approval, the assistance provided by the franchisor in day-to-day operations, the responsibility of NOCO as the Area Director, how the marketing and promotion fees collected from the Haywoods would be used, and how it would make use of the 3% gross sales advertising fund.

95. The Haywoods and Jason Thomas relied on the misrepresentations and omissions alleged in paragraph 94 to their detriment.

96. At all times material, Klie and others at NOCO acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to the Haywoods and Jason Thomas are extrinsic to the Franchise Agreement. Plaintiffs discovered these misrepresentations within the applicable statute of limitations.

97. Prior to Kessels-Nguyen signing their Franchise Agreement, defendant TQFC and its representatives in Colorado, including, without limitation, Davis, Kruse, Larry Hill ("Hill") and Jim Merlo ("Merlo"), made the following fraudulent statements and omissions with the intent to deceive Kessels-Nguyen and Grateful D into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) In a meeting on or about February 2, 2002, TQFC failed to disclose to Kessels-Nguyen that 37% of all Quiznos stores in the United States were losing money, a fact that Kessels-Nguyen did not learn until March 2003, after they had signed the Franchise Agreement;

(b) Prior to signing the Franchise Agreement on March 20, 2002, TQFC failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(c) In meetings and conversations with Kruse, Hill, Davis and Merlo in Denver prior to March 20, 2002, TQFC misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which TQFC and its representatives knew at the time was false and misleading;

(d) Prior to Kessels-Nguyen signing the Franchise Agreement, TQFC provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other material that must be purchased from Quiznos or its approved suppliers;

(e) TQFC misrepresented in the UFOC presented to Kessels-Nguyen and Grateful D prior to their signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;" and

(f) Davis misrepresented to Kessels-Nguyen that the average unit volume for a Quiznos restaurant in a given year was $420,000 (also stated in the UFOC) when, in fact, Davis and TQFC knew at the time that revenues in the Colorado market were far below that amount.

98. Kessels-Nguyen and Grateful D relied on the misrepresentations and omissions alleged in paragraph 97 to their detriment.

99. At all times material, Kruse, Hill, Davis and Merlo acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to Kessels-Nguyen are extrinsic to the Franchise Agreement. Plaintiffs discovered these misrepresentations within the applicable statute of limitations.

100. Prior to McCarthy-Sequeira signing their Franchise Agreements for Quiznos Store No. 2714, defendant TQFC and its representatives in Florida, including, without limitation, Charlotte Russell ("Russell"), made the following fraudulent statements and omissions with the intent to deceive McCarthy-Sequeria and McJon into signing the Franchise Agreement and operating a franchise business for Quiznos[4]:

---

[4] Subsequent to McCarthy-Sequeira signing the Franchise Agreement, plaintiffs also relied on Alex Karas, Don Lauria, Dominck Voso, Ghazzi Hajj and Russell in the perpetuation of Quiznos' fraudulent scheme.

(a) Prior to McCarthy-Sequeria signing their Franchise Agreement, Russell misrepresented the availability of a store site in Jupiter, Florida sought by McCarthy-Sequeria, which Russell used to induce them to execute the Franchise Agreement;

(b) Prior to McCarthy-Sequeira signing the Franchise Agreement, they specifically asked Russell "if there were many Quiznos failing" and Russell responded, falsely as it turns out, "that only one store was in trouble, a franchise in North Florida due to absentee ownership and poor management."

(c) Prior to McCarthy-Sequeria signing the Franchsie Agreement, Russell misrepresented the total investment and operating costs required to open a Quiznos franchise, claiming at one point that it would take "in the range of $60,000 of owner money and a loan of between $140,000-$150,000 to make the store operational;

(d) Prior to McCarthy-Sequeira signing the Franchise Agreement in October 2001, TQFC misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which TQFC and its representatives knew at the time was false and misleading;

(e) Prior to McCarthy-Sequeira signing the Franchise Agreement in October 2001, TQFC provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(f) Prior to McCarthy-Sequeira signing the Franchise Agreement in October 2001, TQFC failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(g) TQFC misrepresented in the UFOC, and through Russell and others involved in the sale of the franchise, that Quiznos would provide franchisee assistance in the development of the store and ongoing franchisee operations, which was patently false;

(h) TQFC misrepresented in the UFOC presented to McCarthy-Sequeira prior to their signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees," a representation echoed by Russell prior to the execution of the Franchise Agreement who stated that Quiznos negotiated, to the advantage of the franchises, "best pricing" due to volume discounts;

(i) TQFC, through Russell, misrepresented the range of store profitability as between $40,000-$60,000, which she knew at the time was false; and

(j) Russell represented on behalf of TQFC that store revenues in Southeast Florida ran between $8,000-$12,000 a week, which Russell knew at the time was false and misleading.

101. McCarthy-Sequeria and McJon relied on the misrepresentations and omissions alleged in paragraph 100 to their detriment.

102. At all times material, Russell, Karas, Voso, Hajj, and Lauria acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These representations and omissions made to McCarthy-Sequeira and McJon are extrinsic to the Franchise Agreements. Plaintiff discovered these misrepresentations and omissions within the applicable statute of limitations.

103. Prior to Kind of Blue signing its Franchise Agreement, defendant QF and its representatives in Massachusetts, including, without limitation, John Teza ("Teza") and Josh Beyer ("Beyer"), made the following fraudulent statements and omissions with the intent to deceive Tully and Kind of Blue into signing the Franchise Agreement and operating a franchise

business for Quiznos:

(a) In a sales seminar in Natick, Massachusetts in October 2002, Teza and Beyer, misrepresented food, labor and costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(b) In a sales seminar in Natick, Massachusetts in October 2002, Teza and Beyer provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) In a meeting with Beyer at a mall prior to Tully signing the Franchise Agreement, Beyer represented to Tully words to the effect, that "Quiznos is the only franchisor that doesn't take kickbacks" and that "all savings are passed on to the franchisee;"

(d) Prior to Kind of Blue signing the Franchise Agreement, QF failed to disclose that franchise owners are not reimbursed for employee meals or retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(e) Teza and Beyer, during the period of time they attempted to sell the franchise to Kind of Blue and Tully, failed to disclose that Quiznos owned and/or controlled entities like Source One, the Quiznos-mandated equipment supplier;

(f) QF misrepresented in the UFOC presented to Tully and Kind of Blue prior to Kind of Blue signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefits of franchisees;" and

(g) During the period between October 2002 and December 2002, QF presented false and misleading proforma data for an average Quiznos franchise in the United States, including, without limitation, providing deceptive data regarding turnover and failure

rates of the Quiznos stores and the lack of profitability of the majority of those stores and affirmatively misrepresenting that Tully should purchase the franchise before the opportunities in Massachusetts disappeared.

104. Tully and Kind of Blue relied on the misrepresentations and omissions alleged in paragraph 103 to their detriment.

105. At all times material, Teza and Beyer acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to Kind of Blue and Tully are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

106. Prior to Plaintiff Westhampton signing its Franchise Agreement, defendant TQFC and its representative in Missouri, including, without limitation, Sue Schaeffer ("Schaeffer") and Rob Schmidt ("Schmidt"), made the following fraudulent statements and omissions with the intent to deceive Westhampton and the Pollock Plaintiffs into signing the Franchise Agreements and operating a franchise business for Quiznos:

(a) Prior to the Pollock Plaintiffs acquiring their third-generation store, Schaeffer and Schmidt misrepresented that the previous owners had failed because they were bad operators who did not have sufficient experience to run the operation successfully;

(b) Prior to Westhampton signing the Franchise Agreement, TQFC misrepresented food, labor and costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(c) Prior to Westhampton signing the Franchise Agreement, TQFC provided false and misleading information related to the substantial markups and kickbacks that add to the

price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(d) Schmidt and Schaeffer failed, prior to Westhampton signing the Franchise Agreement, to advise the Pollock Plaintiffs or Westhampton that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(e) TQFC misrepresented in the UFOC presented to Westhampton and the Pollock Plaintiffs prior to Westhampton signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;"

(f) TQFC provided false and misleading data in the UFOC regarding turnover rates and the number of stores that had closed; and

(g) TQFC intentionally provided Westhampton and the Pollock Plaintiffs access to select franchisees whose stores were more viable, so as to falsely mislead them into believing that a Quiznos operation could be run profitably on an average basis when, in fact, for the majority of store owners the opposite was true.

