# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

Civil Action No. 07-CV-01717-EWN-KMT

BONNIE BRUNET,
MARTIN RIST,
JOSEPH GIBSON,
J&D QUALITY ENTERPRISES LLC,
BRADLEY P. SHELTON,
BPS ENTERPRISES, INC.,
MICHAEL J. CAMPBELL,
PATTY CAMPBELL,
FRESH PERSPECTIVES, INC.,
THOMAS HAYWOOD,
JASON HAYWOOD,
JASON THOMAS, INC. D/B/A QUIZNOS SUB,
DANIEL S. KESSELS,
PHUONG T. NGUYEN,
GRATEFUL D, INC.,
JOHN MCCARTHY,
JONATHON SEQUEIRA,
MCJON LLC,
JAMES M. TULLY,
KIND OF BLUE, INC.,
DAVID M. POLLOCK,
TINA POLLOCK,
NICHOLAS J. POLLOCK,
WESTHAMPTON ENTERPRISES LLC,
JOHN F. MERRY,
THOMAS E. MERRY,
MSQUARED 1, INC.,
JOHN E. VIRGILI,
UNIVERSAL FOODS, INC.,
DAVID M. RONAN,
TERRANCE M. CASEY,
WAVE DANCER HOLDINGS LLC,
CAROLYN PEDDY,
MIKKI LUCAS F/K/A MIKKI PEDDY,
CMC ENTERPRISE PARTNERS LLC,
BRIAN L. CURL,
BN&N ENTERPRISES LLC,
ROBERT HAMPSHIRE,
TWO WISCONSIN BOYS LLC,
MATHEW HAAS,

QP ENTERPRISES, INC.,

INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

vs.

THE QUIZNO'S FRANCHISE COMPANY LLC F/K/A
THE QUIZNO'S CORPORATION,
QUIZNO'S FRANCHISING LLC,
QUIZNO'S FRANCHISING II LLC,
QFA ROYALTIES LLC,
THE QUIZNO'S MASTER LLC,
QZ FINANCE LLC,
QIP HOLDER LLC,
TQSC II LLC F/K/A TQSC LLC,
QCE HOLDING LLC,
QCE INCENTIVE LLC,
QCE FINANCE LLC,
QCE LLC,
AMERICAN FOOD DISTRIBUTORS LLC,
SOURCE ONE DISTRIBUTION LLC F/K/A NATIONAL RESTAURANT
SUPPLY DISTRIBUTION LLC,
S&S EQUIPMENT COMPANY LLC,
BA-BING! LLC F/K/A SOURCE ONE SYSTEMS LLC,
CHAIN MANAGEMENT SYSTEMS LLC,
KINETIC SOURCING SOLUTIONS LLC F/K/A
U.S. FULFILLMENT LLC,
CONTINENTAL LENDING GROUP LLC,
CLG LEASING LLC,
QAFT, INC.,
RICHARD E. SCHADEN,
RICHARD F. SCHADEN,
PATRICK E. MEYERS,
STEVEN B. SHAFFER,
THE CERVANTES HOLDING COMPANY,
CERVANTES CAPITAL LLC,
CERVANTES MASTER LLC, AND
QUIZNOS FINANCE LLC,

Defendants.

---

**AMENDED CLASS ACTION COMPLAINT**

---

The plaintiffs, individually and on behalf of all others similarly situated, allege, by and through their attorneys Marks & Klein, LLP and Kravit, Hovel & Krawczyk S.C., as follows:

**CASE SUMMARY**

1. This is a national class action brought by franchisees of the Quiznos toasted submarine sandwich shop restaurant chain arising from the illegal and deceptive business scheme of Quiznos and its web of affiliated entities and individuals who control and operate the Quiznos franchise system.[1] Through this scheme, defendants induced plaintiffs and class members (the "Class") to purchase and operate franchises and to pay franchise-related fees, exploiting their control and economic power in order to extract exorbitant and unjustifiable payments from franchisees. As a result, defendants reaped (and continue to reap) grossly inflated sales and profits while causing substantial financial harm to plaintiffs and the Class.

2. In executing the scheme, Quiznos preyed upon ordinary consumers like the plaintiffs who had little to no experience operating a business or understanding the legal implications of Quiznos' one-sided, non-negotiable franchise agreement. Employing slick sales scripts and marketing the "American Dream" of business ownership in the "fastest growing franchise in the United States," Quiznos used knowingly deceptive and misleading statements

[1] This action is one of four related cases in the United States that seek class relief for Quiznos' franchisees. The other three lawsuits include: (i) *Siemer, et al. v. The Quizno's Franchise Company LLC, et al.*, Case No. 07-C-2170 (United States District Court for the Northern District of Illinois); (ii) *Westerfield, et al. v. The Quizno's Franchise Company LLC, et al.*, Case No. Case No. 06-C-1210 (United States District Court for the Eastern District of Wisconsin, Green Bay Division); and (iii) *Bonanno, et al. v. The Quizno's Franchise Company LLC, et al.*, Case No. 1:06-CV-2358-WYD-KLM (United States District Court for the District of Colorado). The Siemer Case and the Westerfield Case, like this action, involve franchisees who have operated (or are currently operating) Quiznos franchises. The putative class in this action includes all Quiznos franchisees with complaints over the operation of their restaurants who are not part of the putative class in any similar lawsuit. The Bonanno Case involves the rights of a putative class of approximately 3,200 franchisees who paid a franchise fee to Quiznos of $25,000 yet never obtained a restaurant, the so-called "SNOs"—Quiznos' phrase for those franchises sold but not open. In the scheme at issue in the Bonanno Case, Quiznos generated $75 million in franchise fees while providing the franchisees who paid those franchise fees nothing in return.

designed to obtain plaintiffs' trust and confidence in a fraudulent effort to build the brand and implement the scheme.

3. There are presently 4,636 Quiznos franchises in the United States and that number continues to rise. Quiznos currently classifies the majority of its franchises in the United States as financially distressed. Financial distress for the typical Quiznos franchisee became a way of life in or about October 2000 when defendants first set out to implement the schemes alleged below. In May 2003, less than three years after hatching defendants' plan, defendant Patrick E. Meyers, then Quiznos' General Counsel and at all times consigliore and college friend of defendant Richard E. Schaden, admitted under oath that "40% of Quiznos units are not breaking even." Despite historic knowledge of the financial "house of cards" on which the franchise system is based, defendants have knowingly continued to sell franchises to unwitting consumers over the past eight years on the contrived promise that Quiznos offers its franchisees a turnkey operation and "proven business systems."

4. This case is about broken promises, unfulfilled contractual expectations and false and misleading statements and omissions. Plaintiffs invested their life savings in Quiznos only to face economic ruin and negative earnings. The lucky ones have been able to utilize resources to offset their losses or are fortunate enough to have one of the few stores in a geographic location that ensures a high enough volume to pay the owner essentially minimum wage to work seven days a week in his or her store. Similar to indentured servitude, it is not uncommon for a Quiznos franchisee to work 60 to 80 hours a week, only to make no money and, in fact, be forced to invest additional dollars to stay open and thus avoid being sued by Quiznos for the present value of 15 year's worth of royalties. The typical Quiznos franchisee routinely pumps money into the franchise from the beginning and does so until he or she is forced by market factors,

their lender, their landlord or Quiznos itself to walk away from the astronomical losses suffered as a result of a rigged and one-sided system. This lawsuit addresses a flawed and deceptive economic model manipulated by those in control of the franchise system for their own self-serving gain.

5. The core of the problem is the false representation in Quiznos' Uniform Franchise Offering Circular ("UFOC") n/k/a Franchise Disclosure Document ("FDD") that Quiznos and its affiliates would "negotiate purchase arrangements with suppliers for the benefit of the Franchisees, which often include volume discounts." (Emphasis added.) Plaintiffs believed this common sense representation and relied on it to their detriment. In reality, however, Quiznos uses the mandatory supply relationships it imposes upon its franchisees to extract supra-competitive profits from the franchisees, altogether ignoring its legal obligation to negotiate prices for their benefit. This lie, along with myriad other false representations and broken promises, has led to the economic destruction of plaintiffs and the Class, while lining the pockets of the various defendants. This is not rhetorical spin: the representative plaintiffs in this action are split between those continuing to operate their restaurants and those forced to close their doors due to defendants' conduct.

6. In or around 2000, those in control of Quiznos orchestrated a plan premised upon conduct that was fundamentally inconsistent with the UFOC's promise of economic benefits that would flow from negotiated volume discounts. Through the creation and control of such entities as defendants American Food Distributors LLC, Source One Distribution LLC, Ba-Bing! LLC, Continental Lending Group LLC, CLG Leasing, and Kinetic Sourcing Solutions LLC, defendants created a captive and artificial market in which plaintiffs and the Class were obligated to purchase the food, equipment, services and supplies necessary to run a Quiznos restaurant (the

"Essential Goods"). The result has been to require franchisees to purchase Essential Goods through these entities or mandated unaffiliated distributors with whom these Quiznos "affiliates" have entered into self-serving provider agreements. These Quiznos affiliates add an extra layer to the Essential Goods in amounts that far exceed any justifiable benefit they provide to the Quiznos system. By all accounts these Quiznos-controlled companies operate with little to no overhead and simply act as "pass through" companies in an effort to justify excessive pricing to the franchisees.

7. In their effort to bilk the franchisees of funds, defendants exploit their information advantage in the market for the Essential Goods. Through this process, Quiznos uses its economic power and its exclusive control over the franchise system to, among other things, compel its franchisees to:

(a) Purchase unneeded goods and services.

(b) Purchase needed goods and services in quantities far greater than those necessary to meet the operational needs of their franchises.

(c) Work with Quiznos-mandated distributors and pay those distributors excessive prices for goods and services substantially exceeding what franchisees would pay in arm's length transactions due to the altogether unnecessary markups and fees for the alleged "wholesaling" done by the Quiznos-controlled providers.

(d) Pay a marketing and advertising fee (typically 4-5% of gross sales) that Quiznos, in violation of the terms of plaintiffs' franchise agreements and representations in the UFOCs, uses for its own purposes, including selling more franchises to unwitting consumers and other purposes outside the contractually-defined use of the fees.

(e) Accept retail coupons from customers for free or highly-discounted food items for which franchisees receive no reimbursement from Quiznos and which therefore benefit Quiznos by increasing its sales of overpriced food while causing franchisees to purchase more food products that will generate

additional losses, at a cost typically of 6% of weekly sales—effectively increasing the contractually-defined advertising and marketing cost by this percentage.

(f) Under the mandate of a contractual duty to open the restaurant within 12 months of Quiznos' acceptance of the franchise agreement, authorize the lease of commercial property ill-suited for the success of the franchise given the economic structure of the brand under any conceivable estimates for the Average Unit Volumes ("AUVs") of a typical Quiznos restaurant.

(g) Limit what they charge the retail customer based on maximum pricing obligations imposed on them by Quiznos, which have the effect of squeezing the franchisees economically because they are obligated to pay Quiznos exorbitant costs for food on the front end and cannot charge enough on the retail end to stay afloat economically.

8. Quiznos furthers its schemes through other illegal acts and practices, including but not limited to:

(a) Saturating geographic areas with more franchises than the areas could reasonably support and purposefully pursuing a plan of encroachment to build the brand at the expense of those already operating.

(b) Selling franchises in specified "trade areas" which are arbitrarily defined by Quiznos without it having conducted any reasonable research into whether such trade areas can support even one Quiznos franchise, let alone the multiple franchises that Quiznos sells in a given trade area.

(c) Enforcing biased and discriminatory policies, procedures and practices (not applied equitably to all franchisees) for inspections and alleged "operational standards" designed to deliberately decrease or eliminate Quiznos' obligations to compensate franchisees for their purchase of various mandated products, while concurrently creating an environment designed to keep outspoken franchisees from speaking out or taking action against Quiznos' unfair, unethical, and deceptive business practices.