107. Westhampton and the Pollock Plaintiffs relied on the misrepresentations and omissions alleged in paragraph 106 to their detriment.

108. At all times material, Schaeffer and Schmidt acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to Westhampton and the Pollock Plaintiffs are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

109. Prior to the Merry Plaintiffs signing their Franchise Agreement, defendant QF and its representatives in Washington, including, without limitation, Dianne Moreland ("Moreland")

and Kyle Gjersee ("Gjersee"), made the following fraudulent statements and omissions with the intent to deceive the Merry Plaintiffs and Msquared into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) QF misrepresented in the UFOC, and through Moreland and Gjersee prior to selling a Franchise Agreement to the Merry Plaintiffs, that Quiznos would provide franchisee assistance in the development of the store, the negotiation of the commercial lease, and ongoing franchise operations when, in fact, Quiznos' approach with respect to this "assistance" was self-serving and designed solely and exclusively to protect Quiznos to the detriment of the Merry Plaintiffs;

(b) Prior to the Merry Plaintiffs signing the Franchise Agreement in May 2004, Moreland and Gjersee misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(c) Prior to the Merry Plaintiffs signing the Franchise Agreement in May 2004, Moreland and Gjersee provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers[5];

(d) Prior to the Merry Plaintiffs signing the Franchise Agreement in May 2004, Moreland and Gjersee failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

---

[5] Megan Glaser, a Quiznos representative in the Seattle area, confided in Thomas Merry after the Merry Plaintiffs had run the store for some time with words to the effect, that "the word out of Denver seems to be that Quiznos' new core competency is not operating successful restaurants, but in developing restaurants and earning money from equipment sales and various kickbacks from other vendors."

(e) QF misrepresented in the UFOC presented to the Merry Plaintiffs and Msquared prior to their signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;"

(f) Prior to the Merry Plaintiffs signing their Franchise Agreement, QF, through Moreland, failed to accurately disclose the turnover and failure rate of the franchisees in the United States and further provided false and misleading data about the profitability of the stores, leading the Merry Plaintiffs to believe that the national average for sales revenue of the store was $420,000 and that the average in the Puget Sound area (where Msquared ran its operation) was close to $500,000—information that was false and misleading and blatantly meant to induce the Merry Plaintiffs' signature on the Franchise Agreement; and

(g) Prior to the Merry Plaintiffs signing their Franchise Agreement, Moreland represented, that "a typical franchisee will pay back their initial loan funding the acquisition within seven years," which Moreland knew at the time was false, particularly because she knew of the financial distress being experienced in the Seattle market and the fact that, at or near this time, 35-40% of existing stores in Puget Sound were for sale.

110. The Merry Plaintiffs and Msquared relied on the misrepresentations and omissions alleged in paragraph 109 to their detriment.

111. At all times material, Moreland and Gjersee acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to the Merry Plaintiffs and Msquared are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

112. Prior to Plaintiff Virgili signing his Franchise Agreement for Quiznos Store No. 5992, defendant QF and its representatives in Ohio, including, without limitation, Kevin Casey

("K. Casey"), Bill Alley ("Alley"), and John Lubarsky ("Lubarsky"), made the following fraudulent statements and omissions with the intent to deceive Virgili and Universal into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) Prior to Virgili signing the Franchise Agreement in September-October 2003, Casey represented at a Quiznos sales seminar words to the effect, that "while the FTC prohibited him from giving Virgili this kind of information, a Quiznos franchisee in Ohio could make 'six figures, easily'";

(b) Prior to Virgili signing the Franchise Agreement, QF failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(c) Prior to Virgili signing the Franchise Agreement, QF misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(d) Prior to Virgili signing the Franchise Agreement, QF provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(e) QF misrepresented in the UFOC presented to Virgili and Universal prior to Virgili signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees", a misrepresentation that lead Virgili, wrongly as it turns out, to believe that Quiznos' mass buying power would lead to price benefits to franchisees in order to make more money in store operations;

(f) QF provided misleading information regarding site selection and Quiznos' approach on the encroachment of other stores, most notably with Lubarsky failing to fully disclose all potential locations for an operation in the targeted area sought by Virgili and Universal;

(g) QF misrepresented in the UFOC, and through Casey, Lubarsky and Alley, prior to selling the franchise to Virgili, that QF would provide franchisee assistance in the development of the store, real estate site selection and ongoing franchise operation, which turned out to be false; and

(h) On or about September 15, 2003, Alley, in an effort to induce Virgili and Grandillo to sign the Franchise Agreement, represented that Quiznos was raising the initial franchise fee (from $25,000 to $30,000) at the end of that month, a false representation made only after Virgili and his partner told Alley they wanted time to think about whether to invest in Quiznos.

113. Virgili and Universal relied on the misrepresentations and omissions alleged in paragraph 112 to their detriment.

114. At all times material, K. Casey, Alley, and Lubarsky acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These representations and omissions made to Virgili and Universal are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

115. Prior to Casey and Wave Dancer signing their respective Franchise Agreements, defendant TQFC and its representatives in Texas, including, without limitation, Jeff Humphrey ("Humphrey") and David Bloom ("Bloom"), made the following fraudulent statements and omissions with the intent to deceive Ronan-Casey and Wave Dancer into signing the Franchise

Agreements and operating a franchise business for Quiznos:

(a) Prior to Casey and Wave Dancing signing their Franchise Agreements, TQFC, Bloom of Falcon Ventures (TQFC's designated Area Director in Dallas) and Humphrey misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(b) Prior to Casey and Wave Dancing signing their Franchise Agreements, TQFC, Bloom and Humphrey provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c) Prior to Casey and Wave Dancing signing their Franchise Agreements, TQFC, Bloom and Humphrey failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(d) QF misrepresented in the UFOCs presented to Ronan-Casey and Wave Dancer prior to their signing the Franchise Agreements, that Quiznos would "negotiate purchase agreements with suppliers for the benefits of franchisees; and

(e) QF misrepresented in the UFOC and its Franchise Agreements that it would use designated funds collected from the franchisees on a weekly basis for local and regional advertising, which Quiznos has failed to do.

116. Ronan-Casey and Wave Dancer relied on the misrepresentations and omissions alleged in paragraph 115 to their detriment.

117. At all times material, Humphrey and Bloom acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate

defendants. These misrepresentations and omissions made to Ronan-Casey and Wave Dancer are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

118. Prior to Plaintiff CMC's Franchise Agreement taking legal effect (i.e., before expiration of the 10-day FTC waiting period), defendant QF and its representatives in Georgia, including, without limitation, Kim Trotter ("K. Trotter"), Randy Trotter ("R. Trotter"), and Tom Sturkie ("Sturkie"), made the following fraudulent statements and omissions with the intent to deceive the Peddy Plaintiffs and CMC into operating a franchise business for Quiznos:

(a) Between May 22, 2003 and June 1, 2003, R. Trotter, K. Trotter and Sturkie provided false and misleading information to the Peddy Plaintiffs about Quiznos' policies of encroachment and the placement of stores in competing locations, leading them to believe that Quiznos would not cannibalize existing stores with the development of others too close to the existing operations[6];

(b) Between May 22, 2003 and June 1, 2003, R. Trotter and K. Trotter misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(c) Between May 22, 2003 and June 1, 2003, R. Trotter and K. Trotter provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

---

[6] QF, through the Trotters, refused to tell the Peddy Plaintiff anything about Quiznos until they executed the Franchise Agreement, representing falsely, that QF could not make those disclosures until they had become franchisees.

(d) Between May 22, 2003 and June 1, 2003, R. Trotter and K. Trotter failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(e) Between May 22, 2003 and June 1, 2003, R. Trotter and K. Trotter provided false and misleading statements about the franchisees' obligations to pay for advertising, representing that it would cost 5% of gross revenues, but, in fact, this figure failed to account for the cost of coupons passed on to CMC;

(f) Between May 22, 2003 and June 1, 2003, R. Trotter represented that gross revenues for the CMC store would be over $400,000 annually and that the Peddy Plaintiffs would achieve at least a $20,000 profit on an annual basis;

(g) QF misrepresented in the UFOC presented to the Peddy Plaintiffs and CMC, that Quiznos would "negotiate purchase agreements with the suppliers for the benefits of franchisees;" and

(h) QF failed to disclose and otherwise misled the Peddy Plaintiffs regarding Quiznos' ownership and control of the food and supply vendors and the mandated nature of the vendor relationships.