(d) Illegally obtaining releases for its past misconduct by requiring its franchisees to execute such releases in "ordinary course" business transactions or in situations where Quiznos uses its extraordinary power and control of the franchisee to economically compel the

franchisees' signature on the release through the exercise of duress.

(e) Using the power imbalance achieved through its one-sided franchise agreement to punish and deter outspoken franchisees through protracted legal proceedings.

9. In litigation, Quiznos has been forced to admit to making money in two ways: (a) through the receipt of royalties on the franchisees' weekly retail sales, typically 6-7 % of those sales; and (b) through the sale of Essential Goods to franchisees. While the obligation to pay royalties was disclosed to the plaintiffs, Quiznos never disclosed that it would purposefully impose an additional layer of costs (representing its own excessive profit) on the sale of Essential Goods, stating (as alleged above) the exact opposite in the UFOC. Unbeknownst to plaintiffs, for example, defendant American Food Distributors LLC has required in its vendor relationships since the time of its formation in 2000 that it be allowed to recognize sales revenue from its purported "wholesaling" of the Essential Goods. Or, as stated as recently as July 26, 2007 by William P. Flaherty, the former President of American Food Distributors LLC, Quiznos' food wholesaling affiliates "make[] a margin buying low and selling at a higher price rather than receiving a rebate." This approach is entirely inconsistent with Quiznos' promise that it would negotiate prices "for the benefit of franchisees" because the exclusive market addressed by the Quiznos affiliates, and which is the sole source of their profits, is made up exclusively of Quiznos franchisees.

10. Quiznos lures its franchisees into the system with false statements like "your success is our success," leading plaintiffs to believe that the system would have every incentive to keep operational costs for the franchised locations as low as possible. The Quiznos model actually supports the churning of restaurant owners because each time a franchise fails, the defendants benefit from a new franchisee being locked into the acquisition of Essential Goods at

inflated prices. Any modest interruption in the royalty stream from the failed franchisee is remedied by Quiznos' placement of a new franchisee unaware that Quiznos is really in the business of selling Essential Goods at an exorbitant profit. In essence, since 2000 Quiznos has been in the business of selling Essential Goods with secondary efforts being placed on restaurant operations and retail customer sales. In 2002—prior to execution of the scheme described below—Quiznos earned no revenue from the sale of Essential Goods; today Quiznos is essentially a food and equipment provisioning business.

11. Quiznos' real intent is perhaps best demonstrated by its pattern of behavior when the inevitable franchise failures come to pass. After a franchisee can no longer bear the ruinous financial losses caused by Quiznos' exploitation, the franchisee goes out of business—only to face Quiznos' threat of a lawsuit to enforce provisions of the franchise agreement that purport to make franchisees legally liable for payment of royalties over the entire 15-year term of the agreement, even though the franchisee has been forced out of business due to Quiznos' own conduct. While threatening the "stick" of a lawsuit to recover the present value of a 15-year royalty stream, Quiznos then seeks a signed, unconditional waiver of all rights from the franchisee, a "carrot" that makes sense to the threatened and beaten down franchisee but is later used to prevent the franchisee from seeking any legal redress against Quiznos.

12. Quiznos' efforts to exculpate itself from past misconduct extend beyond defunct franchisees. In a systematic pattern of conduct, Quiznos also extracts releases from those franchisees lucky enough to find a buyer for their distressed stores, placing the franchisees between the proverbial "rock and a hard place" by having to choose between: (a) retaining their legal rights at the price of keeping their failing stores open in a system economically rigged against the franchisee; or (b) selling their stores to a third party buyer and being required by

Quiznos to sign a "Consent to Transfer" that contains a release purporting to eliminate the franchisees' right to sue Quiznos for the very conduct that forced the sale in the first place. Franchisees in this position are under duress to execute such a release, because Quiznos is unwilling to permit them to extricate themselves from their failing businesses unless they do so.

13. As franchisees voluntarily or involuntarily remove themselves from the system, Quiznos then takes advantage of the failed store locations to facilitate the churning of new franchisees awaiting store locations into the same, now-vacant and often bankrupt locations. In the process, Quiznos creates second-generation (and, in some cases, third- and fourth-generation) franchisees with lower entry costs, as the new franchisees purchase the recovered equipment of the defunct franchisee, with Quiznos' assistance, from the lien-holding bank at pennies on the dollar. Quiznos thus suffers no loss and only a short-term interruption in royalties, while also meeting its obligation to provide locations to the excessive backlog of franchisees resulting from the illegal scheme set forth in the Bonanno Case (summarized above in Footnote No. 1). Then, having placed a store in the hands of a new and unwitting franchisee, Quiznos executes the same pricing and profit scheme against the new owner—actions that continue the illegal practice of increasing revenues on the backs of those with no control.

14. Quiznos' economic control over its franchisees is uncompromising. After locking its franchisees into the system, Quiznos and its agents purportedly "assist" the franchisee with a commercial lease for the soon-to-be-developed restaurant. Quiznos and its representatives do not reveal, however, that its agents often have economic relationships with the landlord and that the leases have been engineered with economic incentives favoring the salesman, the landlord and Quiznos. In this regard, the UFOC misleads the franchisee because it suggests the viability of a restaurant at the commercial range of rents specified when Quiznos knows, given the

economic model on which the whole franchise system is premised, that rent obligations in that range will lead to the failure of all but the busiest stores. Quiznos knows that its AUVs have been flat or falling since 2004, yet it continues to promote the execution of leases that effectively doom the franchisee to economic collapse. The long-term leases (10 to 15 years) entered into often ultimately result in the economic demise of the franchisees, because franchisees cannot make a profit under such onerous rent obligations and, when prudently deciding to close their doors to end the losses being incurred, they are left with a landlord suing them for breach of their lease obligations. This is a bitter irony for the franchisee given that Quiznos promotes its provision of assistance to franchisees in developing the appropriate real estate relationship to ensure the long-term financial viability of the store.

15. Quiznos also fails to properly disclose the costs associated with labor at the typical franchised location—in yet another effort to deflate the actual cost of operating a typical restaurant and induce franchisees into the system. Quiznos mandates that its franchisees staff the lunchtime "rush" (between 11 a.m. and 2 p.m.) with four employees and the dinner hour (between 5 p.m. and 8 p.m.) with at least two employees. Quiznos fails to disclose that the only way to meet Quiznos-defined "average" labor costs is by having the owner-operator work in the franchised location. The effect is to skew labor costs and misrepresent their actual impact on operations.

16. At the end of each week, the typical Quiznos operator sends approximately 21% of gross sales out the door—12% to Quiznos through the payment of royalties (7%) and marketing and advertising fees (5%), an additional 6% in discounts for the free food given away due to Quiznos' historical abuse of the coupon process, and at least another 3% (if not more) as inflated prices to its vendors for Essential Goods. To add insult to incredulity, the franchisee

then incurs labor costs far beyond what Quiznos represents they would cost under the Quiznos-mandated minimum personnel requirement, leaving the owner-operator with no choice but to "cut" labor costs by working 7 days a week in the store for free. From there, the franchisee services the bank loan that supported the original store build-out and the overpriced acquisition from defendant Source One Distribution LLC of the restaurant equipment needed to open. Finally, the franchisee pays its unrealistically high rent. The end result is economic disaster and explains why Quiznos' own data reflects the high level of financial distress in the franchise system throughout the United States. Quiznos, of course, has known all of this for years but the consumers who bought franchises from the company, including the representative plaintiffs in this action, were the last to know due to defendants' efforts to conceal the full story and to affirmatively mislead those buying into the system.

17. To redress the serious economic injury visited upon them, plaintiffs and the Class now bring this action alleging claims for: (a) violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962; (b) violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101 *et. seq.;* (c) breach of contract; (d) breach of the implied covenant of good faith and fair dealing; (e) unjust enrichment; (f) intentional misrepresentation ("Fraud in the Inducement"); (g) promissory fraud; (h) economic duress; (i) illusory contract; (j) breach of fiduciary duty; (k) declaratory judgment; and (l) violations of Colorado's "Civil Theft" statute, Colo. Rev. Stat. §18-4-405.

## JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which one or more of members of the putative class are

citizens of a state different from any one of the defendants. The Court also has subject matter jurisdiction of the RICO claims pursuant to 28 U.S.C. § 1331. Finally, the Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19. The Court has personal jurisdiction over each defendant pursuant to Colo. Rev. Stat. §§ 13-1-124(1)(a)(b) because they each transact business in the State of Colorado and have committed tortuous acts within this state. In addition, each defendant has purposefully directed its activities at residents of the State of Colorado and this litigation results from injuries that arise out of and relate to those activities. Defendants also maintain continuous and systemic business contacts with the State of Colorado. Defendants relied upon agents and representatives throughout the United States who maintained purposeful, continuous and systemic contacts with the State of Colorado to assist in the effectuation of the schemes alleged in this Amended Complaint, including Anthony Kruse, Don Lauria, Mike Wotten, Charlotte Russell, Larry McAllister, Scott Warren, Andy Klie, David Garagozzo, Charlie Riley, Justin Rokocki, Michael Newman, John Teza, Josh Beyer, Sue Schaeffer, Rob Schmidt, Kyle Gjersee, Dianne Moreland, Kevin Casey, Bill Alley, John Lubarsky, Jeff Humphrey, David Bloom, Randy Trotter, Tom Sturkie, Larry Sapp, Steve Rodgers, Dave Wagner, John Hajj. At all times material, these individuals acted as the agents and representatives of Quiznos, such that their conduct is attributable to one or more of the defendants.

20. Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) and (b), the nationwide venue provisions of RICO. Alternatively, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this judicial district.

## PARTIES

**The Plaintiffs**

21. Plaintiffs Bonnie Brunet and Martin Rist (the "Brunet-Rists") are husband and wife and citizens of California. They reside at 181 Blessing Lane, Bonny Doon, California 95060. The Brunet-Rists operate a Quiznos franchise in Augusta, Maine, along with plaintiff Joseph Gibson, their business partner. The Brunet-Rists are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

22. Plaintiff Joseph Gibson ("Gibson") is a citizen of Maine. He resides at 393 Broadway, Rockland, Maine 04841. Gibson operates a Quiznos franchise in Augusta, Maine with the Brunet-Rists. Gibson is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

23. On or about June 25, 2004, the Brunet-Rists and Gibson formed a Maine limited liability company called J&D Quality Enterprises LLC ("J&D"), which has its principal place of business at 99 Bangor, Augusta, Maine 04330. On or about July 30, 2004, defendant Quizno's Franchising LLC and J&D executed a franchise agreement for the operation of Quiznos Store No. 7881, located at 99 Bangor Street, Augusta, Maine 04330. That day, these same parties executed a second franchise agreement for the operation of Quiznos Store No. 7882, which Quiznos and J&D agreed would be located in Rockland, Maine. This second store is still not open even though J&D paid the franchise fee to Quiznos. It is a SNO as defined above in this Amended Complaint.

24. Plaintiff Bradley P. Shelton ("Shelton") is a citizen of Colorado. He resides at 858 Downing Street, Denver, Colorado 80218. On or about December 13, 2001, defendant The

Quizno's Franchise Company LLC f/k/a The Quizno's Corporation and Shelton executed a franchise agreement for the operation of Quiznos Store No. 3020, located at 8770 Wadsworth Blvd., Unit T, Arvada, Colorado 80003.

25. On or about February 7, 2002, Shelton formed a Colorado corporation called BPS Enterprises, Inc. ("BPS"), which has its principal place of business at 858 Downing Street, Denver, Colorado 80218. On or about April 26, 2002, Quiznos and Shelton entered into an agreement assigning Shelton's rights and obligations under the franchise agreement to BPS.