119. The Peddy Plaintiffs and CMC relied on the misrepresentations and omissions alleged in Paragraph 118 to their detriment.

120. At all times material, R. Trotter, K. Trotter and Sturkie, acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to the Peddy Plaintiffs and CMC are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

121. Prior to Plaintiff Curl signing his Franchise Agreement, defendant QF and its representatives in Kentucky, including, without limitation, Larry Sapp, Steve Rodgers, Dave Wagner, John Hajj, and Mark Cirtten, made the following fraudulent statements and omissions with the intent to deceive Curl and BN&N into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) At a seminar in April 2004 in Louisville, Sapp misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(b) In the April 2004 seminar, Sapp represented that the average Quiznos store in the United States did $425,000 in revenues annually when, in fact, this was not the case for any store in Louisville;

(c) QF misled Curl about its approach and views on encroachment and store site selection, leading him to believe that the company would not cannibalize its own franchisees by developing stores too close to one another geographically;

(d) QF misrepresented in the UFOC presented to Curl and BN&N prior to Curl signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees;" and

(e) QF misrepresented in the UFOC that it would use designated funds collected from the franchisees on a weekly basis for local and regional advertising, which Quiznos failed to do.

122. Curl and BN&N relied on the misrepresentations and omissions alleged in paragraph 121 to their detriment.

123. At all times material, Sapp, Rodgers, Wagner, Hajj and Cirtten acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or

more of the corporate defendants. These misrepresentations and omissions made to Curl and BN&N are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

124. Prior to Plaintiff Hampshire signing his Franchise Agreement, defendant QF and its representatives in Florida, including, without limitation Mike Wotten, Monte Ochs, and John Crider, made the following fraudulent statements and omissions with the intent to deceive Hampshire and Two Wisconsin Boys into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) At a meeting at the Renaissance Hotel in Sea World on February 26, 2004, Crider and Wotten provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(b) At the same meeting at the Renaissance Hotel, Crider and Wotten failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(c) On February 26, 2004 or at anytime thereafter, Crider and Wotten failed to disclose that Quiznos owned and controlled Source One and other Quiznos-mandated food and supply vendors;

(d) QF misrepresented in the UFOC presented to Hampshire and Two Wisconsin Boys prior to their signing of the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees.";

(e) At the meeting at the Renaissance Hotel in Sea World on February 26, 2004, Hampshire and his brother inquired about the amount of rebates that Quiznos or its affiliates received from vendors and Wotten falsely stated words to the effect, that "the rebates

were volume discounts being given back to Quiznos due to significant increases in the number of franchises for the year and that prices to the franchisees would be adjusted in the following year to reflect the volume discounts extended to Quiznos;"

(f) In the meeting at Sea World on February 26, 2004, QF failed to disclose the large percentage of franchisees in the United States that were not profitable and, instead, affirmatively represented that Quiznos was a growing brand with high profit potential; and

(g) Quiznos misrepresented in the UFOC, and through Wotten, Crider and Ochs prior to signing the Franchise Agreement, that Quiznos would provide franchisee assistance in the development of the store and ongoing franchise operations when, in fact, the "help desk" was anything but helpful and actually failed on a routine basis to provide Hampshire and Two Wisconsin Boys any meaningful assistance.

125. Hampshire and Two Wisconsin Boys relied on the misrepresentations and omission alleged in paragraph 124 to their detriment.

126. At all times material, Wotten, Crider and Ochs acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to Hampshire and Two Wisconsin Boys are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

127. Prior to Plaintiff Haas signing his Franchise Agreement, defendant QF and its representatives in Florida, including, without limitation, Lauria and Karas, made the following fraudulent statements and omissions with the intent to deceive Haas and QP into signing the Franchise Agreement and operating a franchise business for Quiznos:

(a) In a sales seminar run by Lauria and Karas in May-June of 2004, QF represented that the new store development cost would be between $180,000 and $210,000

when, in fact, QF failed to make complete disclosures with respect to all of the hidden costs and it actually cost Haas and QP $290,000 to open the store;

(b) QF misrepresented in the UFOC presented to Haas and QP prior to Haas signing the Franchise Agreement, that Quiznos would "negotiate purchase agreements with suppliers for the benefit of franchisees";

(c) In the presale seminar conducted by Karas and Lauria in May-June 2004, QF misrepresented food, labor and other costs associated with operating a Quiznos franchise by using "Net 2" data (as opposed to "Net 3" data), which QF and its representatives knew at the time was false and misleading;

(d) In the presale seminar referenced above, Karas and Lauria provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(e) In the May-June 2004 presale seminar conducted by Karas and Lauria, QF failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise; and

(f) In the UFOC, QF represented that the average Quiznos store made approximately $422,000 annually in revenue, which did not apply to stores in South Florida.

128. Plaintiffs Haas and BP relied on the misrepresentations and omissions alleged in paragraph 127 to their detriment.

129. At all times material, Lauria and Karas acted as the authorized agents and representatives of Quiznos, such that their conduct is attributable to one or more of the corporate defendants. These misrepresentations and omissions made to Haas and BP are extrinsic to the Franchise Agreements. Plaintiffs discovered these misrepresentations and omissions within the

applicable statute of limitations

## CLASS ACTION ALLEGATIONS

130. Pursuant to Federal Rules of Civil Procedure 23(a) and (b), plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons defined as:

> All residents of the United States except those residing in Wisconsin, Michigan, and Illinois (including persons and business entities) that owned a Quiznos franchise during the longest period permitted by the applicable statutes of limitations. Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

**Rule 23(a)**

131. **Numerosity**: Members of the Class are so numerous that their individual joinder is impractical. The precise identities, number and addresses of members of the Class are unknown to plaintiffs, but may and should be known with proper and full discovery of defendants, third-parties, and their respective records.

132. **Existence of Common Questions of Fact and Law**: There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class. The common questions of fact and law include, among other things:

(a) Whether and to what extent defendants' practices, conduct, and misrepresentations violate federal or state law;

(b) Whether defendants have engaged in mail and wire fraud;

(c) Whether defendants engaged in a pattern of racketeering activity;

(d) Whether the Quiznos franchise system is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(e) Whether defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(f) Whether defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(a) and (c) proximately caused injury to the plaintiffs' and class members' business or property;

(g) Whether the defendants have market power in one or more relevant markets;

(h) Whether defendants unlawfully coerced their franchisees to purchase specific goods and services from them as a condition for the right to participate in the Quiznos franchise system;

(i) Whether defendants' unlawful anticompetitive practices constitute unreasonable restraints of trade, monopolization, or attempted monopolization in violation of the Sherman Act, 15 U.S.C. §§ 1, 2;

(j) Whether defendants' unlawful anticompetitive practices constitute unreasonable restraints of trade, monopolization, or attempted monopolization in violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, 6-4-105;

(k) Whether, in connection with the filing, offering, or sale of the subject franchises, defendants directly or indirectly employed any devices, schemes, or artifices to defraud plaintiffs within the meaning of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-105(1), *et al.*;

(l) Whether, in connection with the filing, offering, or sale of the subject franchises, defendants directly or indirectly made any untrue statements of material fact or omitted certain material facts necessary in order to make the statement(s) made, in the light of the circumstances under which they are made, not misleading under the CCPA;

(m) Whether, in connection with the filing, offering, or sale of the subject franchises, defendants directly or indirectly engaged in any act, practice, or course of business

which operates or would operate as a fraud or deceit upon any person, within the meaning of the CCPA;

(n) Whether defendants' affirmative statements and material omissions constitute intentional fraud;

(o) Whether Quiznos' UFOC contained fraudulent representations and omissions;

(p) Whether Quiznos breached any terms of the UFOC or the Franchise Agreement;

(q) Whether plaintiffs sustained injury as a result of Quiznos' breaches of the Franchise Agreement and/or the implied covenant of good faith and fair dealing;

(r) Whether any of the provisions of Quiznos' Franchise Agreements are void and/or unenforceable;

(s) Whether plaintiffs and the Class are entitled to recover compensatory, exemplary, treble, statutory or punitive damages based on defendants' fraudulent, illegal, and anticompetitive conduct or practices; and

(t) Whether plaintiffs and the Class are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

133. **Typicality**: Plaintiffs are members of the Class. Plaintiffs' claims have a common origin and share common bases. Their claims originate from the same illegal, fraudulent and confiscatory practices of the defendants, and the defendants act in the same way toward the plaintiffs and the Class members. If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

134. **Adequacy**: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

**Rule 23(b)(2) and (3)**

135. This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because plaintiffs and the Class seek declaratory and injunctive relief, and all of the above factors of numerosity, common questions of fact and law, typicality and adequacy are present. Moreover, defendants have acted on grounds generally applicable to plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

136. This lawsuit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe defendants' conduct and practices. Additionally, effective redress for each and every class member against defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes. Even if individual class members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against defendants.