26. Plaintiffs Michael J. Campbell and Patty Campbell (the "Campbells") are husband and wife and citizens of Colorado. They reside at 20460 E. Costilla Avenue, Centennial, Colorado 80016. In or about March 2003, defendant Quizno's Franchising LLC and the Campbells executed a franchise agreement for the operation of Quiznos Store No. 5109, located at 16495 E. 40th Circle, Quiznos Suite B, Aurora, Colorado 80011.

27. In or about February 2003, the Campbells formed a Colorado corporation called Fresh Perspectives, Inc. ("Fresh Perspectives"), which has its principal place of business at 16495 E. 40th Circle, Quiznos Suite B, Aurora, Colorado 80011. The Campbells use Fresh Perspectives to operate the Quiznos restaurant referenced above. Fresh Perspectives is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

28. Plaintiffs Thomas Haywood and Jason Haywood (the "Haywoods") are father and son, respectively, and citizens of New York. They reside at 29 Ashworth Court, Amherst, New York 14228. On or about September 16, 2003, defendant Quizno's Franchising LLC and the Haywoods executed a franchise agreement for the operation of Quiznos Store No. 5826, located at 3868 E. Robinson Road, Amherst, New York 14228.

29. On or about October 3, 2003, the Haywoods formed a New York corporation called Jason Thomas, Inc. d/b/a Quiznos Sub ("Jason Thomas"), which has its principal place of business at 3868 E. Robinson Road, Amherst, New York 14228. Until they closed their store, the Haywoods used Jason Thomas to operate the Quiznos restaurant referenced above. Jason Thomas is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

30. On or about August 31, 2004, Jason Thomas executed a franchise agreement for the operation of Quiznos Store No. 7970. This store never opened and constituted a SNO. In or about April 2007, Jason Thomas and Quiznos reached a resolution of the issues related to the SNO through the execution of a "Termination and Release Agreement" and Quiznos' return of the $20,000 franchise fee paid for that store. In inducing the Haywoods and Jason Thomas to sign the termination agreement, Michael R. Daigle, then the Executive Vice President-Development for Quiznos ("Daigle"), represented in a March 1, 2007 e-mail that the agreement "contains a release, but the release is limited to claims under this particular agreement." For these reasons, the Haywoods and Jason Thomas seek relief in this litigation solely in relation to Quiznos' conduct involving Store No. 5826.

31. Plaintiffs Daniel S. Kessels ("Kessels") and Phuong T. Nguyen ("Nguyen") (collectively "Kessels-Nguyen") are citizens of Colorado and business partners. Plaintiff Kessels resides at 3696 WCR 6, Erie, Colorado 80516. Plaintiff Nguyen resides at 2557 West 108th Place, Westminster, Colorado 80234. On or about March 20, 2002, defendant The Quizno's Franchise Company LLC f/k/a The Quizno's Corporation and Kessels-Nguyen executed a franchise agreement for the operation of Quiznos Store No. 3309, located at 3040 28th Street, Boulder, Colorado 80301.

32. On or about January 3, 2005, Kessels-Nguyen formed a Colorado corporation called Grateful D, Inc. ("Grateful D"), which has its principal place of business located at 3040 29th Street, Boulder, Colorado 80301. Kessels-Nguyen use Grateful D to operate the Quiznos restaurant referenced above. Grateful D is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

33. Plaintiffs John McCarthy ("McCarthy") and Jonathon Sequeira ("Sequeira") (collectively "McCarthy-Sequeira") are father-in-law and son-in-law, respectively, and citizens of Florida. McCarthy resides at 7305 S.E. Seagate Lane, Stuart, Florida 34997. Sequeira resides at 1147 S.E. Kirk Street, Stuart, Florida 34997. On or about October 20, 2001, defendant The Quizno's Franchise Company LLC f/k/a The Quizno's Corporation and McCarthy-Sequeira, along with McCarthy's son Brian McCarthy, executed a franchise agreement for the operation of Quiznos Store No. 2714, eventually located at 101 U.S. Highway 1, North Palm Beach, Florida 33408. Quiznos' agent who sold the franchise, Charlotte Russell ("Russell") falsely represented to McCarthy-Sequeira, in an effort to induce the sale, that they would be able to operate a store in Jupiter, Florida, which did not materialize because, as Russell knew at the time, Jupiter had placed a moratorium on fast food stores.

34. On or about September 11, 2003, McCarthy-Sequeira, along with their respective spouses, formed a Florida limited liability company called McJon LLC ("McJon"), which initially maintained its principal place of business at 300 A1A, Suite 0-306, Jupiter, Florida 33477 and later maintained it at 7305 S.E. Seagate Lane, Stuart, Florida 34997. Until they closed the store in October 2005, McCarthy-Sequeira used McJon to operate the Quiznos restaurant referenced above.

35. On or about March 30, 2004, defendant Quizno's Franchising LLC and McJon executed a franchise agreement for the operation of Quiznos Store No. 6973. This store has never opened and constitutes a SNO. When McCarthy formally requested a return of the $20,000 franchise fee paid by McJon, Quiznos refused to return the franchise fee in full and sought a voluntary termination of the franchise agreement and execution of a release that would purport to release Quiznos for all past conduct. Neither McJon nor McCarthy-Sequeira signed the release and they intend to pursue their legal interests in relation to the SNO as members of the putative class in the Bonanno Case.

36. Plaintiff James M. Tully ("Tully") is a citizen of Massachusetts. He resides at 203 6th Street, Apartment No. 3, Leominster, Massachusetts 01453. Tully is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct as alleged herein.

37. On or about December 2, 2002, Tully formed a Massachusetts corporation called Kind of Blue, Inc. ("Kind of Blue"), which at all times relevant maintained its principal place of business at 89 Whalon Street, Fitchburg, Massachusetts 01420. On or about December 18, 2002, defendant Quizno's Franchising LLC and Kind of Blue executed a franchise agreement for the operation of Quiznos Store No. 4670, located at 89 Whalon Street, Fitchburg, Massachusetts 01420. Tully and Kind of Blue closed their store on or about February 2, 2007.

38. Plaintiffs David M. Pollock and Tina Pollock (the "Pollocks") are husband and wife and citizens of Missouri. They reside at 1344 Westhampton Woods Court, Chesterfield, Missouri 63005. Plaintiff Nicholas J. Pollock ("Nick Pollock") is their son; Nick Pollock is a citizen of Missouri. He resides at 1721 Marsha Lane, Maryland Heights, Missouri 63043. The Pollock Plaintiffs (e.g., the Pollocks and Nick Pollock) are proper party plaintiffs to this action

because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

39. On or about August 7, 2001, the Pollock Plaintiffs formed a Missouri limited liability company called Westhampton Enterprises LLC ("Westhampton"), which has its principal place of business at 1344 Westhampton Woods Court, Chesterfield, Missouri 63005. On or about October 26, 2001, defendant The Quizno's Franchise Company LLC f/k/a The Quizno's Corporation and Westhampton executed a franchise agreement for the operation of Quiznos Store No. 630, located at 12113 Manchester Road, Crystal Lake Park, Missouri 63131.

40. Plaintiffs Thomas Merry and John Merry (collectively the "Merry Plaintiffs") are father and son, respectively, and are citizens of Washington. Thomas Merry resides at 7414 5th Avenue N.E., Seattle, Washington 98115. John Merry resides at 15223 14th Avenue N.W., Gig Harbor, Washington 98332. On or about May 6, 2004, defendant Quizno's Franchising LLC and the Merry Plaintiffs executed a franchise agreement for the operation of Quiznos Store No. 7416, located at 412 N.E. 70th Street, Seattle, Washington 98115. The Merry Plaintiffs are proper party plaintiffs in this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

41. On or about April 29, 2004, the Merry Plaintiffs formed a Washington limited liability company called Msquared 1, Inc. ("Msquared"), which has a principal place of business of 7403 Lakewood Drive, Lakewood, Washington 98499. On or about July 23, 2004, Quiznos and the Merry Plaintiffs entered into an agreement assigning the Merry Plaintiffs' rights and obligations under the franchise agreement to Msquared. The Merry Plaintiffs sold their store to a third-party buyer on or about June 12, 2006 for $1.

42. Plaintiff John E. Virgili ("Virgili") is a citizen of Ohio who resides at 1023 Riviera Way, Macedonia, Ohio 44056. On or about October 22, 2003, defendant Quizno's Franchising LLC and Virgili, along with Virgili's business partner Greg Grandillo, executed a franchise agreement for the operation of Quiznos Store No. 5992, located at 34851 Euclid Avenue, Willoughby, Ohio 44094. That day, these same parties executed a second franchise agreement for the operation of Quiznos Store No. 5993. This second store is still not open and constitutes a SNO. Virgili intends to pursue his interests related to the SNO as a member of the putative class in the Bonanno Case.

43. On or about October 9, 2003, Virgili, along with Grandillo, formed an Ohio corporation called Universal Foods, Inc. ("Universal"), which had its principal place of business at 34851 Euclid Avenue, Willoughby, Ohio 44094. Virgili used Universal to operate the Quiznos restaurant referenced above. Universal is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

44. Plaintiffs David M. Ronan ("Ronan") and Terrance M. Casey ("Casey") (collectively "Ronan-Casey") are business partners and citizens of Texas. Ronan resides at 13204 Woodhaven Drive, Farmers Branch, Texas 75234. Casey resides at 13204 Woodhaven Drive, Farmers Branch, Texas 75234. On or about May 8, 2000, defendant The Quizno's Franchise Company LLC f/k/a The Quizno's Corporation and Casey executed a franchise agreement for the operation of Quiznos Store No. 1708. Shortly thereafter, Quiznos and Casey entered into an agreement assigning Casey's rights and obligations under the franchise agreement to plaintiff Wave Dancer Holdings LLC. Ronan-Casey are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

45. On or about May 19, 2000, Ronan-Casey formed a Texas limited liability company called Wave Dancer Holdings LLC ("Wave Dancer"), which has its principal place of business at 9205 Skillman Street, Suite 112, Dallas, Texas 75243. Ronan-Casey use Wave Dancer to operate the franchise restaurant referenced above and those identified elsewhere in this paragraph. On or about July 17, 2000, Quiznos and Wave Dancer executed a franchise agreement for the operation of Quiznos Store No. 565, located at 1101 Melbourne Road, Hurst, Texas 76053. On or about October 1, 2001, Quiznos and Wave Dancer executed another franchise agreement for the operation of Quiznos Store No. 2747. This store never opened and constitutes a SNO. Wave Dancer and Ronan-Casey intend to pursue their interests related to the SNO as a member of the putative class in the Bonanno Case.

46. Plaintiffs Carolyn Peddy and Mikki Lucas f/k/a Mikki Peddy (collectively the "Peddy Plaintiffs") are mother and daughter, respectively, and citizens of Georgia. Carolyn Peddy resides at 3848 Welham Green Court, Douglasville Georgia, 30135. Mikki Lucas resides at 24 Honeysuckle Drive, Villa Rica, Georgia 30180. The Peddy Plaintiffs are proper party plaintiffs to this action because they have suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

47. On or about May 28, 2003, the Peddy Plaintiffs formed a Georgia limited liability company called CMC Enterprise Partners LLC ("CMC"), which at all times relevant maintained a principal place of business at 3848 Welham Green Court, Douglasville, Georgia 30135. On or about May 22, 2003, defendant Quizno's Franchising LLC and CMC executed a franchise agreement for the operation of Quiznos Store No. 5348, located at 2495 East West Connector, Austell, Georgia 30106. The Peddy Plaintiffs and CMC closed their store on January 29, 2007.