**Estoppel Regarding Enforcement of Limitation Period**

137. Throughout the implementation of their fraud and continuing until the present day, defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing plaintiffs and the Class from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

138. In particular, various Quiznos representatives have consistently and routinely represented that the franchisees' concerns raised in this Complaint and elsewhere were of the utmost importance to Quiznos and would be rectified, which have served the deliberate purpose of lulling plaintiffs into believing that Quiznos had their best interest at heart and that the pursuit of legal action was unnecessary. The following serve as examples:

(a) In late 2003 and early 2004 John Fitchett represented to the Campbells that Quiznos was working to reduce food and paper costs when, in actuality, Quiznos had intentionally set out at that time to begin raising prices dramatically;

(b) When Quiznos reached the milestone of having opened 1800 franchises in or about 2003, it falsely represented to its franchisees that it constituted a "buying club" and that prices for food and supplies would be going down;

(c) In 2005, Janice Branam from Quiznos and Joe Elery of MileHi introduced a new produce program, which they represented would lower the franchisee food costs;

(d) Repeatedly since 2003, Quiznos corporate officials have represented that their goal was to reduce food and supply costs, yet costs since then in the Colorado market have gone from 28.5% to 32.5%;

(e) In an Annual Meeting in 2005 in Dallas, Texas, Quiznos representatives falsely stated that food and supply pricing would be lowered and that Pepsi would be providing revenue for advertising;

(f) In regular meetings of the regionally-based Marketing Action Teams ("MATs"), Quiznos falsely impresses upon MAT members that Quiznos, including Chief Executive Officer Brenneman, is concerned about changes to help franchisees become profitable and deliberately requests members of the MAT team to contact store owners and advise of Quiznos intent to resolve the problems with the franchise system;

(g) In a videotaped presentation from 2005, Steve Shaffer, Quiznos' former President, stated: "In 2005 franchise profitability is one of my top priorities. There are two ways for franchisees to make more money: 1. increase sales and 2. lower costs. We've made some strides by increasing sales and we've shown some improvement in lowering costs but discounts remain way too high. Rest assured, we will lower discount rates."

(h) In a videotaped presentation from 2006, President Shaffer claimed: "Our top priority for 2006 is to help you reduce your FLPDs (e.g. "food, labor, paper and discounts"). In 2005, our chain's FLPDs were around 59% and that is just too high;"

(i) In a meeting in Buffalo, New York, Quiznos representatives Eli Chediak and Kyle Gjersee represented to the Haywoods and others from that market that they would "help the Buffalo Market no matter what it took" and further represented that they would "quit their jobs if they did not help";[7]

---

[7] Chediak went on to state that was a joke, because he actually needed his job to pay down debt on a failed restaurant.

(j) In an August 16, 2006 memorandum from Gjersee to the Buffalo Market, Quiznos identified fact-specific tasks that Quiznos would act on to remedy the problems in the market and, yet, since then has taken no action; and

(k) Despite acknowledging that food costs and store profitability were a problem, President Shaffer learned about an internal corporate study done by Quiznos' Brian Smith that demonstrated for a fact that nearly 50% of all Quiznos franchises were not profitable and, when confronted with this information, Shaffer instructed Smith to destroy the report and not discuss it with anyone.

139. The purpose of these ongoing communications and actions was to dissuade franchisees from taking any action, legal or otherwise, to enforce their rights.

140. Defendants have also actively concealed information necessary for plaintiffs and the Class to discover the existence of their claims. Plaintiffs and the Class reasonably relied on the defendants' actions and/or omissions in failing to discover the factual and legal basis of their claims.

141. As a result of defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, plaintiffs and the Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims. Accordingly, defendants are estopped from raising affirmative defenses relying upon any statutes of limitations or contractual limitations periods otherwise applicable to the claims asserted herein by plaintiffs.

## FIRST CLAIM FOR RELIEF
## CIVIL RICO (18 U.S.C. § 1962(C))
## (FRAUDULENT SCHEME TO SELL ESSENTIAL GOODS AT INFLATED PRICES)

***[As to Defendants QFII, QFA, TQSC, TQSCII, Cervantes, Rick Schaden and Dick Schaden by All Plaintiffs ]***

142. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

143. Defendants QFII, QFA, TQSC, and/or its successor TQSC II, Cervantes, Rick Schaden and Dick Schaden have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

144. The Quiznos franchise system, which is comprised of defendants QFII, QFA, TQSC, and/or its successor TQSC II, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs. The structure of the enterprise is imposed by, among other things, the terms of the various Franchise Agreements upon which defendants rely in requiring plaintiffs, each of which is a legal entity separate from any defendant, to take certain actions and to refrain from taking other actions, and by the terms and conditions of the Quiznos' "Operations Manual" that purports to allow Quiznos as franchisor to dictate detailed aspects of store operations. The contractual rights exercised by Quiznos franchising entities under the Franchise Agreements and the Operations Manual allow the Quiznos' franchising entities to control the franchisees' actions in the manner of a classic top-down hierarchy, in which decisions are made by the franchising entities and then dictated to the franchisees, who have no choice but to follow the orders or risk termination. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by plaintiffs to members of the general public, the advertising of plaintiffs' stores and of Quiznos generally by both plaintiffs and by the Quiznos defendants themselves, the hiring of employees by franchisees, and many other day-to-day business activities that do not partake of criminality.

145. The defendants conduct the affairs of the enterprise, as opposed to merely their own affairs, by, among other things, invoking provisions of the Franchise Agreement and the Operations Manual to require the plaintiffs to take certain actions and to refrain from taking certain actions, and in general by asserting control over the activities of franchisees in a hierarchical manner, as alleged in paragraph 144.

146. If it were not for the separate legal existence of the franchisees, the defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so as to defraud the plaintiffs of money and/or property. For example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos franchisees can the defendants fraudulently induce such purchases. Similarly, if Quiznos operated only through company-owned stores, then Quiznos would not be able to create subsidiaries and affiliate supply companies that sold food, services, and their products at highly inflated prices, because Quiznos would be charging those inflated prices to itself. This would be impossible if Quiznos operated exclusively through company-owned stores, and this, among other reasons, is why Quiznos divested itself of all corporate stores except two, having once owned 35 in their early growth years.

147. Defendant QFII participated in the conduct of the enterprise through the exercise of its control, granted to it by the Franchise Agreements, over the plaintiffs' purchase of products, services and materials by requiring the plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

148. Defendant QFA participated in the conduct of the enterprise through the exercise of its control, granted to it by the Franchise Agreements, over the plaintiffs' purchase of

products, services and materials by requiring the plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

149. To the extent that rights to enforce and apply the Franchise Agreements of the plaintiffs have in fact been delegated to defendant TQSC and/or its successor TQSC II, they have participated in the conduct of the enterprise through the exercise of their control, granted to them by the Franchise Agreements, over the plaintiffs' purchase of products, services and materials by requiring the plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

150. Defendant Cervantes has participated in the conduct of the enterprise by its provision of products and services to the plaintiffs through its affiliates.