48. Plaintiff Brian Curl ("Curl") is a citizen of Kentucky. He resides at 8103 Keira Ridge Court, Louisville, Kentucky 40291. On or about July 12, 2004, defendant Quizno's Franchising LLC and Curl executed a franchise agreement for the operation of Quiznos Store No. 7900, located at 10234 Westport Road, Louisville, Kentucky 40241.

49. On or about February 28, 2005, Curl formed a Kentucky limited liability company called BN&N Enterprises LLC ("BN&N"), which at all times relevant maintained a principal place of business at 8103 Keira Ridge Court, Louisville, Kentucky 40291. Until he sold the store on November 30, 2005, Curl used BN&N to operate the Quiznos restaurant referenced above. BN&N is a proper party plaintiff in this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

50. Plaintiff, Robert Hampshire ("Hampshire") is a citizen of Florida. He resides at 2533 Ascot Court, Kissimmee, Florida 34744. On or about March 11, 2004, defendant Quizno's Franchising LLC and Hampshire, along with this brother Kenneth Hampshire, executed a franchise agreement for the operation of Quiznos Store No. 6980, located at 515 Kissimmee Park Road, St. Cloud, Florida 34769-1542. Hampshire is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

51. On or about March 25, 2004, Hampshire and his brother formed a Florida limited liability company called Two Wisconsin Boys LLC ("Two Wisconsin Boys"), which had its principal place of business at 515 Kissimmee Road, Saint Cloud, Florida 34769. On or about April 16, 2004, Quiznos and Hampshire, along with his brother, entered into an agreement assigning Hampshire's (and his brother's) rights and obligations under the franchise agreement to Two Wisconsin Boys. On or about March 25, 2005, Kenneth Hampshire transferred his interest in Quiznos Store No. 6980 to Hampshire. Until he sold the store on or about February

26, 2007, Hampshire used Two Wisconsin Boys to operate the Quiznos restaurant referenced above.

52. Plaintiff Matthew Haas is a citizen of Florida. He resides at 1525 S.W. 13th Court, Fort Lauderdale, Florida 33312. On or about July 2, 2004, defendant Quizno's Franchising LLC and Haas executed a franchise agreement for the operation of Quiznos Store No. 7865, located at 1211 North Federal Highway, Deerfield Beach, Florida 33441. Haas is a proper party plaintiff to this action because he has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

53. On or about August 24, 2005, Haas, along with his wife, formed a Florida corporation called QP Enterprises, Inc. ("QP"), which at all times relevant maintained a principal place of business of 1326 S.E. 17th Street, Box 217, Fort Lauderdale, Florida 33316. In or about January 2006, Quiznos and Haas entered into an agreement assigning Haas' rights and obligations under the franchise agreement to QP. Until Haas closed his store on September 26, 2006, he used QP to operate the Quiznos restaurant referenced above.

**The Defendants**

54. Defendant The Quizno's Franchise Company LLC f/k/a The Quizno's Corporation ("TQFC") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQFC, in its own right and as the successor to the rights and liabilities of The Quizno's Corporation and The Quizno's Franchise Company, was the franchisor for Quiznos franchises granted prior to July 2002. TQFC sold franchises to Shelton, Kessels-Nguyen, McCarthy-Sequeira, Westhampton, Casey, and Wave Dancer. During the time it served as the franchisor, TQFC did substantial business within Colorado and is therefore amenable to personal jurisdiction in Colorado.

55. Defendant Quizno's Franchising LLC ("QF") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QF, an affiliate of TQFC, was the franchisor for Quiznos franchises granted between July 2002 and February 2005. QF sold franchises to J&D, the Campbells, the Haywoods, McJon, Kind of Blue, the Merrys, Virgili, CMC, Curl, Hampshire, and Haas. During the time it served as the franchisor, QF did substantial business within Colorado and is therefore amenable to personal jurisdiction in Colorado.

56. Defendant Quizno's Franchising II LLC ("QFII") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QFII has sold Quiznos franchises since February 2005. QFII acts as the current franchisor responsible for franchise relations (in conjunction with defendant TQSC II LLC) and is a wholly-owned subsidiary of defendant QFA Royalties LLC. QFII does substantial business within Colorado and is amenable to personal jurisdiction in Colorado.

57. Defendant QFA Royalties LLC ("QFA") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. In November 2004, TQFC and QF transferred all rights and liabilities they maintained in then-existing franchise agreements to QFA, which left QFA as the franchisor for all Quiznos franchise agreements entered into before the effective date of transfer. QFA is a wholly-owned subsidiary of defendant QIP Holder LLC. QFA does substantial business within Colorado and is amenable to personal jurisdiction in Colorado.

58. Defendant The Quizno's Master LLC ("TQM") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. From May 2002 until November 2004, TQM owned Quiznos' intellectual

property, including its trademarks, copyrights, and confidential information. During this period, TQM licensed this intellectual property to the various Quiznos entities in their operation and control of the Quiznos franchise system. In addition, TQM was at certain times material the parent of TQFC and an affiliate of QF. It is named as a defendant because it has benefitted financially from the illegal schemes outlined in this Amended Complaint in that its licensed intellectual property has routinely been used by Quiznos as a means to legitimize overcharging franchisees for the Essential Goods. TQM also owns defendant American Food Distributors LLC. Defendant TQM does substantial business within Colorado and is amenable to personal jurisdiction in Colorado.

59. Defendant QZ Finance LLC ("QZF") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Defendants used QZF as a vehicle to obtain a $250 million loan on which to assist Quiznos in its ongoing fraudulent scheme to grow the brand nationally; in this process, defendants used QZF as the financing entity for the securitization of its future royalties from franchisees. For a limited period of time in or about February 2005, QZF obtained by assignment all rights and liabilities in the franchise agreements previously executed by TQFC and QF to facilitate that securitization. Defendant QZF does substantial business within Colorado and is amenable to personal jurisdiction in Colorado.

60. Defendant QIP Holder LLC ("QIP") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. In November 2004, TQM transferred its interests in Quiznos' intellectual property to QIP. Like its predecessor TQM, defendant QIP has benefitted financially through the abuse of its licensing rights in Quiznos' intellectual property. QIP owns all of the membership units in QFA, which,

along with QFII, oversees franchise relations for the Quiznos Brand. Defendant QIP does substantial business within Colorado and is amenable to personal jurisdiction in Colorado.

61. Defendant TQSC II LLC f/k/a TQSC LLC ("TQSC II") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Franchisors QFII and QFA maintain "Service Agreements" with TQSC II as they did with TQSC LLC, TQSC II's predecessor-in-interest. Pursuant to those agreements, QFII and QFA rely on TQSC II to perform their obligations under the franchise agreements to which they are a party. In addition, TQSC II acts as the franchise sales agent for QFII for which it is purportedly paid a fee. Defendant TQSC II does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

62. Defendant QCE Holding LLC ("QCE Holding") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. In its February 1, 2008 FDD, QFII identifies QCE Holding as the "ultimate parent" of QFII and its affiliates. Upon information and belief, the majority interest in QCE Holding is owned or controlled by defendants The Cervantes Holding Company, Cervantes Capital LLC, and/or Cervantes Master LLC (collectively the "Cervantes Defendants") or affiliates of the Cervantes Defendants. Minority equity positions in QCE Holding are held by non-parties J.P. Morgan Partners, J.P. Morgan Partners Global Investors, L.P., J.P. Morgan Partners Global Investors (Selldown), L.P., and TurnWorks, Inc. (collectively "J.P. Morgan"), which in turn rely on non-party CCMP Capital Advisors LLC to manage their equity interest. Defendant QCE Holding does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

63. Defendant QCE Incentive LLC ("QCE Incentive") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202.

QCE Incentive manages a stock option plan designed to retain and reward certain Quiznos employees, officers, directors and other persons involved in operating QCE Holding and to align the interests of those individuals with those holding equity positions in QCE Holding and its affiliates. QCE Incentive is controlled by the board of directors of QCE Holding and is owned, directly or indirectly, by one or more of the Cervantes Defendants and J.P. Morgan. The company is structured to allow for the redemption of ownership units in the Quiznos brand if those in control of Quiznos choose to participate in a liquidity event resulting in the sale of the brand to the public market or to other non-party private equity firms. Defendant QCE Incentive does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

64. Defendant QCE Finance LLC ("QCE Finance") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. QCE Finance is the sole and controlling member of defendant QCE LLC, which in turn controls the day-to-day operations of the Quiznos brand and those entities and affiliates responsible for such operations in the United States and Canada. Defendant QCE Finance does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

65. QCE LLC ("QCE") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. QCE is a consolidated holding company that owns all of the businesses that comprise the Quiznos brand, including, without limitation, all of the corporate defendants named in this action except the Cervantes Defendants, QCE Holding, QCE Incentive, and QCE Finance. Defendant QCE does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

66. Defendant American Food Distributors LLC ("AFD") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado

80202. AFD purports to serve as a wholesaler of Quiznos' branded and nonbranded restaurant products to unaffiliated distributors who in turn sell the products to plaintiffs and the Class pursuant to mandatory supply obligations imposed on the franchisees by Quiznos through the franchise agreements. AFD also leases fountain and bubble equipment for carbonated beverages to Quiznos franchisees under a mandatory supply agreement with PepsiCo., Inc. ("Pepsi"). Defendant TQM owns all of the membership units in AFD. Defendant AFD does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

67. Defendant Source One Distribution LLC f/k/a National Restaurant Supply Distribution LLC ("Source One") is a Delaware limited liability company with its principal place of business at 540 Gallatin Place N.W., Albuquerque, New Mexico 87121. Source One sells restaurant equipment and building materials, architectural services, third party point-of-sale and credit card processing systems, uniforms, supplies, printing and other services to plaintiffs and the Class pursuant to mandatory supply obligations imposed on the franchisees by Quiznos through the franchise agreements. Defendant S&S Equipment Company LLC now owns all of the membership units in Source One; until that recent change S&S Equipment Company LLC was a joint venturer in Source One with National Restaurant Supply, Inc., a non-party unaffiliated with Quiznos. Source One works in conjunction with defendants Ba-Bing! LLC and Kinetic Sourcing Solution LLC in providing products and services to plaintiffs. Defendant Source One does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

68. Defendant S&S Equipment Company LLC ("S&S Equipment") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. Upon information and belief, S&S Equipment is owned by defendant Richard

F. Schaden and non-party Restaurant Retail Management LLC, which is controlled by defendant Richard E. Schaden and non-party The Sandwich Trust. Defendant S&S Equipment does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

69. Defendant Ba-Bing! LLC f/k/a Source One Systems LLC ("Ba-Bing") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. Ba-Bing sells non-party point-of-sale cash registers and credit card processing systems to plaintiffs and the Class pursuant to mandatory supply obligations imposed on the franchisees by Quiznos through the franchise agreements. Defendant Ba-Bing does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

70. Defendant Chain Management Systems LLC ("Chain Management") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. It owns all of the membership units in Ba-Bing and has benefited financially from its association in the scheme outlined in this Amended Complaint. The membership units in Chain Management are owned by non-parties RFS Investments LLC (controlled by defendant Richard F. Schaden), PEM LLC (controlled by defendant Patrick E. Meyers), Leading Brands LLC (now known as defendant Source One LLC), FHS LLC (controlled by Frederick H. Schaden, the brother of defendant Richard E. Schaden), and Quiznos' former Chief Financial Officer John Gallivan. Defendant Chain Management does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