151. Defendants Rick Schaden and Dick Schaden have participated in the affairs of the enterprise because they personally either made or approved decisions to knowingly overcharge plaintiffs for products, services and materials which plaintiffs were required to buy in order to operate their franchises, and to require plaintiffs to purchase products, services and materials from approved vendors whose prices to franchisees were known by Dick Schaden and Rick Schaden to be inflated beyond fair market value because of kickbacks that the approved vendors were required to pay one or more Quiznos entities in order to become approved vendors.

152. The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by 18 U.S.C. § 1343.

153. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendant QFII devised and effected a scheme to defraud the plaintiffs, which scheme consisted of deliberately and knowingly overcharging the plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

154. The execution of the scheme to defraud by defendant QFII involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant QFII.

155. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of QFII's fraudulent scheme are as follows: payments made by plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from plaintiffs' bank accounts through electronic funds transfers made using interstate wire; plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendants' fraudulent overcharging practices.

156. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendant QFA devised and effected a scheme to defraud the plaintiffs that have Franchise Agreements signed prior to February 2005, which scheme consisted of deliberately and knowingly overcharging the plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and

knowingly causing the plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

157. The execution of the scheme to defraud by defendant QFA involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant QFA.

158. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of QFA's fraudulent scheme are as follows: payments made by plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from plaintiffs' bank accounts through electronic funds transfers made using interstate wire; plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendants' fraudulent overcharging practices.

159. To the extent that the franchisor's rights under plaintiffs' Franchise Agreements have been delegated to defendant TQSC or its successor TQSC II, defendant TQSC and/or its successor TQSC II, devised and effected a scheme to defraud the plaintiffs in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, which scheme consisted of deliberately and knowingly overcharging the plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

160. The execution of the scheme to defraud by defendant TQSC and/or its successor TQSC II, involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant TQSC and/or its successor TQSC II.

161. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of TQSC's and/or its successor TQSC II's fraudulent scheme are as follows: payments made by plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from plaintiffs' bank accounts through electronic funds transfers made using interstate wire; plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendants' fraudulent overcharging practices.

162. The predicate acts committed by defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

163. The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the same victims of money each time a fraudulently inflated price is charged to the franchisee and received, in the form of a direct payment to Quiznos or a kickback paid to Quiznos by an approved supplier, by Quiznos or an affiliated entity. In addition, all of the Quiznos franchisees across the United States, current and past, have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

164. The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because the practice of fraudulently overcharging the Quiznos franchisees for products, services and materials they must purchase in order to operate their stores is a crucial means by which Quiznos maintains its high revenues and profits. Indeed, the scheme is likely to continue on its present course until Quiznos existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer such as J.P. Morgan. As of the filing of this Complaint, there is no way to know whether this goal will be achieved.

165. Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

**SECOND CLAIM FOR RELIEF**
**CIVIL RICO (18 U.S.C. § 1962(C))**
**(FRAUDULENT SCHEME TO SELL FRANCHISE AGREEMENTS)**
***[As To Defendants QFII, QFA, TQSC, TQSCII, Cervantes, Rick Schaden and Dick Schaden By All Plaintiffs]***

166. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

167. Defendants QFII, QFA, TQSC, and/or its successor TQSCII, Cervantes, Rick Schaden, and Dick Schaden, have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

168. The Quiznos franchise system, which is comprised of defendants QFII, QFA, TQSC, and/or its successor TQSC II, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is

an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs. The structure of the enterprise is imposed by, among other things, the terms of the various Franchise Agreements upon which defendants rely in requiring plaintiffs, each of which is a legal entity separate from any defendant, to take certain actions and to refrain from taking other actions, and by the terms and conditions of the Quiznos' "Operations Manual" that purports to allow Quiznos as franchisor to dictate detailed aspects of store operations. The contractual rights exercised by Quiznos franchising entities under the Franchise Agreements and the Operations Manual allow the Quiznos' franchising entities to control the franchisees' actions in the manner of a classic top-down hierarchy, in which decisions are made by the franchising entities and then dictated to the franchisees, who have no choice but to follow the orders or risk termination. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by plaintiffs to members of the general public, the advertising of plaintiffs' stores and of Quiznos generally by both plaintiffs and by the Quiznos defendants themselves, the hiring of employees by franchisees, and many other day-to-day business activities that do not partake of criminality.

169. The defendants conduct the affairs of the enterprise, as opposed to merely their own affairs, by, among other things, invoking provisions of the Franchise Agreement and the Operations Manual to require the plaintiffs to take certain actions and to refrain from taking certain actions, and in general by asserting control over the activities of franchisees in a hierarchical manner.

170. If it were not for the separate legal existence of the franchisees, the defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so

as to defraud the plaintiffs of money and/or property. For example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos franchisees can the defendants fraudulently induce such purchases. This would be impossible if Quiznos operated exclusively through company-owned stores.

171. Defendant QFII participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

172. Defendant QFA participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

173. Defendant TQSC and/or its successor TQSCII participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

174. Defendant Cervantes has participated in the conduct of the enterprise by its provision of management services to the defendants, which managers either approved or made decisions to knowingly induce franchise sales through misrepresentation and deceit.

175. Defendants Rick Schaden and Dick Schaden have participated in the affairs of the enterprise because they personally either made or approved decisions to knowingly induce

franchise sales through misrepresentation and deceit.

176. The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by U.S.C. § 1343.

177. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendants devised and effected a scheme to defraud prospective franchisees by knowingly and deliberately making false representations of fact, and/or omitting material true facts, to prospective franchises in order to induce them to purchase a Quiznos franchise.

178. The execution of the scheme to defraud by defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendants.

179. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendants' fraudulent scheme are as follows: UFOCs and Franchise Agreements were distributed using the United States mails; agents of the corporate defendants named in this Complaint, including such individuals as Charlotte Russell, Alex Karas, Don Lauria, Ghazzi Hajj and Dominick Voso (who participated in the scheme against Plaintiffs McJon and McCarthy-Sequeira), David Bloom and Jeff Humphrey (who participated in the scheme against Wave Dancer and Ronan-Casey), and all of the other agents and representatives of Quiznos identified in paragraphs 85-129, made and received telephone calls to and from prospective franchisees in which further fraudulent representations and omissions were made in order to induce entry into Franchise Agreements, and franchisees used the mail to send their franchisee fee payments to Quiznos.

180. The fraudulent representations and omissions giving rise to this and other related claims are stated with particularity in the "General Allegations" section in paragraphs 85-129 of

this Complaint.

181. The predicate acts committed by defendants as alleged in this Complaint constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

182. The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the franchisees through their payment of the initial franchise fee, as well as other future payments to be received by Quiznos, such as for overpriced products, services, materials and the like. In addition, all of the Quiznos franchisees across the United States have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

183. The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because Quiznos' business model is built upon continually increasing the number of new franchises coming into the system. Indeed, the scheme is likely to continue on its present course until Quiznos' existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

184. Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF § 1 OF THE SHERMAN ACT
***[As to All Defendants But The Schadens By All Plaintiffs]***

185. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

186. There exists a market or markets for ownership interests in Quick Service Toasted Sandwich Restaurant Franchises, in which Quiznos maintains substantial market power. Quiznos maintains over 5,000 shops in the United States. It is one of the dominant players in the sandwich and bakery franchise category, and is the top ranked sandwich chain by sales growth in

the United States.

187. Separate market or markets exist for the related goods and services associated with the operation of a Quick Service Toasted Sandwich Restaurant Franchises, including raw materials, services and food products (referred to throughout this Complaint as "Essential Goods").

188. Quiznos affiliates, including entities in which it maintains a financial or other ownership interest, as well as approved vendors from which it receives contractual kickbacks, are the sole sources from which plaintiffs and the Class may purchase Essential Goods. As a practical matter, Quiznos will not approve suppliers who do not agree to pay kickbacks to Quiznos or affiliated entities as a condition of obtaining such approval.

189. Quiznos conceals the nature of its relationships with its affiliates and approved vendors from potential franchisees including plaintiffs and the Class members, in order to lock them into onerous Franchise Agreements, create excessive switching costs, and restrict or eliminate competition in the market or markets for Essential Goods.

190. At all times Quiznos and its affiliates had market and/or economic power in the relevant markets, sufficient to force plaintiffs and the Class to purchase and accept Essential Goods from Quiznos-affiliated vendors.