71. Defendant Kinetic Sourcing Solutions LLC f/k/a U.S. Fulfillment LLC ("Kinetic Sourcing") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. Kinetic Sourcing is the official supplier of store products and services used by Quiznos franchisees, including such things as office supplies,

payroll services, pest control services through Terminix, logo wear, payroll processing services through ADP, laundry and cleaning services through Cintas, and promotional items. It is owned by non-parties Restaurant Retail Management LLC (controlled by defendant Richard E. Schaden) and RFS Investments LLC (controlled by defendant Richard F. Schaden). Defendant Kinetic Sourcing does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

72. Defendant Continental Lending Group LLC ("Continental Lending") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. From March 2002 until August 2007, Continental Lending maintained a contract with Muzak® LLC for the mandatory provision of music to Quiznos franchised restaurants. Continental Lending assigned that contract to TQSC II in or about August 2007. Continental Lending also engaged in lending money to franchisees. Defendant Continental Lending does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

73. Defendant CLG Leasing LLC ("CLG") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. At all times relevant, CLG served as the mandatory leasing agent of certain point-of-purchase cash register systems to Quiznos' franchisees, including the Aloha and QPOS systems. Continental Lending owns all of CLG's membership units. CLG also leased credit card processing machines to the franchisees. Defendant CLG does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

74. Defendant QAFT, Inc. ("QAFT") is a Delaware corporation with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. QAFT is trustee to the

national, regional and local advertising funds collected by Quiznos from its franchisees on a weekly basis, including the "National Marketing Fund Trust" and the "Regional Advertising Program Trust." Its predecessor trustees were defendants TQFC and TQM. Defendant QAFT does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

75. Defendant Richard E. Schaden ("Rick Schaden") is an adult citizen of Colorado who resides at 10563 E. Goosehaven Drive, Lafayette, Colorado 80026. Rick Schaden is the Chairman of QFII's board of directors and served as the Chief Executive Officer of QFII, QFA and TQSC II from February 2005 until January 2007. He served QF in this capacity from July 2002 until January 2007 and TQFC in this capacity from October 2000 until January 2007. Rick Schaden also held this position with TQFC's predecessors from their creation in 1991 until June 2002. He has served Quiznos and its affiliates in other employment and ownership capacities over the years. In addition, Rick Schaden is the Chief Executive Officer of defendant Cervantes Capital LLC and, upon information and belief, maintains ownership interests in and employment relationships with each of the Cervantes Defendants. Rick Schaden also maintains control over non-parties DG Trust, RES Glacier Trust, Restaurant Retail Management LLC and The Sandwich Trust, which, upon information and belief, have served as repositories for the monies obtained illegally through the conduct outlined in this Amended Complaint.

76. Defendant Richard F. Schaden ("Dick Schaden") is an adult citizen of Colorado who resides at 800 South 68th Street, Boulder, Colorado 80303-4336. Dick Schaden is an attorney specializing in aviation litigation. Between 1991 and the present, he has served as a member of the board of directors of TQFC and its predecessors, QF, and QFII. He is the father of Rick Schaden and with his son acquired the Quiznos brand in 1991. Upon information and belief, Dick Schaden maintains ownership interests in and employment relationships with each

of the Cervantes Defendants. Dick Schaden also maintains control over non-parties DG Trust, RFS Northern Tier Trust, RFS Investments LLC and The Sandwich Trust, which, upon information and belief, have served as repositories for the monies obtained illegally through the conduct outlined in this Amended Complaint.

77. Defendant Patrick E. Meyers ("Meyers") is an adult citizen of Colorado who resides at 2576 South Milwaukee Street, Denver, Colorado 80210-6215. Meyers is a college friend of Rick Schaden who, by training, is an attorney. From 1991 until 1997, Meyers worked in private practice in Denver. From January 1993 until June 2002, Meyers served TQFC as a director; he has been a director of QFII since its formation. Over the years, he has served the Quiznos brand as General Counsel and as the officer responsible for finance, planning and support. Upon information and belief, Meyers owns stock and/or membership units in one or more of the Cervantes Defendants. Meyers is an officer authorized to conduct business on behalf of the Cervantes Defendants and is the sole director of defendant The Cervantes Holding Company.

78. Defendant Steven B. Shaffer ("Shaffer") is an adult citizen of Colorado who resides at 1840 East Cedar Avenue, Denver, Colorado 80209. Shaffer served TQFC, QF and QFII as their President from February 2004 until November 2006. From July 2002 to February 2004, Shaffer worked as the Executive Vice President of Brand Expansion for TQFC and QF, overseeing many of the illegal sales practices outlined in this Amended Complaint. Shaffer moved to Denver from St. Louis in October 2000 when he assumed the role of Vice President of Franchise Support Services. Shaffer worked for TQFC in a number of positions from St. Louis during the period October 1998 until his move to Denver in October 2000. Shaffer started with Quiznos in 1992 as a franchisee and became an Area Director in the St. Louis market in 1996.

79. Defendant The Cervantes Holding Company ("Cervantes Holding") is a Delaware corporation with its principal place of business at 1515 Arapahoe Street, Tower One, Tenth Floor, Denver, Colorado 80202. Cervantes Holding is under common control with the Quiznos entities and has acted in concert with them. Defendants consider Cervantes Holding to be an affiliate of Quiznos for certain purposes. Upon information and belief, Cervantes Holding maintains a majority interest in one or more Quiznos entities, including QCE Holding. Defendant Cervantes Holding does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

80. Defendant Cervantes Capital LLC ("Cervantes Capital") is a Delaware limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, Tenth Floor, Denver, Colorado 80202. Cervantes Capital is under common control with the Quiznos entities and has acted in concert with them. Upon information and belief, Cervantes Capital maintains a majority interest in one or more Quiznos entities, including QCE Holding. Defendant Cervantes Capital does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

81. Defendant Cervantes Master LLC ("Cervantes Master") is a Delaware limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, Tenth Floor, Denver, Colorado 80202. Cervantes Master is under common control with the Quiznos entities and has acted in concert with them. Upon information and belief, Cervantes Master maintains a majority interest in one or more Quiznos entities, including QCE Holding. Defendant Cervantes Master does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

82. Defendant Quiznos Finance LLC ("Quiznos Finance") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Denver, Colorado 80202. Upon information and belief, Quiznos Finance owns an equity position in QCE Holding along with Cervantes Master. Defendant Quiznos Finance does substantial business in Colorado and is amenable to personal jurisdiction in Colorado.

83. Quiznos represents in its UFOC that "there is common control of all entities in the QUIZNOS system." These entities, only some of which are named as defendants in this action, also share common officers and directors. In this Amended Complaint, the term "Quiznos" refers to the web of affiliated companies, corporations and limited liability companies that, acting together or separately, control and manage the business of the Quiznos franchise system.

84. The individual defendants named in this lawsuit, along with non-parties John Fitchett, John Gallivan, Brooksy Smith, Bob Viviano, Scott O'Hara, Amy Powers, Michael Daigle, Carri Bryan, Dominick Voso, William Flaherty, Vance Fouraker, Lewis Rudnick, John Teza, Eli Chediak, and others, known and unknown, are the principal architects of the illegal behavior alleged in this Amended Complaint. In their business dealings, all of these individuals have historically engaged in obfuscation and deceptive behavior designed solely to promote their own individual gain or that of the masters they serve. Through the exercise of their control and manipulation of the Quiznos' corporate hierarchy, the named individual defendants have personally made hundreds of millions of dollars on the backs of the plaintiffs and all others similarly situated throughout the United States.

## GENERAL ALLEGATIONS

**Building and Selling an Empire**

85. In 1991, defendants Rick Schaden and Dick Schaden acquired the Quiznos brand. At the time, there were eighteen stores in the Denver metropolitan area and the Schadens owned five of them. In 1992, the Schadens began to work with defendant Shaffer, who initially was a franchisee in St. Louis, Missouri and later would develop that area into one of the largest Quiznos markets in the United States as an Area Director. The zealous, deceptive and highly scripted sales regimen used by Shaffer in St. Louis would become the standard by which Quiznos would later grow the brand nationally.

86. By 1994, *Nation's Restaurant News* had named Quiznos a "Hot Concept," which put the company on the map as an emerging brand. The Schadens needed cash to grow the brand and from 1994 until 2001 Quiznos operated as a public company. Growing incrementally, the company had 100 restaurants in the United States by 1996 and 1000 stores worldwide by 2000. Having worked with the brand as a director of TQFC since 1993, defendant Meyers formally joined the company in 1997 at the invitation of his friend Rick Schaden. From 1997 to the present, Meyers has played an integral role in devising and implementing the schemes alleged in this Amended Complaint and which continue to this day.

87. In 2000, with the Schadens and Meyers believing it was in their best interest to take the company private again, Quiznos provided its public shareholders an opportunity to tender their common shares for $8.50/share. Ninety-five (95) percent of the outside shareholders challenged the price and a group of Quiznos investors participated in dissenters' rights litigation in Colorado seeking a determination of the "fair value" of the Quiznos stock. Presiding over the stock purchase dispute, Denver District Judge Robert L. McGahey, Jr. concluded that Quiznos

"acted in bad faith in its insistence that $8.50 a share was a 'fair value'" and set the price at $32.50/share. In his ruling, Judge McGahey found that Quiznos' proxy statement to its shareholders was "an exercise in obfuscation." The Schadens and Meyers have historically directed these same obfuscatory practices at the Quiznos franchisees.

88. At or near the time Quiznos began to implement its plan to repurchase its publicly-held stock at the fraudulent price, the Schadens, Meyers, certain members of the Schaden Family, and others known and unknown (the "Schaden Ownership Group") developed and began to implement, with the assistance of some or all of the individuals identified in paragraph 84, the scheme at issue in this litigation. First, knowing the feud with the disgruntled public shareholders would eventually come to an end, the Schaden Ownership Group set out to build a privately-held national brand. For this the Schadens and Meyers brought in a "closer" (Shaffer) who through a scripted, slick and fraudulent sales presentation had built Quiznos' St. Louis Market into one of the largest in the United States. In order to build a national brand, defendants knew they needed someone with solid sales credentials, but who was willing to exceed the boundaries of the law in order to achieve growth and oversee new store sales, and no one fit the role better than Shaffer. Second, with an increased number of franchisees, Quiznos saw an opportunity to capitalize on a growing marketing and advertising fund, which the franchise agreement obligated the franchisees to build with a payment of 4-5% of their weekly sales. Ignoring its promise that most of the fund would be dedicated to local advertising, Quiznos used the fund to implement a national branding campaign; it also used the fund improperly to sell franchises to perpetrate more growth. Finally, the Schaden Ownership Group saw an opportunity to create and control a captive market in which they could capture additional profits from the plaintiffs by acting as the "supplier" of Essential Goods. In so doing, they

created AFD and, later Source One, Ba-Bing, Kinetic Sourcing, Continental Lending, CLG, S&S Equipment, and others for the sole and exclusive purpose of extracting an extra layer of profit from franchisees under the guise of a legitimate function in the franchise system.

89. In April 2002, as the dissenters' rights case worked its way through the Colorado court system, the company's board of managers authorized a plan to grow the brand in all 50 states without regard to how that growth would affect existing franchisees, ignoring whether the market would support development at the rate contemplated. The franchise agreement, the board learned, would purportedly allow Quiznos to impose upon existing franchisees a growth at any cost mentality, to encroach on the stores operated by those franchisees, and to avoid any need to provide "conflict procedures" to resolve disputes between franchisees with respect to geographic encroachment. By January 2003, with the aggressive sales plan well underway, encroachment issues had become a weekly if not daily issue for the company as franchisees began to complain about the erosion of sales. Quiznos ignored the concerns and Shaffer's staff internally ridiculed employees who expressed a desire to address them.