191. By reason of the terms of the Franchise Agreements and the investments and sunken costs the franchisees have made in their franchises, Quiznos has substantial power in the market or markets for both Quick Service Toasted Sandwich Restaurant Franchises and the market or markets for Essential Goods.

192. Quiznos coerces plaintiffs and the Class to purchase Essential Goods solely from its affiliates, through contractual provisions contained in Franchise Agreements and its pre-contractual information deficiencies and post-contractual switching costs. Through these and

other means, Quiznos can and does coerce franchisees to purchase nearly all of the products, services and materials they need from Quiznos itself or from approved vendors designated and controlled by Quiznos and its affiliates.

193. Through the exercise of Quiznos' economic power as alleged herein, Quiznos has conditioned the purchase by plaintiffs of their franchises and their continued existence as franchisees upon their purchase of Essential Goods from Quiznos itself or from approved vendors in which it maintains a financial interest.

194. As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and the Class have suffered damages by, among other things, being forced to pay supracompetitive prices for Essential Goods.

195. A substantial amount of interstate commerce has been adversely affected and Quiznos' practices impose an unreasonable adverse effect on competition in one or more of the relevant markets, because Quiznos' policy of coercing and conditioning the purchase and operation of a franchise and the purchase by franchisees of Essential Goods forecloses the ability of vendors unwilling to pay kickbacks to Quiznos and its affiliated entities from selling their products, services and materials to the plaintiffs, even though the quality of such products, services and materials is equal to if not better than the quality of what is supplied by Quiznos-approved vendors.

196. Quiznos' unlawful and coercive tying of its franchises to products, services and materials from approved suppliers is *per se* unlawful and in violation of Section 1 of the Sherman Act, 15 U.S.C § 1, and has caused damage to the plaintiffs and the Class.

197. Alternatively, if Quiznos' tying conduct is not *per se* unlawful, it is unlawful under the rule of reason, in that the anticompetitive effects of defendants' conduct outweigh any procompetitive effects thereof. Not only does Quiznos' conduct impose supracompetitive prices

on plaintiffs and the Class, it impedes the ability of other suppliers to engage in competition with Quiznos' affiliates and vendors to provide higher quality raw materials, services and food products at lower costs. Moreover, consumers are injured in that they are forced to indirectly pay the kickbacks and excessive prices for product charged to franchises by Quiznos' affiliates and vendors. There is no pro-business or efficiency justification for the kickbacks and supracompetitive pricing, nor does any legitimate business purpose require these practices.

198. By reason of the illegal conduct of Quiznos as alleged herein, plaintiffs and the Class are entitled to damages in an amount to be proven at trial and then trebled pursuant to 15 U.S.C. § 15, and to permanent injunctive relief prohibiting Quiznos' unlawful tying conduct.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF § 6-4-104 OF THE COLORADO ANTITRUST ACT**
***[As to All Defendants But The Schadens By All Plaintiffs]***

199. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

200. The aforementioned practices of defendants constitute an unreasonable restraint of trade and a *per se* unlawful tying arrangement or, if not *per se* unlawful, an unreasonable restraint of trade, all in violation of the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-104.

201. As a result of the conduct described above, plaintiffs and the Class have suffered damages by, among other things, being forced to pay supracompetitive prices for Essential Goods.

202. By reason of defendants' unlawful conduct, plaintiffs and the Class are entitled damages in an amount to be proven at trial and trebled pursuant to Colo. Rev. Stat. § 6-4-114 and such other relief as provided under Colorado law.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**VIOLATION OF § 2 OF THE SHERMAN ACT**
***[As To All Defendants But The Schadens By All Plaintiffs ]***

203. Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint as if set forth in full.

204. The foregoing conduct of Quiznos constitutes unlawful monopolization or an unlawful attempt to monopolize the market or markets for Essential Goods by means of conduct that is predatory, exclusionary or that otherwise forecloses legitimate competition. As a result of Quiznos' conduct, Quiznos has obtained, or there is a dangerous probability that it will obtain, market or monopoly power in one or more of such markets. Quiznos conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

205. As a result of the Quiznos' unlawful conduct, plaintiffs and the Class have suffered damages by, among other things, being forced to pay supracompetitive prices for Essential Goods.

206. By reason of the illegal conduct of Quiznos as alleged herein, plaintiffs and the Class are entitled to damages in an amount to be proven at trial and then trebled pursuant to 15 U.S.C. § 15, and to permanent injunctive relief prohibiting Quiznos' unlawful tying conduct.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**VIOLATION OF § 6-4-105 OF THE COLORADO ANTITRUST ACT**
***[As To All Defendants But The Schadens By All Plaintiffs ]***

207. Plaintiffs repeat and reallege each of the foregoing paragraphs of the Complaint as if set forth in full.

208. The foregoing conduct of Quiznos constitutes unlawful monopolization or an unlawful attempt to monopolize the market or markets for Essential Goods by means of conduct that is predatory, exclusionary or that otherwise forecloses legitimate competition. As a result of the Quiznos' conduct, Quiznos has obtained, or there is a dangerous probability that it will

obtain, market or monopoly power in one or more of such markets. Quiznos conduct violates Colo-Rev. Stat. § 6-4-105.

209. As a result of the Quiznos' unlawful conduct, plaintiffs and members of the Class have suffered damages by, among other things, being forced to pay supracompetitive prices for Essential Goods.

210. By reason of Quiznos' unlawful conduct, plaintiffs and the Class are entitled damages in am amount to be proven at trial and trebled pursuant to Colo. Rev. Stat. § 6-4-114 and such other relief as provided under Colorado law.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**
***[As to All Defendants by All Plaintiffs ]***

211. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

212. As alleged with specificity in this Complaint, defendants engaged in unfair and deceptive trade practices in their relationship with plaintiffs and the Class. Along with others known and unknown, the Schaden Defendants caused Quiznos to engage in deceptive trade practices. Upon information and belief, they participated in the deceptive practices alleged in this Complaint by overseeing, directing and otherwise ratifying the action of the corporations they control.

213. The deceptive trade practices described in this Complaint occurred in the course of defendants' business and, in the case of the Schaden Defendants, as part of their occupation as officers and directors of the various corporate defendants.

214. The deceptive trade practices alleged in this Complaint significantly impacted the public as actual or potential consumers of the defendants' goods and services. This class action seeks redress for more than 5,000 Quiznos franchisees located throughout the United States.

Quiznos' conduct in selling franchises and in its relationship with franchisees subsequent to entry of the Franchise Agreements resulted in a significant and detrimental impact on members of the public. The CCPA provides protection to those affected by pre- and post-sale deceptions in consumer relationships.

215. Plaintiffs and the Class were actual consumers of the defendants' goods and services and were injured in the course of their business and occupation as a result of defendants' deceptive trade practices and their violation of the CCPA.

**EIGHTH CLAIM FOR RELIEF**
**INTENTIONAL FRAUD**
**(FRAUD IN THE INDUCEMENT)**
***[As to All Defendants by All Plaintiffs ]***

216. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

217. As alleged with specificity in this Complaint, defendants knowingly made false statements of past and present fact to, and omitted or concealed true statements of fact from, the plaintiffs. Defendants' false statements created an untrue and misleading impression in the mind of plaintiffs. With respect to each such true statement alleged to have been omitted or concealed by the defendants, the defendants owed each plaintiff a duty to disclose the truth of such omitted or concealed fact. These facts were material in plaintiffs' decision to acquire a Quiznos franchise because a reasonable person under the circumstances would regard the facts misrepresented and otherwise omitted as important in deciding to purchase a Quiznos franchise. Defendants knew that plaintiffs would find the misrepresented and omitted facts to be important in deciding how to proceed.

218. Defendants concealed these facts with the intent of creating a false impression of the actual facts in plaintiffs' mind and knowing plaintiffs would not have taken the course of action they did had they been told all of the facts.

219. The statements and omissions of the defendants as alleged herein were untrue.

220. Defendants knew or should have known at the time they made the representations and omissions that their affirmative statements as alleged herein were false, and that their omissions or concealments were deceptive by virtue of being incomplete.

221. The defendants made the false statements, and engaged in the omissions and concealments, with the intent to defraud the plaintiffs and in order to induce the plaintiffs to rely on the statements, omissions and concealments.