90. That same year, defendants created Source One which, with AFD providing food and related restaurant supplies, would serve as the primary conduit by which all franchisees would be obligated to acquire the equipment necessary to open and operate a Quiznos restaurant. By buying the Essential Goods low and reselling them to franchisees at artificially high prices, defendants grew their provisioning business while ignoring franchise operations and the impact of the reckless growth plan implemented by Shaffer at the direction, and with the knowledge, of the Schaden Ownership Group. In the words of former Quiznos Regional Vice President Mark ("Max") Maximovich, Quiznos underwent a "regime change" when it morphed from a legitimate franchise operation to a sales organization solely focused on selling more franchises and

overpriced food, equipment, services and supplies. Another former officer of Quiznos concurs: In their view, Quiznos routinely required its operations personnel to approve store locations that were unable to sustain a Quiznos restaurant, and in many cases were located in close proximity to existing stores. When faced with the choice of putting a franchise in a bad location immediately and making a sale, or waiting to find a good location, Quiznos chose the sale over the best interests of its franchisees.

91. Quiznos adopted its three-prong plan (aggressive nationwide sales of franchises; abuse of the marketing and advertising fund to capitalize on national advertising and system growth; and profits in the mandated supplier business) to inflate Quiznos' profitability and make it more attractive to potential buyers and investors, toward the ultimate goal of allowing the Schaden Ownership Group and other Quiznos insiders to sell their ownership interest for billions of dollars. In December 2005, the Schaden Ownership Group placed Quiznos up for sale. Through the New York investment bank of Goldman Sachs, the Schaden Ownership Group shopped the company at an offered price of $2.3 billion. In short, Quiznos had grown from a $25 million company in 2000 to a $2.3 billion company a mere five years later. Growth of this kind has never occurred in any franchise business, including established brands like McDonald's and Quiznos' main competitor Subway.

92. To achieve this remarkable growth, Quiznos employed a false and deceptive marketing scheme that misrepresented the state of the brand. The company's website represented to prospective franchisees that Quiznos had "proven systems" and a "proven economic model." It made false earnings claims to would-be buyers by suggesting that the typical Quiznos "draws 200 plus [customers] on a daily basis with customers who are fanatically loyal (as validated in focus groups and consumer surveys)." In one website posting, Quiznos

represented that it "focuses on distinctive sites ***without*** over-saturating markets" when, in fact, the company had decided in April 2002 to allow encroachment without consequence or concern for the carnage visited upon franchisees. Representing to prospective franchisees that "[n]ot all entrepreneurs get toasted, just the smart ones," Quiznos painted the picture of a meaningful alternative to just "finding another job" and sparked interest with promises of "site selection assistance . . . local support . . . third party financing . . . national television advertising . . .and thousands of locations worldwide." A radio commercial asked:

> Ever ***dream*** of owning your own business? ***Earning money for yourself Instead of someone else?*** Well, make your dream a reality by attending a free Quiznos Business Ownership Seminar. Entrepreneur Magazine rates Quiznos Sub as one of the top franchising opportunities in America . . . . ***No prior restaurant experience is necessary. Seats are limited.*** So call now 1-800-925-QUIZ or go to QuiznosRadio.com.

93. On the Internet, in direct mail brochures, on the radio, in television infomercials, and in advertising flyers, Quiznos aggressively enticed prospective franchisees to join the system with similar distortions and misrepresentations.

94. To get the franchisees to the next step in the sale process, Quiznos gave them a push. At Shaffer's direction, the company paid an administrative staff in Denver to develop and solicit leads. Quiznos paid commissions to anyone and everyone involved in the sales process—the focus being to get what Shaffer referred to as "butts in the chair" at the sales events being held around the country. Quiznos would pay the administrative staff to qualify applicants per application and would give commissions to those who got applicants to attend the sales seminar. This created an inherent conflict of interest because the individual completing the application was given financial incentives to have the application approved regardless of whether it warranted approval. Selling franchises was so easy, several of Quiznos top sales performers at a

poker game in Boca Raton, Florida laughed at the suggestion of a colleague that they were just "selling pieces of paper!" By 2004, top management referred to Quiznos' astronomical success in selling franchises with reference to Major League Baseball Hall-of-Famer Dizzy Dean: "It Ain't Braggin If You Can Do It."

95. At sales seminars held in hotel conference rooms throughout the United States, Quiznos would go in for the kill and build on the by then well-fertilized and misleading promises of business ownership, turnkey and proven systems, and operational support. With regimented clarity, Quiznos' representatives, many of whom had little or no experience with owning or operating a restaurant, would explain to the prospective franchisees that "Quiznos is the ultimate business model." Shaffer explained it this way under oath:

> [O]ur sales process was a highly structured, regulated process . . . [W]e structured and sculptured every step along the way. And our people were acquired [sic] to basically stay on track.

96. Using this "highly structured" process, defendants would promise the allure of being an entrepreneur with the safety of Quiznos' "turnkey business model" and affirmatively represented that it had a "proven concept" nationally. They would commit to "support systems every step of the way in building a Quizno's restaurant" and promised having "a local representative . . . trained to provide assistance to each franchise owner from training to site selection to the new store opening." The scripted sales pitch would draw in the franchisee by promising "[o]n-going operations support" that would include "quality assurance, operations, marketing and business management as well as special support for new promotions and new product roll-outs." All of these representations would be strategically placed around other representations demonstrating the growing number of franchise units that had been sold in the United States, how a failure to act would lead to a missed opportunity, and how national

publications like *Entrepreneur Magazine* and *Nation's Restaurant News* had touted Quiznos with "top rankings."

97. A former Quiznos officer explains that company employees joked that if an individual was alive, had a credit score, and their check did not bounce, Quiznos would sell them a franchise. In many instances, Quiznos' sale practices targeted immigrants with the promise of owning their own business and achieving the "American Dream." In many cases, these individuals were not proficient in English. According to this same officer, even after Quiznos instituted an English proficiency test, its own sales people often got around the requirement by signing up a sufficiently proficient "operating owner," while the majority owner (who was thus taking the greatest financial risk) would lack basic English proficiency. Quiznos even extended this practice to those who sold franchises for the company. For years, the Boston Area Directorship was run by a woman that Quiznos knew did not speak English.

98. The results of Quiznos' fraudulent franchise sales campaign were tremendous for the growing franchisor, resulting in exponential growth of its brand. In 1997, when Meyers joined the Schadens at the company, Quiznos had 150 operating restaurants in the United States; today the company has 4,636, with another 500 around the world. With approximately 5,136 franchised units worldwide, this is the kind of growth that impresses investors and allows for a $2.3 billion offering price to would-be suitors.

99. In April 2006, the Schaden Ownership Group saw the fruits of its investment banking contacts pay off. That month, Quiznos sold 49% of the company to the private equity arm of J.P. Morgan. Paying $585 million for a minority interest in the business, J.P. Morgan has the opportunity and, in fact, intends to purchase the remainder of the equity interest still held by the Schaden Ownership Group at a specified time and for a specified price in the future.

100. For Quiznos to complete the sale of itself to J.P. Morgan, it must maintain and even improve the financial results it has experienced over the years leading to the sale to J.P. Morgan, including substantial revenue growth. To that end, Quiznos has continued to the present day its unlawful and deceptive practices with respect to its franchisees that allow it to extract millions upon millions of dollars from the franchisees, while simultaneously making it difficult if not impossible for most Quiznos franchisees to operate profitably.

**Plaintiffs' Lack of Sophistication**

101. Plaintiffs did not stand a chance in avoiding defendants' web of deceit given the sales process manipulations engaged in by Quiznos. Quiznos designed that process to ensure the maximum number of franchise sales by obtaining signatures on franchise agreements in a manufactured environment contrived to obtain plaintiffs' trust. In so doing, Quiznos' sales representatives rushed through the agreements in obtaining signatures, had the franchisees sign them in comfortable surroundings (e.g., a local restaurant, their homes, or other familiar locales), built false trust through the use of phrases like "partners" and partnership," and represented the urgency of acting on the "hottest brand" lest they lose out on a dream. Such conduct, which was directed at each of the plaintiffs, is systemic and was purposefully meant to prey upon a naive consuming public. Consequently, plaintiffs' lack of experience in the very areas that would prove critical in being able to meaningfully analyze the opportunity presented essentially sealed their fate from the start.

102. **The Kessels-Nguyen Plaintiffs.** Neither Kessels nor Nguyen had the kind of business experience and sophistication necessary to understand or appreciate the consequences of signing their franchise agreement. The franchise they set out to run constituted their first experience as business owners. Kessels has a 2-year associate's degree in electronics; other than

serving as a line cook when he was a teenager, Kessels' first restaurant experience was when he bought a Quiznos franchise. Until this litigation, Kessels never had any experience with attorneys or with commercial contracts like the franchise agreement.

103. **The Shelton Plaintiffs.** Shelton had never owned a business before he acquired his Quiznos franchise and had no food industry experience. He had no experience negotiating lengthy and detailed commercial contracts like the franchise agreement he signed. Until he started running BPS, Shelton had never had any experience with attorneys. Shelton signed his agreement at a local restaurant with Quiznos sales representative Anthony Kruse ("Kruse"). During that meeting, Kruse coached Shelton through the whole process and directed him where to sign the franchise agreement and related documents. Shelton told Kruse he wanted to have an attorney review the franchise agreement, but Kruse represented that "nothing could be changed" and that it would be a "waste of money." When Shelton asked questions about the agreement during the course of the sales relationship, Kruse and another Quiznos representative named Joel Davis represented the document as "standard" and "non-negotiable." Quiznos presented Shelton with what it called its "Disclosure Acknowledgement Statement" at the time Kruse asked him to sign the franchise agreement. That document purports to express a limitation on what Shelton relied on in deciding to buy his franchise; like all documents effected by Quiznos, its legal legitimacy is questionable. When Shelton suggested that he wanted to have an attorney review the document, Kruse stated it was a "standard form" which Shelton had to sign to get the franchise. Despite the fact that Shelton had relied on things besides the UFOC in deciding to buy his franchise, Shelton signed the "Disclosure Acknowledgement Statement" with the word "None" written in at the bottom. This is not an accurate reflection of the facts, but Kruse assured Shelton that the form meant nothing.

104. **<u>The Haas Plaintiffs</u>.** Prior to purchasing his franchise, Haas had never owned a business. Haas was a math major in college. For most of his life since college, Haas has worked on sailboats, as a bosun and first mate. He had no experience negotiating lengthy and detailed commercial contracts before he signed his franchise agreement; Haas also had no experience in the restaurant industry and had never worked with attorneys before. Haas signed his agreement at a meeting at a local restaurant with Quiznos sales representative Don Lauria ("Lauria"). During that meeting, Lauria coached Haas through the whole process and directed him where to sign the franchise agreement and related documents.

105. **<u>The Hampshire Plaintiffs</u>.** In his professional life before he operated a Quiznos, Hampshire sold auto parts. He had no meaningful experience negotiating lengthy and detailed commercial contracts like the franchise agreement. Hampshire signed his agreement at a meeting with Quiznos sales representatives John Crider ("Crider") and Mike Wotten ("Wotten"). During that meeting, Crider and Wotten coached Hampshire through the process and directed him where to sign the franchise agreement and related documents. Hampshire and his brother stated that they wanted an attorney to review the agreement, but Wotten told them not to waste their money because Quiznos would not agree to any changes. Wotten further represented that Hampshire's effort to have an attorney review the franchise materials "would delay the approval process" and "hinder [Hampshire's] ability to obtain a good site for the restaurant"—sites that Wotten told Hampshire "would be taken if [Hampshire] didn't move forward today." Crider, for his part, reinforced the need to act and the manufactured trust. He represented that "Quiznos would never do anything to hurt [Hampshire] because the franchisees were the lifeblood of the company." Hampshire also signed the "Disclosure Acknowledgement Statement," representing "None" in the section concerning representations on what besides the UFOC he relied on to buy

the franchise. Wotten told Hampshire that writing "None" was required and that by listing all the things Hampshire actually relied on would only delay things further. Hampshire signed due to Wotten's and Crider's ongoing insistence that writing "None" was standard and required and their repeated statements that they had other prospects waiting to take Hampshire's opportunity.