222. Each plaintiff believed the false statements made to him or her, or believed that no facts existed inconsistent with defendants' omissions and concealments, and reasonably acted in reliance upon those beliefs to his or her detriment.

223. As a result of their detrimental reliance on defendants' fraudulent statements and omissions, plaintiffs and the Class have been damaged in the future in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
***[As To Defendants TQFC, QF, QFII, QFA, TQSC, And TQSCII By All Plaintiffs Who Signed Franchise Agreements Or Obtained Rights To Them By Assignment]***

224. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

225. Each Franchise Agreement alleged to have been executed in this Complaint, if deemed enforceable by the Court despite plaintiffs' request for rescission, constitutes a contract binding on the defendants. In addition, Quiznos expressly incorporates its UFOC into the Franchise Agreement and thereby binds itself to its terms. In each Franchise Agreement alleged to exist in this case, the parties agreed as follows:

> (C) NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, ***EXCEPT AS SET FORTH*** IN THIS DOCUMENT AND ***IN ANY OFFERING***

> ***CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON FRANCHISOR*** IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

(Haas Franchise Agreement, ¶ 23.12(C).)(Emphasis added.)

226. The UFOCs presented to each plaintiff provide that Quiznos would "negotiate purchase agreements with suppliers for the benefit of Franchisees." By using its control over the suppliers from whom Quiznos allows franchisees to purchase products, services and materials to increase its own revenues through its kickback scheme, and by failing to use its "market power" due to volume purchases for the benefit of franchisees, Quiznos has breached its contractual obligation to negotiate with suppliers for the benefit of franchisees.

227. Quiznos has also breached its contractual obligations to plaintiffs and the Class by, among other things: (a) failing to provide promised support and assistance in operating franchises; (b) failing to properly appropriate advertising funds; (c) failing to disclose the relationships it has with approved vendors, including the kickbacks it receives from them; (d) misusing the marketing funds paid by plaintiffs and the Class for purposes prohibited by the Franchise Agreement; and (e) failing to negotiate prices for food and supplies in a manner meant to benefit plaintiffs.

228. The breach of contract alleged herein was a substantial factor causing plaintiffs harm.

229. Plaintiffs and the Class have been damaged in amounts to be proven at trial.

## TENTH CLAIM FOR RELIEF
## BREACH OF THE IMPLIED COVENENT OF GOOD FAITH AND FAIR DEALING
***[As To Defendants TQFC, QF, QFII, QFA, TQSC, And TQSCII By All Plaintiffs Who Signed Franchise Agreements Or Obtained Rights To Them By Assignment]***

230. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

231. Each Franchise Agreement between plaintiffs and defendants includes not only express written provisions, but also those terms and conditions, which although not formally expressed, are implied by law. Such implied terms are as binding as the terms that are actually written into the agreement.

232. Inherent in all contracts is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take any action that will injure the other party or compromise his benefit of the contract.

233. The obligations of Quiznos to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between Quiznos and plaintiffs, which imbalance allows Quiznos to implement the business scheme described in detail in this Complaint and incorporated by reference. Quiznos, in fact, maintains near unilateral discretion in the implementation of its Franchise Agreements and UFOCs.

234. Quiznos has breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by acts independent of the deceptive practices. Quiznos has denied plaintiffs the ability to achieve their reasonable expectations in entering into the franchise relationship.

235. Defendants breach of the implied covenant of good faith and fair dealing was a substantive factor causing Plaintiffs and the Class damage.

## ELEVENTH CLAIM FOR RELIEF
## ECONOMIC DURESS
***[As to All Defendants On Behalf of Plaintiffs McCarthy-Sequeria, McJon, Curl, BN&N, the Merry Plaintiffs, Msquared, Hampshire, and Two Wisconsin Boys]***

236. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

237. On or about July 18, 2005, McCarthy-Sequeria and McJon, on the one hand, and defendant TQSCII, on the other hand, entered into what Quiznos designated a "Financial Assistance Agreement." By this time, McJon was struggling financially due to the economic schemes alleged herein and Quiznos agreed to extend $2,918.58 to McJon to allow it to pay its lender a sum due. Despite obtaining McJon's commitment to repay the sum, TQSCII also extracted what purports to be a general release providing as follows:

> 4. RELEASE
>
> Franchise Owner and its affiliates, and their respective officers, directors, owners (including Guarantor), principals, employees, representatives, heirs, agents, administrators, successors and assigns hereby release Quiznos, Franchisor and their respective affiliates, and each of their respective current and former officers, directors, owners, principals, employees, representatives, agents, successors and assigns (the "Quiznos Parties") from any and all claims, demands, obligations, actions, liabilities, defenses or damages of every kind and nature whatsoever, in law or in equity, whether known or unknown (collectively, the "Claims"), which may hereafter be discovered, in connection with, as a result of, or in any way arising from, any relationship or transaction with any of the Quiznos Parties, however characterized or described, from the beginning of time until the date of this Agreement. Franchise Owner and Guarantor represents and warrants that they have not assigned or otherwise transferred any Claims released by this paragraph.

238. Quiznos' conduct as described herein placed McJon in the financial position it found itself on July 18, 2005, namely having to borrow funds from Quiznos to maintain the ongoing viability of its restaurant. Quiznos improperly used its economic power to extract a "release" from McJon and McCarthy-Sequeria. Certain members of the Class have signed a "Financial Assistance Agreement" similar in form to the one signed by McJon and McCarthy-Sequeria.

239. On or about November 10, 2005, BN&N Enterprises executed an "Asset Purchase Agreement" with third-party Bouchillon Development Westport LLC ("Bouchillon"), which effectuated the sale of the store owned by Curl and BN&N to Bouchillon. In order for Curl and BN&N to be able to sell their operation, Quiznos used its economic power to require them to sign what purports to be a general release providing as follows:

> 9.6 **Release of Quizno's.** Seller, the Seller Guarantors (as set forth on the signature pages below) and Buyer, and each of them, for themselves and their affiliates, employees, officers, directors, successors, assigns, and other representatives, fully and forever unconditionally release and discharge Franchisor, and its affiliates, parents, subsidiaries, and their respective employees, officers, directors, successors, assigns, guarantors and other representatives (the "Released Parties"), from any and all claims, demands, obligations, actions, liabilities and damages of every kind or nature whatsoever, in law or in equity, whether known or unknown to them, which they may have against the Released Parties as of the execution by Franchisor of the Consent (or, solely with respect to Seller and the Seller Guarantors, which may thereafter be discovered, accrued, or sustained), in connection with, as a result of, or in any way arising from, any relations or transactions with the Released Parties, however characterized or described, including but not limited to, any claims arising from the Seller Franchise Agreement, the Buyer Franchise Agreement, this Agreement, the Franchisor's Consent or the transactions described herein.
>
> If the Restaurant is located in the State of California, the following provisions are applicable to Seller, the Seller Guarantors and Buyer. If the Restaurant is not located in the State of California, the following provisions are applicable only with respect to any of Seller, the Seller Guarantors or Buyer who are residents of the State of California.
>
> It is the intention of Seller, Buyer and the Seller Guarantors in executing this Agreement that this instrument be and is a general release which shall be effective as a bar to each and every claim, demand or cause of action, released by the executing parties. Each of Seller, Buyer and the Seller Guarantors recognize that he, she or it may have some claim, demand or cause of action against the Released

> Parties of which he, she, or it is totally unaware and unsuspecting, which he, she or it is giving up by executing this Agreement. It is their expressed understanding that executing this instrument will deprive him, her or it of each such claim, demand or cause of action and prevent him, her or it from asserting it against the Released Parties. In furtherance of this intention, each of Seller, the Seller Guarantors and Buyer expressly waive any rights or benefits conferred by the provisions of Section 1542 of the California Civil Code, which provides as follow:
>
> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."
>
> Seller, the Seller Guarantors and Buyer acknowledge and represent that he, she, or it has consulted with legal counsel before executing this Agreement and the he, she, or it understands its meaning, including the effect of Section 1542 of the California Civil Code, and expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands and causes of action.

240. Certain members of the Class have signed a general release in the context of getting Quiznos' consent to sell their stores similar in form to the one signed by Curl and BN&N.