106. **The McCarthy-Sequeira Plaintiffs.** John Sequeira graduated from high school. Prior to running his Quiznos, Sequeira worked for Domino's Pizza and a local plumbing company as an apprentice. His father-in-law John McCarthy is a social worker by training who has spent most of his adult life in the social services field. Neither Sequeira nor McCarthy had ever owned a business before they acquired their Quiznos franchise. John McCarthy had limited experience negotiating lengthy and detailed commercial contracts like the franchise agreement; the other McCarthy-Sequeira Plaintiffs had none. The McCarthy-Sequeira Plaintiffs signed their agreement at a meeting with Quiznos sales representative Charlotte Russell ("Russell") at a local restaurant. When McCarthy suggested that he have an attorney review the agreement, Russell stated that the agreements were uniform and "cannot be changed." The McCarthy-Sequeira Plaintiffs were told by Russell to sign the "Disclosure Acknowledgement Statement" and write "None" in the space provided to identify what besides the UFOC they had relied on to buy their franchise. Despite being told to complete the form in this fashion, Russell had failed to provide the UFOC to them at any time before they signed the franchise agreement, in contravention of federal and state law. McCarthy asked Russell why they should complete the form as proposed when he and his family had relied entirely on Russell and other information besides the UFOC in deciding to buy a Quiznos. Russell told him the document was just a formality. During that meeting, Russell coached the McCarthy-Sequeira Plaintiffs through the process and directed them where to sign the franchise agreement and related documents.

107. **The Gibson and Brunet-Rist Plaintiffs.** Joe Gibson signed his franchise agreement at his home at a meeting with Quiznos representative Scott Warren ("Warren"). Gibson asked Warren if he should have an attorney review it and Warren represented that it was a "standard" agreement and that he "didn't think it was needed." Brunet and Rist signed the agreement at their home. Warren and McAllister represented the opportunity to Gibson, Brunet and Rist as "take it or leave it" and that other prospects were standing in line to take the store if they did not proceed with the purchase. In fact, the two franchises acquired by J&D (the company that they used to run operations) were the last two sold in Maine. Sales tricks of this kind were routine as was Quiznos' use of "dummy" franchisees that Quiznos put up to parrot Quiznos' party line about the success of the brand. The Brunet-Rist Plaintiffs called an individual on the list of "franchisees" and were told that their store was doing great. Later, the Brunet-Rist Plaintiffs learned that the individual worked for Quiznos in its corporate office.

108. **The Campbell Plaintiffs.** Mike Campbell has a 2-year degree in electronic technology; Patty Campbell never went to college. She worked most of her adult life as a medical technician at various healthcare institutions. Before running the restaurant, Mike Campbell worked in IT. The Campbell Plaintiffs had never owned a business prior to buying their franchise. They did not have any experience negotiating lengthy and detailed commercial contracts like the franchise agreement. The Campbell Plaintiffs signed their agreement at a meeting with Quiznos sales representative Davis. During that meeting, Davis coached the Campbell Plaintiffs through the whole process and directed them where to sign the franchise agreement and related documents. When Mike Campbell suggested that he was going to have to have his attorney review the franchise agreement, Davis and Quiznos representative Jim Merlo ("Merlo") emphatically told Campbell that no changes would be approved.

109. **The Haywood Plaintiffs.** Prior to signing their franchise agreement, the Haywood Plaintiffs had never owned a business. Tom Haywood had worked in the cable industry most of his adult life and does not have a college degree; his son Jason Haywood made pizzas for Besta Pizza and sold disability insurance a few years prior to the Haywoods' purchase of their Quiznos restaurant. Neither had ever negotiated or reviewed a franchise agreement before being asked to sign the Quiznos agreement. While Jason worked in the pizza and sub business, Tom's only restaurant experience was as a bus boy in the late 1960s. The Haywood Plaintiffs signed their agreement at a meeting with Quiznos sales representatives Andy Klie ("Klie") and other agents of Quiznos Area Director NOCO, including David Garagozzo, ("Garagozzo"), Charlie Riley ("Riley"), Justin Rokocki ("Rokocki") and Michael Newman ("Newman"). During that meeting, Klie, Garagozzo, Riley, Rokocki and Newman coached the Haywood Plaintiffs through the whole process and directed them where to sign the franchise agreement and related documents. When the Haywood Plaintiffs questioned certain terms of the agreement, NOCO's representatives told them the agreement was not negotiable.

110. **The Tully Plaintiffs.** Tully had never owned a business before he ran his restaurant. He is a computer engineer who works in IT. Tully had no experience in the restaurant business and had little experience using attorneys. He did not have any experience negotiating the legal aspects of commercial contracts. Tully signed his agreement at a meeting at his house with Quiznos sales representative Josh Beyer ("Beyer"). During that meeting, Beyer coached Tully through the process and directed him where to sign the franchise agreement and related documents. When Tully inquired, Beyer told Tully that Quiznos would not negotiate terms of the agreement. Tully signed on the basis of Beyer's representations about the brand.

111. **The Pollock Plaintiffs.** The Pollock Plaintiffs had never owned a business before they acquired their franchise. Tina and Nick Pollock have high school diplomas; Dave Pollock is an engineer who never before had negotiated or reviewed a franchise agreement of the kind presented to him. Tina Pollock does not work outside the home, but did once work as a secretary. Nick Pollock worked for Subway before the Pollock Plaintiffs bought their Quiznos. The Pollock Plaintiffs signed their agreement at a meeting with Quiznos sales representative Rob Schmidt ("Schmidt"). During that meeting, Schmidt coached the Pollock Plaintiffs through the whole process and directed them where to sign the franchise agreement and related documents. They understood that the franchise agreement was not negotiable and signed the agreement based on the promises and representations made by Schmidt and Quiznos representative Sue Schaeffer ("Schaeffer"). When Dave Pollock suggested that he have an attorney review the franchise agreement, Schmidt encouraged him not to because it would be a waste of time given Quiznos' refusal to change its terms.

112. **The Merry Plaintiffs.** The Merry Plaintiffs had never owned a business and had limited experience in the food industry. They signed their agreement at a meeting with Quiznos sales representatives Dianne Moreland ("Moreland") and Kyle Gjersee ("Gjersee"). During that meeting, Moreland and Gjersee coached the Merrys through the whole process and directed them where to sign the franchise agreement and related documents.

113. **The Virgili Plaintiffs.** John Virgili never graduated from college. Prior to owning his restaurant, Virgili sold industrial advertising. He had never owned a business before his Quiznos, which represented his first experience in the restaurant industry. He had no experience negotiating lengthy and detailed commercial contracts like the franchise agreement. Virgili signed his agreement at a meeting with Quiznos sales representative Bill Alley ("Alley").

During that meeting, Alley coached Virgili through the whole process and directed him where to sign the franchise agreement and related documents.

114. **The Ronan-Casey Plaintiffs.** Casey and Ronan signed two of their franchise agreements at meetings with Quiznos sales representatives Jeff Humphrey ("Humphrey"), David Bloom ("Bloom") and Charla Saberi-Nikou ("Saberi-Nikou"). During these meetings, Humphrey, Bloom and Saberi-Nikou coached Casey and Ronan through the process and directed them where to sign the franchise agreement and related documents. Casey and Ronan requested to alter the terms of one of their agreements (providing for a specific location), but Bloom and Saberi-Nikou represented that Quiznos would not alter the agreement. In assessing the opportunity, Ronan spoke with certain Quiznos franchisees, a few of whom criticized the company. When Ronan asked Bloom, Humphrey, Saberi-Nikou and Quiznos representative Adam Affek about the criticisms, they each independently represented that the franchisees making the comments were "bad operators," leading Ronan to believe that their comments should be disregarded. This was a common trick used by Quiznos' sales representatives as a means to deflect criticism about the brand.

115. **The Peddy Plaintiffs.** Carolyn Peddy never obtained a college degree; she had no restaurant experience before buying her Quiznos franchise. Mikki Peddy worked at Arby's before she came to run the family's Quiznos. Carolyn has held jobs as a payroll supervisor, traffic coordinator, account manager and supervisor of co-op advertising. The Peddy Plaintiffs had never owned a business until they bought their Quiznos. They had no experience negotiating lengthy and detailed commercial contracts like the franchise agreement. The Peddy Plaintiffs signed their agreement in a food court at the Arbor Station Mall with Quiznos sales representative Randy Trotter ("Randy Trotter"). During that meeting, Randy Trotter coached the

Peddy Plaintiffs through the process and directed them where to sign the franchise agreement and related documents. He explained to the Peddy Plaintiffs that Quiznos would act as their "agent" with their "best interest at heart." When Carolyn Peddy suggested that she and her daughter have an attorney review the franchise agreement, Randy Trotter stated that it was "unnecessary."

116. **The Curl Plaintiffs.** Curl had never owned a business. He had no experience negotiating lengthy and detailed commercial contracts. Curl signed his agreement at a meeting with Quiznos sales representative Larry Sapp ("Sapp"). During that meeting, Sapp coached Curl through the process and directed him as to where to sign the franchise agreement and related documents.

**Quiznos' Exploitation of Its Information Advantage to Ensnare Plaintiffs**

117. As the franchisor, Quiznos and (and has) access to information regarding its franchise system that is far superior and more complete than the information it chose to make available to plaintiffs or that was available to them through any other sources. Rather than disclose this information to franchisees, Quiznos utilizes this information gap to further its own interests at the franchisees' expense.

118. Quiznos also deliberately discloses information without telling the complete story in a deliberate effort to mislead, which is every bit as fraudulent as an outright lie. For example, Quiznos provides representative financial data to prospective franchisees through various "earnings claims" in the UFOC and FDD. It then provides as follows:

> YOUR ACTUAL FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED. THE AVERAGE GROSS SALES FIGURES PRESENTED ABOVE REPRESENT SALES BEFORE DEDUCTIONS FOR CONTINUING ADVERTISING AND ROYALTY FEES PAYABLE TO THE FRANCHISOR AND ALL OTHER OPERATING EXPENSES.

SEE ITEMS 6 AND 7 OF THIS OFFERING CIRCULAR FOR A PARTIAL LIST OF EXPENSES YOU WILL INCUR.

THE SALES FIGURES ABOVE ARE AVERAGES OF HISTORICAL DATA OF SPECIFIC FRANCHISES. THEY SHOULD NOT BE CONSIDERED AS POTENTIAL SALES THAT MAY BE REALIZED BY YOU. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ACHIEVE THESE SALES LEVELS. ACTUAL RESULTS VARY FROM RESTAURANT TO RESTAURANT, AND WE CANNOT ESTIMATE THE RESULTS OF ANY PARTICULAR FRANCHISE.

119. These "warnings" are themselves misleading, because Quiznos knows that the "gross sales" numbers are based on what Quiznos refers to as "Net 2" data—a higher number that does not include discounts, including the cost of unreimbursed coupons.

120. Quiznos owed at all times relevant a legal duty to disclose complete information to plaintiffs to avoid making its affirmative representations about the franchise system (including, without limitation, the earnings claims) not misleading. Quiznos breached this duty by, among other things, omitting to tell plaintiffs the following material facts in advance of plaintiffs' decisions to purchase their franchises:

(a) That Quiznos knew, at the time of the dissenters' rights suit, that "40% of Quiznos units were not breaking even"—a fact that defendant Rick Schaden admits he "would like to know" before buying a Quiznos franchise.