241. On or about June 12, 2006, the Merry Plaintiffs and Msquared executed an "Asset Purchase Agreement' with third-party Ruchi Dinan d/b/a Ruchi, Inc. ("Ruchi"). In late 2005 or early 2006, prior to having secured a buyer, John Merry spoke to Quiznos representative Gjersee to advise that the Merry Plaintiffs had been unable to find a buyer for their store and that they were contemplating closing it. Gjersee stated words to the effect, that "simply closing the store would result in Quiznos suing them." This was a threat designed to have the Merry Plaintiffs continue to search for a buyer and thereafter obtain a release.

242. In order for the Merry Plaintiffs and Msquared to be able to sell their operation for $1, Quiznos used its economic power to require them to sign what purports to be a general

release similar in form to the one signed by Curl and BN&N except further releasing Quiznos' "area directors."

243. Certain members of the Class have signed a general release in the context of getting Quiznos' consent to sell their stores similar in form to the one signed by the Merry Plaintiffs and Msquared.

244. On or about December 8, 2006, Hampshire and Two Wisconsin Boys, on the one hand, and QFA, QFII and third-party buyer CSL Enterprise LLC ("CSL"), on the other hand, executed an "Agreement and Conditional Consent to Transfer", which effectuated the sale of the store owned by Hampshire and Two Wisconsin Boys to CSL. This agreement itself effectuated a sales contract from August 7, 2006. In order for Hampshire and Two Wisconsin Boys to be able to sell their operation, Quiznos used its economic power to require them to sign what purports to be a general release providing as follows:

> 5. **Release of Franchisor**. Seller, the seller Guarantors and Buyer, and each of them, for themselves and their affiliates, employees, officers, directors, successors, assigns, and other representatives, hereby fully and forever unconditionally release and discharge Franchisor, and its affiliates, parents, subsidiaries, and their respective employees, officers, directors, successors, assigns, guarantors and other representatives (the "Released Parties"), from any and all claims, demands, obligations, actions, liabilities and damages of every kind or nature whatsoever, in law or inequity, whether known or unknown to them, which they may have against the Released Parties as of the date of this Agreement, or which may thereafter be discovered, accrued, or sustained, in connection with, as a result of, or in any way arising from, any relations or transactions with the Released Parties, however characterized or described, including but not limited to any claims arising from the Seller Franchise Agreement, the Buyer Franchise Agreement or the Purchase Agreement or the transactions described herein.
>
> If the Restaurant is located in California or if either Buyer or Seller is a resident of California, the following shall apply:

> **<u>Section 1542 Acknowledgment</u>**. It is the intention of Seller and the Seller Guarantors in executing this Agreement that this instrument be and is a general release which shall be effective as a bar to each and every claim, demand or cause of action released by Seller and the Seller Guarantors. Seller and the Seller Guarantors recognize that he, she or it may have some claim, demand or cause of action against the Released Parties of which he, she, or it is totally unaware and unsuspecting, which he, she or it is giving up by executing this Agreement. It is the intention of Seller and the Seller Guarantors in executing this instrument that it will deprive him, her or it of each such claim, demand or cause of action and prevent him, her or it from asserting it against the Released Parties. In furtherance of this intention, Seller and the Seller Guarantors expressly waive any rights or benefits conferred by the provisions of Section 1542 of the California Civil Code, which provides as follows:
>
> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."
>
> Seller and the Seller Guarantors acknowledge and represent that he, she, or it has consulted with legal counsel before executing this Agreement and that he, she, or it understands its meaning, including the effect of Section 1542 of the California Civil Code, and expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands and causes of action.

245. On their face, the "releases" identified above purport to exculpate defendants, their affiliates and representatives from liability with respect to claims against them. These "releases", and any like them, were improperly compelled and obtained through economic duress. It would be unfair and inequitable to uphold the release due to the unequal bargaining power between defendants, plaintiffs and the Class. In addition, it would be inequitable to allow Quiznos to benefit from releases obtained due to circumstances caused by Quiznos (e.g., the sale of a Quiznos store and the need for short-term financial assistance).

246. Plaintiffs and those similarly situated that were coerced to sign any of the identified release documents were under the domination of Quiznos when compelled to sign them. In requiring the execution of the releases, Quiznos obtained signatures that manifested a nonexistent assent on the part of the signing franchisees. The resulting exchange (the release of the parties responsible for the economic ruin visited upon them by their association with Quiznos) is not fair on its terms and the effectiveness of the threat in inducing plaintiffs' manifestation of assent was increased by Quiznos' prior unfair dealing. In addition, Quiznos' efforts to extract a release constituted a use of power for illegitimate ends.

247. The releases obtained by Quiznos and all similar releases are voidable on the grounds of duress as the result of an improper threat to which plaintiffs had no reasonable alternative other than to sign the release. In particular, plaintiffs knew that franchisees who simply go out of business are often sued by Quiznos, and that Quiznos demands in such suits the present value of royalties that Quiznos claims would have been owed for the unexpired term of the Franchise Agreement. This effectively left plaintiffs with no choice but to sign the offered releases under duress.

248. All non-parties who seek to take advantage of the release knew of the economic duress that gave rise to the release and therefore are prohibited from taking advantage of their terms.

## TWELFTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT

***[As To Defendants TQFC, QF, QFII, QFA, TQSC, And TQSCII By All Plaintiffs Who Signed Franchise Agreements Or Obtained Rights To Them By Assignment]***

249. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

250. An actual and justiciable controversy exists between defendants and plaintiffs concerning the parties' respective rights and obligations under the Franchise Agreements and

UFOCs, and whether Quiznos should be held liable for alleged misconduct during the relationship between the parties.

251. In addition to the extremely one-sided operational and approval terms included in the adhesive form Franchise Agreements, Quiznos has included procedural obstacles, which intend to discourage claims against it and/or attempt to shield it from ***any*** liability.

252. These following provisions from the Franchise Agreements, among others, are unenforceable:

(a) Limitations on suing potentially liable parties;

(b) Truncated statute of limitations;

(c) Preclusion of punitive or exemplary damages;

(d) Exclusion of a duty to deal in good faith;

(e) No class action; and

(f) Preclusion of consolidating proceedings.

253. The collective inclusion of all of the onerous provisions in the adhesive form Franchise Agreement is violative of Colorado public policy and renders the Franchise Agreements void and unenforceable.

254. Plaintiffs are therefore entitled to a declaration from the Court that the Quiznos Franchise Agreements signed by plaintiffs, and others similarly situated, are void and unenforceable. Alternatively, plaintiffs ask the Court to strike those provisions that are unenforceable.

WHEREFORE, plaintiffs, individually and on behalf of all others similarly situated, seek the following relief:

(a) An Order certifying the proposed Class herein and appointing plaintiffs and the undersigned counsel of record to represent the Class;

(b) An Order rescinding the Franchise Agreements of each and every plaintiff and member of the Class based on defendants' fraudulent inducement thereof or, alternatively, damages for said fraud;

(c) An Order issuing a preliminary injunction enjoining defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(d) An Order issuing a permanent injunction enjoining defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(e) An Order declaring the Franchise Agreements of each and every plaintiff and member of the Class unconscionable and, therefore, unenforceable;

(f) A Judgment awarding plaintiffs and the Class compensatory, consequential, and statutory damages, including, without limitation, their loss of investment capital, loss of income, loss of assets and savings, pre-judgment interest and post-judgment interest;

(g) A Judgment awarding plaintiffs and the Class exemplary, punitive and treble damages;

(h) A Judgment awarding plaintiffs and the Class attorneys fees and costs; and

(i) Such other relief as the Court finds just and proper.

Dated this 14th day of August, 2007.

By: ______________________
Mark M. Leitner
Joseph S. Goode
Kravit, Hovel & Krawczyk, S.C.
825 N. Jefferson St.
Milwaukee, WI 53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135
E-mail: goode@kravitlaw.com
leitner@kravitlaw.com
Attorneys for Plaintiffs

Justin M. Klein
Marks & Klein, LLP
63 Riverside Avenue
Red Bank NJ 07701
Telephone: (732) 747-7100
Facsimile: (732) 219-0625
E-mail: justin@marksklein.com
Attorneys for Plaintiffs

**PLAINTIFFS DEMAND A JURY**