(b) That Quiznos did not reimburse retail customer coupons, effectively adding 6% to the franchisee's carrying cost such that the gross sales numbers represented in the UFOC were inaccurate.

(c) That the sales agents who sold plaintiffs their franchises and those who solicited their participation in the franchise sales seminar process had economic incentives to sell them the franchise.

(d) That "same store" sales (the economic metric by which a franchisor compares growth on an apples to apples basis) were

consistently trending down from their historical levels, at least as represented by Quiznos in the dissenters' rights lawsuit.

(e) That AFD, Source One, Ba-Bing, CLG, Continental Lending, Kinetic Sourcing, and others would be used as profit centers by those in control of the brand and that the promise to negotiate supplier prices "for the benefit of franchisees" was, as a result, illusory.

(f) That Quiznos was, in fact, a business primarily focused on making money as a distributor of Essential Goods, not as a franchisor offering "franchises to operate a restaurant offering submarine sandwiches, salads, soups, and soft drinks under the service mark 'QUIZNOS'."

(g) That, in Quiznos' view at the time of the dissenters' rights suit, AUVs for the typical Quiznos franchise were not "large enough for the franchisee to easily make a profit, unless the franchisee worked in the store him or herself, often with the assistance of a spouse."

(h) That, according to Quiznos at the time of the dissenters' rights suit, the 7% royalty collected by Quiznos on a weekly basis constituted a "burden" on the ability of the franchisee to make a profit.

(i) That Quiznos routinely raided the advertising and marketing fund for its own purposes unrelated to those contractually established in the franchise agreement, including the sale of encroaching franchises.

(j) That Quiznos' approach on coupons would effectively raise the percentages paid on a weekly basis for marketing and advertising by an additional 6%.

(k) That Quiznos knew, at the time plaintiffs acquired their stores, that it had a large number of financially "distressed stores" and an immediate need to train operations staff in handling large volumes of store turnovers in the system.

(l) That the competition for securing quality QSR real estate in sites that would promote success of the plaintiffs' stores was fierce and that Quiznos would promote opening a store over validating the viability of the site.

121. Quiznos also purposefully misled plaintiffs in the UFOC by resorting to half-truths, incomplete statements, and outright lies that make the UFOC misleading and fraudulent. The UFOCs presented to plaintiffs contained the following misrepresentations and misleading statements and omissions that were material to plaintiffs' decisions to acquire a franchise: That Quiznos and its affiliates "negotiate purchase agreements with suppliers for the benefit of Franchisees."

(a) That its turnover rates are on par with national averages even though the UFOC under-reports the brand's closure rates and fails to report its true turnover rate, which in 2006 was an astounding 30% (more than three times the national average).

(b) That Quiznos manipulates its use of the phrase "gross sales" in the UFOC to overstate AUVs for the typical Quiznos franchise. In the Quiznos system, the company distinguishes between what it calls "Net 2" and "Net 3" revenues. Nevertheless, Quiznos does not tell franchisees about this distinction until after they have signed a franchise agreement, most often at their franchise training close to the time they are set to open their restaurant. The distinction is critical, because "Net 2" data, which is what Quiznos disclosed in the UFOC prior to the plaintiffs' signing of the franchise agreements, reflects none of the discounts borne by the franchisee, most notably the coupon discounts that until very recently ran as high as 6% each week. For this reason, the "Earnings Claims" in each UFOC constitute deceptive statements about store earnings and are misleading.

(c) That Quiznos was, in fact, a business primarily focused on making money as a distributor of Essential Goods, not as a franchisor offering "franchises to operate a restaurant offering submarine sandwiches, salads, soups, and soft drinks under the service mark 'QUIZNOS'."

(d) That Quiznos engages in routine realignment of the corporate entities serving as the franchisor so as to avoid reporting historical financial data for operations of the franchise system on the basis that the "newly created" entity has no such history. In this case alone, there are four entities (TQFC, QF, QFA, and QFII) that served as the franchisor for plaintiffs.

(e) That the typical Quiznos franchisee will have a 30% variable margin in which to pay fixed costs of franchise operations; whereas most QSRs maintain 40-50% variable margin to attribute to such fixed costs.

(f) That the rebates from Quiznos' vendors (disclosed in the UFOC) would result in excessive and unreasonable costs being imposed on the franchisees for the purchase of Essential Goods.

(g) That Source One, AFD and the other Quiznos affiliates responsible for provisioning stores consider it critical to their success as "wholesalers" that they obtain the right to buy low in the open market and sell high to the franchisees.

(h) That the rent ranges set out in the UFOC will not have an adverse impact on store profitability.

(i) That labor costs are understated due to the mandatory personnel requirements, which necessarily require the owner-operator to work full-time for free.

(j) That food, labor and paper costs, often the largest cost items in any restaurant operation, were consistent with industry averages when the UFOC fails to provide complete and non-misleading information related to such costs through the deceptive use of "Net 2" percentages (which are lower because they are based on gross sales not including discounts) rather than "Net 3" percentages (which are higher because they are based on gross sales including discounts).

(k) That the Quiznos' average ticket on a single sale is significantly higher than other QSRs that Quiznos claims to compete with (e.g., Subway, McDonald's, Blimpies) and that the higher ticket amount will adversely impact market size potential and ultimately adversely impact the overall profitability of a typical Quiznos franchise.

(l) That Quiznos would literally flood the market with coupons and effectively mandate their acceptance without reimbursement from Quiznos.

122. Quiznos continues its deceptive relationship after obtaining the franchisee's signature on the franchise agreement. During required corporate training for new franchisees, Quiznos represents through the use of inaccurate and deceptive graphs, charts and related

calculations that, within five years, a Quiznos location would be debt free and maintain a substantial resale value. Based upon these deceptive figures, Quiznos encourages and induces existing franchisees to purchase multiple locations, before they can become aware of the true lack of profitability resulting from Quiznos' unlawful policies and practices.

123. Quiznos carries this practice through with those who actually open their stores by the weekly delivery of false food, labor, paper and discount data for operators in the field. In so doing, Quiznos distributes summary data that understates the percentage of each by basing these percentages on the listed "Net 2" revenue numbers. This approach is misleading and inconsistent with industry practice, which typically reports such costs based on the net sale number (what Quiznos calls "Net 3") so as to accurately show the true cost of running the business.

**Deceptive Practices Specifically Used to Sell Franchises to the Named Plaintiffs**

124. **The Gibson and Brunet-Rist Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives McAllister and Warren made the following fraudulent statements and omissions before July 30, 2004 with the intent to deceive J&D (and its principals) into signing its franchise agreements and operating a franchise for Quiznos:

(a) McAllister and Warren provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(b) McAllister and Warren misrepresented that the average revenues for a Quiznos store were $8,400 to $10,000 a week, when, in fact, they knew at the time of the representation that revenues in the Maine market were far below that amount;

(c) McAllister and Warren failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(d) McAllister and Warren failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee; and

(e) McAllister and Warren failed to disclose that 40% of the franchisees in the United States and Canada were not profitable and, instead, painted a picture that Quiznos was an "up and coming" franchise business, affirmatively misrepresenting that the Brunet-Rists and Gibson should purchase a second franchise (which they did) because all franchise opportunities in Maine would soon be gone.[2]

125. **The Shelton Plaintiffs.** In addition to the false representations and misleading statements contained in TQFC's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, TQFC representatives Davis and Kruse made the following fraudulent statements and omissions before December 13, 2001 with the intent to deceive Shelton into signing his franchise agreement and operating a franchise for Quiznos:

(a) Davis and Kruse failed to disclose that TQFC owned and/or controlled Source One, AFD, and various other "affiliates," all of which are Quiznos-mandated food and supply providers;

(b) Davis and Kruse provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(c) Kruse misrepresented that Quiznos would never let any store close, leading Shelton to believe that Quiznos would do everything possible to provide franchisee assistance, when, in fact, the exact opposite turned out to be true;

---

[2] In October, 2006, Brunet spoke by telephone with McAllister and confronted him with Quiznos' lies and omissions and the fact that the company's conduct had resulted in bankruptcies, suicides, and divorces among the franchisee population. McAllister admitted in the call that he had "resigned his position from Quiznos" and was "emotionally unwell" from the experience. When Brunet repeated the extent of the damage Quiznos had caused to so many people, McAllister said he was "close to a nervous breakdown and had to separate himself from Quiznos."

(d) Davis and Kruse failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(e) Davis and Kruse failed to disclose that more than 30% of all Quiznos in the United States were failing to make a profit;

(f) Davis and Kruse failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(g) Davis and Kruse represented that two other markets – Kansas City and Dallas – "were already closed" to new franchisees and that the Denver market would be "closed out" by year end to new units, falsely leading Shelton to believe that he had to act with haste or lose out on the opportunity.

126. **The Campbell Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Colorado, including, without limitation, Davis and Merlo, made the following false and fraudulent statements and omissions before March 18, 2003 with the intent to deceive the Campbells into signing their franchise agreement and operating a franchise for Quiznos:

(a) Davis affirmatively misrepresented that Quiznos did not issue coupons and further indicated words to the effect that, "we wouldn't do anything that would hurt the franchisee like that";

(b) Davis provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(c) Davis and Merlo failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(d) Davis and Merlo failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(e) Davis and Merlo falsely represented that franchisees did not have to honor coupons when, in practice, they had no choice, stating that Quiznos would not take action like that to hurt franchisee profitability; and

(f) Davis and Merlo presented false and misleading data regarding the number of transfers within the system and number of stores that had defaulted and failed.

127. **The Haywood Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representative Klie and other agents of Quiznos' Area Director NOCO, including Garagozzo, Riley, Rokocki, and Newman, made the following fraudulent statements and omissions before September 16, 2003 with the intent to deceive the Haywoods into signing their franchise agreement and operating a franchise for Quiznos:

(a) Klie falsely represented that less than 4% of Quiznos stores go out of business, when in fact, the percentage of store closures and turnovers due to bankruptcy or financial insolvency was significantly higher at the time and Klie knew as much (or recklessly stated as such) but withheld that information;

(b) NOCO failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(c) Klie and others at NOCO provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(d) NOCO never disclosed prior to the time the Haywoods signed their franchise agreement that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(e) Klie and others failed to disclose that more than 30% of all Quiznos in the United States were failing to make a profit;

(f) Klie and others at NOCO misrepresented the options that existed for the execution of a commercial lease for a Quiznos operation in Buffalo, leading the Haywoods to believe that the only lease option was a 10-year agreement when, in fact, others in the Buffalo market had obtained more advantageous and shorter leases;

(g) Klie and others at NOCO misrepresented and otherwise failed to disclose all of the material facts regarding Quiznos' growth and expansion plans for the Buffalo market, which resulted in the Haywoods experiencing encroachment from competing stores that led to a loss of sales; and

(h) NOCO presented false and misleading information related to the costs associated with lease approval, the assistance provided by the franchisor in day-to-day operations, the responsibility of NOCO as the Area Director, how the marketing and promotion fees collected from the Haywoods would be used, and how Quiznos would make use of the advertising fund.

128. **<u>The Kessels-Ngyuen Plaintiffs</u>.** In addition to the false representations and misleading statements contained in TQFC's UFOC as well as its omissions alleged elsewhere in this Amended Complaint, TQFC representatives in Colorado, including, without limitation, Davis, Kruse, Larry Hill ("Hill") and Merlo made the following fraudulent statements and omissions before March 20, 2002 with the intent to deceive Kessels and Ngyuen into signing their franchise agreement and operating a franchise for Quiznos:

(a) Davis failed to disclose to Kessels and Nguyen that 40% of all Quiznos stores in the United States were losing money, a fact that the Kessels-Nguyen plaintiffs did not learn until March 2003, after they had signed the franchise agreement;

(b) Davis failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(c) Davis failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of