which represented the revenues that would actually be received by a franchisee;

(d) Davis provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other material that must be purchased from Quiznos and its approved suppliers and distributors; and

(e) Davis misrepresented to Kessels and Nguyen that the average unit volume for a Quiznos restaurant in a given year was $420,000 when, in fact, Davis knew at the time that revenues in the Colorado market were far below that amount.

129. **The McCarthy-Sequeira Plaintiffs.** In addition to the false representations and misleading statements contained in TQFC's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, TQFC representatives in Florida, including, without limitation, Russell, made the following false and fraudulent statements and omissions before October 20, 2001 with the intent to deceive the McCarthy-Sequeira Plaintiffs into signing their franchise agreement and operating a franchise for Quiznos:

(a) Russell misrepresented the availability of a store site in Jupiter, Florida sought by the McCarthy-Sequeira Plaintiffs;

(b) The McCarthy-Sequeira Plaintiffs specifically asked Russell "if there were many Quiznos failing" and Russell responded, falsely as it turns out, "that only one store was in trouble, a franchise in North Florida due to absentee ownership and poor management;"

(c) Russell misrepresented the total investment and operating costs required to open a Quiznos franchise, claiming at one point that it would take "in the range of $60,000 of owner money and a loan of between $140,000-$150,000 to make the store operational;

(d) Russell failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(e) Russell failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(f) Russell provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(g) Russell failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(h) Russell misrepresented that Quiznos would provide franchisee assistance in the development of the store and ongoing franchisee operations, which was patently false;

(i) Russell misrepresented that Quiznos negotiated, to the advantage of the franchises, "best pricing" due to volume discounts;

(j) Russell misrepresented the range of store profitability as between $40,000-$60,000, which she knew at the time was false; and

(k) Russell misrepresented that store revenues in Southeast Florida ran between $8,000-$12,000 a week, which Russell knew at the time was false and misleading.

130. **The Tully Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Massachusetts, including, without limitation, John Teza ("Teza") and Beyer, made the following representations and omissions before December 2, 2002 with the intent to deceive Kind of Blue (and its principals) into signing its franchise agreement and operating a franchise for Quiznos:

(a) Teza and Beyer failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(b) Teza and Beyer provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(c) Beyer misrepresented that "Quiznos is the only franchisor that doesn't take kickbacks" and that "all savings are passed on to the franchisee;"

(d) Beyer failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(e) Teza and Buyer failed to disclose that franchise owners are not reimbursed for employee meals or retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise; and

(f) Teza and Beyer failed to disclose that QF owned and/or controlled entities like Source One, the Quiznos-mandated equipment supplier.

131. **The Pollock Plaintiffs.** In addition to the false representations and misleading statements contained in TQFC's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, TQFC representatives in Missouri, including, without limitation, Schaeffer and Schmidt, made the following representations and omissions before October 26, 2001 with the intent to deceive Westhampton (and its principals) into signing its franchise agreement and operating a franchise for Quiznos:

(a) Schaeffer and Schmidt misrepresented that the previous owners had failed because they were bad operators who did not have sufficient experience to run the operation successfully;

(b) Schaeffer and Schmidt failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(c) Schaeffer and Schmidt failed to disclose that more than 30% of all Quiznos in the United States were failing to make a profit;

(d) Schaeffer and Schmidt provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(e) Schaeffer and Schmidt failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise; and

(f) Schaeffer and Schmidt provided false and misleading data regarding turnover rates and the number of stores that had closed.

132. **The Merry Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Washington, including, without limitation, Moreland and Gjersee, made the following representations and omissions before May 6, 2004 with the intent to deceive the Merrys into signing their franchise agreement and operating a franchise for Quiznos:

(a) Moreland and Gjersee misrepresented that Quiznos would provide franchisee assistance in the development of the store, the negotiation of the commercial lease, and ongoing franchise operations when, in fact, Quiznos' approach with respect to this "assistance" was self-serving and designed solely and exclusively to protect Quiznos to the detriment of the plaintiffs;

(b) Moreland and Gjersee failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(c) Moreland and Gjersee provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(d) Moreland and Gjersee failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(e) Moreland and Gjersee failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise; and

(f) Moreland represented that "a typical franchisee will pay back their initial loan funding the acquisition within seven years," which Moreland knew at the time was false, particularly because she knew of the financial distress being experienced in the Seattle

Market and the fact that, at or near this time, 35-40% of existing stores in Puget Sound were for sale.

133. **The Virgili Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Ohio, including, without limitation, Kevin Casey ("Casey"), Alley, and John Lubarsky ("Lubarsky"), made the following fraudulent statements and omissions before October 22, 2003 with the intent to deceive Virgili into signing his franchise agreement and operating a franchise for Quiznos:

(a) Casey represented at a Quiznos sales seminar words to the effect, that "while the FTC prohibited him from giving out this kind of information, a Quiznos franchisee in Ohio could make 'six figures, easily'";

(b) Casey, Alley and Lubarsky failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(c) Casey, Alley and Lubarsky failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(d) Casey, Alley and Lubarsky failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(e) Casey, Alley and Lubarsky provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(f) Casey, Lubarsky and Alley misrepresented that QF would provide franchisee assistance in the development of the store, real estate site selection and ongoing franchise operation, which turned out to be false; and

(g) Alley represented that prices on Essential Goods were negotiated in the "best interest" of the franchisees.

134. **The Ronan-Casey Plaintiffs.** In addition to the false representations and misleading statements contained in TQFC's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, TQFC representatives in Texas, including, without limitation, Humphrey, Bloom, Saberi-Nikou and Affek, made the following representations and omissions before May 8, 2008 with the intent to deceive the Ronan-Casey Plaintiffs into signing their franchise agreement and operating a franchise for Quiznos:

(a) Bloom and Humphrey failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(b) Bloom and Humphrey failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(c) Bloom and Humphrey provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors; and

(d) Bloom and Humphrey failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise.

135. **The Peddy Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Georgia, including, without limitation, Randy Trotter, Kim Trotter (collectively the "Trotters") and Tom Sturkie ("Sturkie"), made the following fraudulent statements and omissions before May 22, 2003 with the intent to deceive CMC (and its principals) into signing its franchise agreement and operating a franchise for Quiznos:

(a) The Trotters and Sturkie provided false and misleading information about Quiznos' policies of encroachment and the placement of stores in competing locations, leading the Peddy

Plaintiffs to believe that Quiznos would not cannibalize existing stores with the development of others too close to the existing operations;

(b) The Trotters failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(c) The Trotters failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(d) The Trotters provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(e) The Trotters failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(f) The Trotters provided false and misleading statements about the franchisees' obligations to pay for advertising, representing that it would cost only 5% of gross revenues;

(g) Randy Trotter represented that gross revenues would be over $400,000 annually and that CMC would achieve at least a $20,000 profit on an annual basis;

(h) The Trotters and Sturkie failed to disclose and otherwise misled the Peddy Plaintiffs regarding Quiznos' ownership and control of the food and supply vendors;

(i) Randy Trotter represented that Quiznos used its buying power of 3,000 units to negotiate discounted prices for the franchisees; and

(j) Randy Trotter represented that Quiznos was in the process of developing a food cooperative, which brands like Subway use to keep costs down.

136. **The Curl Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Kentucky, including, without limitation, Sapp, Steve Rodgers

("Rodgers"), Dave Wagner ("Wagner"), and John Hajj ("Hajj"), made the following fraudulent statements and omissions before July 12, 2004 with the intent to deceive Curl into signing his franchise agreement and operating a franchise for Quiznos:

(a) Sapp, Rodgers, Wagner and Hajj failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(b) Sapp represented that the average Quiznos store in the United States did $425,000 in revenues annually when, in fact, this was not the case for any store in Louisville;

(c) Sapp failed to disclose that more than 40% of all Quiznos in the United States were failing to make a profit;

(d) Sapp misled Curl about QF's approach and views on encroachment and store site selection, leading him to believe that the company would not cannibalize its own franchisees by developing stores too close to one another geographically;

(e) Sapp, Rodgers, Wagner and Hajj misrepresented that QF would use designated funds collected from the franchisees on a weekly basis for local and regional advertising, which Quiznos failed to do;

(f) Sapp, Rodgers, Wagner and Hajj provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors; and

(g) Sapp, Rodgers, Wagner and Hajj failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise.

137. **The Hampshire Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Florida, including, without limitation Wotten, Monte Ochs ("Ochs"), and Crider made the following fraudulent statements and omissions

before March 11, 2004 with the intent to deceive Hampshire into signing the franchise agreement and operating a franchise for Quiznos:

(a) Crider and Wotten provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(b) Crider and Wotten failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise;

(c) Crider and Wotten failed to disclose that more than 30% of all Quiznos in the United States were failing to make a profit;

(d) Crider and Wotten failed to disclose that Quiznos owned and controlled Source One and other Quiznos-mandated food and supply vendors;

(e) Hampshire and his brother inquired about the amount of rebates that Quiznos or its affiliates received from vendors and Wotten falsely stated words to the effect, that "the rebates were volume discounts being given back to Quiznos due to significant increases in the number of franchises for the year and that prices to the franchisees would be adjusted in the following year to reflect the volume discounts extended to Quiznos;"

(f) Crider, Wotten and Ochs failed to disclose the large percentage of franchisees in the United States that were not profitable and, instead, affirmatively represented that Quiznos was a growing brand with high profit potential;

(g) Crider, Wotten and Ochs misrepresented that Quiznos would provide franchisee assistance in the development of the store and ongoing franchise operations when, in fact, the "help desk" was anything but helpful and actually failed on a routine basis to provide Hampshire any meaningful assistance; and

(h) Crider and Wotten represented that food costs were 28.5% in the chain and that labor would run 20% such that most franchise owners netted 10-20%.

138. **The Haas Plaintiffs.** In addition to the false representations and misleading statements contained in QF's UFOC, as well as its omissions alleged elsewhere in this Amended Complaint, QF representatives in Florida, including, without limitation, Lauria and Alex Karas ("Karas"), made the following fraudulent statements and omissions before July 2, 2004 with the intent to deceive Haas into signing his franchise agreement and operating a franchise for Quiznos:

(a) Lauria and Karas represented that the new store development cost would be between $180,000 and $210,000 when, in fact, QF failed to make complete disclosures with respect to all of the hidden costs and it actually cost Haas $290,000 to open the store;

(b) Lauria and Karas failed to disclose that their earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee;

(c) Lauria and Karas failed to disclose that more than 30% of all Quiznos in the United States were failing to make a profit;

(d) Lauria and Karas provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(e) Lauria and Karas failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisees of operating a Quiznos franchise; and

(f) Lauria and Karas represented that the average Quiznos store made approximately $422,000 annually in revenue, which did not apply to stores in South Florida.

**Quiznos' Unconscionable and Unenforceable Franchise Agreements**

139. Quiznos further exploits its information advantage and its overwhelming bargaining power to require its franchisees to sign unconscionably one-sided franchise agreements, without any potential for negotiation of their terms.

140. The franchise agreements are procedurally unconscionable. The age, education, intelligence, business acumen and experiences of the plaintiffs; the overwhelmingly greater bargaining power of Quiznos compared to each of the plaintiffs; the fact that Quiznos drafted the franchise agreements; the absence of a meaningful (and non-misleading) explanation of the franchise agreement's terms; and the inability of the plaintiffs to insist on alterations to the contract all favor a finding of procedural unconscionability. These factors are not isolated to the representative plaintiffs, but apply uniformly to the putative Class.

141. The franchise agreements are also substantively unconscionable in many respects. They are contracts of adhesion that, among many other things, purport to:

(a) Unreasonably truncate any statutes of limitation that may apply to franchisees' legal claims.

(b) Disclaim any responsibility for the effect of Quiznos' decisions and actions on the franchisees' viability.

(c) Restrict the ability of franchisees to litigate in their home states and require litigation in Denver, Colorado.

(d) Prohibit consolidation with other franchisees to press similar claims.

(e) Bar franchisees from bringing a class action.

(f) Deprive plaintiffs' of their constitutionally-guaranteed right to a jury trial.

(g) Prohibit plaintiffs from suing Quiznos for violating the implied covenant of good faith and fair dealing that Colorado Law injects into every contract.

(h) Prohibit claims against any affiliate, employee, director or officer of the franchisor even where those parties have engaged in illegal conduct.

(i) Impose the application of Colorado Law in all circumstances, no matter the locale of the franchisee or the nature of the alleged wrongdoing at issue between the parties.

(j) Unilaterally limit a franchisee's damages "in a maximum amount equal to the net profits of the Restaurant for the year prior" (typically zero profits, so altogether eliminating any contractual right to claim damages).

(k) Reserve for itself the right to sue the franchisee for 15 years' worth of lost royalties and marketing fees after the franchise fails.

(l) Prohibit the recovery of punitive or exemplary damages.

(m) Prohibit the use of "course of dealing" evidence to "explain, modify or contradict" the franchise agreement.

142. There is no commercially reasonable basis to deprive plaintiffs and the members of the Class of these rights. These provisions are designed to protect the very kind of systemic, unlawful conduct that this action seeks to redress, and are entirely one-sided in favor of Quiznos.

143. In marketing and implementing the franchise agreements, defendants engaged in a systemic practice of ensuring their ability to rely on the one-sided franchise agreement in litigation of this kind. For example, Quiznos used its "Disclosure Acknowledgement Statement" (referred to above) that it requires its franchisees to sign, in the face of contradictory facts, as a requirement to purchase the franchise. Quiznos' representatives responsible for selling franchises induce franchisees to sign the Disclosure Acknowledgement Statement or other similar waivers by telling the franchisees it is "standard," "required" and "routine" to state that they only relied on the UFOC even though franchisees have relied on information not within the UFOC, including, without limitation, information provided at sales seminars, statements by Quiznos-authorized sales representatives, information on the Quiznos Website and in other advertising materials, and in information from other public media, such as Entrepreneur Magazine. Quiznos relies on the non-reliance clause from its Disclosure Acknowledgement Statement to argue that it is not legally possible for plaintiffs to assert that they reasonably relied

on defendants' fraudulent statements and omissions other than those set out in the UFOC, FDD and franchise agreement.

144. To take full advantage of this strategy, Quiznos has historically preyed on unsophisticated franchisees who are members of the consuming public. The practice of having the plaintiffs sign non-reliance clauses, which Colorado Law prohibits, is intended to rig the result in later litigation. Documents internal to Quiznos demonstrate that its agents selling franchises were instructed to complete the legally-unenforceable non-reliance clause for the franchisee no matter what the facts were so as to allow Quiznos to later argue that the franchisees relied on nothing other than the misleading UFOC and one-sided franchise agreement. Similarly, while the franchise agreement advises the franchisee to retain counsel to review it in advance of signing, Quiznos' representatives routinely told plaintiffs that the retention of counsel would be "a waste of money."

145. These practices are illegal and give rise to factual questions about the tactics used by Quiznos in selling franchises throughout the country and the legal legitimacy of any claim by Quiznos that the plaintiffs or the members of the class had any meaningful "freedom of contract" in deciding whether to sign their franchise agreements or whether they should be bound by its one-sided provisions that have no commercially reasonable basis.

**<u>Quiznos' Policy of Extracting Unlawful Profits From Its Franchisees</u>**

146. Once the franchisees are caught in the scheme, Quiznos ties the continuing operation of their franchises and their use of Quiznos' trademarks and right to participate in the franchise system to the supply of the Essential Goods necessary for operation of the franchised restaurants.

147. The franchise agreements provide that the franchisee must "purchase all equipment, products, services, supplies and materials required for the operation of the Restaurant from manufacturers, suppliers or distributors designated by Franchisor or its affiliates." These products include, among other things, staple food items such as meat, cheese, and condiments, services such as Muzak®, credit card processing services, beverages and snack chips, cash register systems, payroll services, accounting services, equipment necessary to open and run the restaurant (e.g., ovens to toast the subs, shelving, soup warmers, knives), and paper products used in the stores.

148. Quiznos uses this mandatory supply provision to create an artificial market and captive consumer that eliminates any competition for the sale of the Essential Goods and therefore allows it to engage in unrestricted price-gouging. Since 2000, Quiznos has seen its EBITDA (e.g., earnings before interest, taxes, depreciation, and amortization) grow from approximately $6 million in 2000 to $137 million in 2007, which is a direct reflection of Quiznos' ability to control the supply market for its franchisees to its own end. Indeed, AFD's gross margin on food and restaurant product distribution is nearly double that of every broad line master distributor, including the much larger SYSCO, Vistar, U.S. Foodservice, Dominos Distribution and those reporting to the RMS Survey database (showing data for 76 distributors with over $400 million in sales). AFD received revenue of $499,638,722 for the fiscal year ending on December 31, 2006 from the sale of food products to franchisees, independent of the $26,640,990 it obtained as rebates from suppliers. S&S Equipment's share of Source One's revenues for the fiscal year ending on December 31, 2006 was $65,742,297, with an additional $4,821,113 in vendor rebates. These amounts are particularly staggering given that Quiznos did not make a dime from the sale of Essential Goods before 2001. In short, defendants have used

Quiznos' contractual powers to extract huge profits from the plaintiffs in the operation of defendants' provisioning business.

**Quiznos' First Approach to Obtaining Profits on Essential Goods**

149. The first way in which Quiznos exploits its power to compel the purchases that franchisees must make is through the inclusion of undisclosed markups and "sourcing fees." With respect to Quiznos-controlled suppliers such as AFD, Source One, Ba-Bing, Kinetic Servicing, Continental Lending, and CLG, which sell (or sold) both directly or indirectly to franchisees, Quiznos charges prices that Quiznos knows to be higher than franchisees could obtain for products, materials and services of equal or even higher quality from independent third party vendors. This practice results in Quiznos and/or its affiliated companies reaping revenues and profits greatly in excess of what they would be if franchisees were not bound to buy from Quiznos and its affiliates. It also runs directly contrary to Quiznos' promise to negotiate such prices "for the benefit of the franchisees."

150. While the franchise agreements contain a provision purporting to allow the use of "undesignated" suppliers with Quiznos' approval, the franchisees soon learn that this provision is meaningless and misleading because such approval is rarely, if ever, granted. For example, Maximovich, a former operations offer for Quiznos, testified that efforts by him to authorize a franchisee to acquire equipment for a store opening from an alternate vendor resulted in reprimand by Quiznos. There is little wonder why: according to Maximovich, the franchisee acquired the very same equipment for approximately $60,000 less than it would have paid had it used Source One at the insistence of Quiznos.

151. Quiznos does not restrict its over-charging to the large-scale equipment drops that every new store takes on at the outset of the relationship (which, by itself, adds to the debt

burden taken on by the new franchisee). Those entities delegated to provision the stores mark up everything to ensure that Quiznos gets its percentage before the Essential Goods find their way to the restaurant. An invoice from Denver-based Mile Hi Specialty Foods, an unaffiliated regional distributor that maintains a distribution agreement with AFD, shows the length Quiznos will go to make money in this manner and breach its promise to negotiate for the benefit of the franchisees. Those franchisees obligated by Quiznos to use Mile Hi as their regional distributor paid $30.15 for a 12-count box of paper towels with a SKU No. of RK600E in May 2007. The exact same box of paper towels cost $20.60 for an Einstein Bagel proprietor using Mile Hi as its distributor. The contract for Muzak® provides another example: the typical Quiznos franchisee pays between $40-50/month for this mandatory service, while an individual not obligated to buy the service through Quiznos' "approved program" could get it for $19.99/month.

152. Pricing of this nature is endemic throughout the Quiznos franchise system. CLG, the company responsible at one time for the lease of the QPOS cash register system, imposed mandatory lease obligations upon the franchisees for use of the equipment. While an outright purchase of the equipment would have cost a franchisee approximately $5,400, CLG's leasing program resulted in a nominal interest rate in the lease of 33%, allowing CLG to require payment of an additional $3,588 from the franchisee to the Quiznos affiliate.

153. Quiznos also makes the process for alternate-supplier approval deliberately vague and complex. It contains no timelines for approval, and as a result Quiznos frequently never even responds to franchisees' requests for such approval, or provides any reasonable explanation for disapprovals. To the contrary, the company has purposefully provided disincentives to use alternative supplies by tying franchisees' ability to obtain financial rewards under Quiznos' STAR Reward Program to the franchisees' use of the Quiznos-chosen suppliers. While Quiznos

finally relented (on January 18, 2006) to allow franchisees with more than one year in the system to use alternative bookkeepers (in lieu of Horne CPA), alternative cleaning and laundry supply services (in lieu of Cintas) and alternative payroll providers (in lieu of ADP), it specifically conditioned the plaintiffs' right to pursue alternative suppliers in these areas with a restriction: the risk of not receiving their STAR Reward dollars.

154. Many of the plaintiffs attempted to use alternative suppliers with little success. For example, Virgili purchased soup lids (same manufacturer, same product number) from Restaurant Depot at a cost of 30% less than the price he was paying from Quiznos. He presented them to Quiznos representative Ray Ganem during an area sales meeting and inquired about the price disparity, to which Ganem had no response. Virgili went back to Restaurant Depot and did additional price comparisons on tuna, olives, plastic bags, as well as other items. He then prepared comparison spreadsheets and circulated them to the Quiznos representatives for review. He never received a response from them.

155. Carolyn Peddy is a certified payroll supervisor who had previously been employed by ADP. She approached Quiznos representative Randy Trotter about preparing her own payroll and was advised that she would not be permitted to do so. Peddy later requested permission to purchase her own accounting software and again her request was denied. She also researched and found that she could purchase Muzak for less money by dealing directly with Muzak but when she approached Quiznos about doing so, Quiznos rejected her request.

156. Mikki Lucas, Carolyn Peddy's daughter, obtained produce from Phoenix Produce prior to a mandate from Quiznos to purchase from food distributor NorthStar. As NorthStar also purchased from Phoenix Produce, Lucas thought it impractical to begin purchasing from NorthStar, as it would mean that instead of her produce shipping directly to her in Georgia, it

would first go to NorthStar's warehouse in South Carolina, causing delays in delivery and producing more waste from spoiled produce. However, a Quiznos representative advised her that she needed to stop purchasing from Phoenix Produce and begin purchasing from NorthStar only.

157. Robert Hampshire advised Quiznos representatives Crider and Wotten that he had a preexisting relationship with food and equipment suppliers, Sysco and McLane and that he wanted to use and maintain those relationships when he opened his Quiznos store. Wotten told him that Quiznos would negotiate more favorable deals with its distributors because of its buying power. Hampshire took him at his word; however, six months after opening his restaurant, Hampshire concluded that his food costs were running at 32-33% of sales, approximately 5% over the 28.5% represented by Quiznos before he signed the franchise agreement.

158. In addition to purposefully hindering the franchisee's ability to use alternative suppliers identified by the franchisees, Quiznos also threatens any supplier that attempts to provide competitive pricing to Quiznos' franchisees or share information with franchisees that would undercut Quiznos' control of the pricing scheme. Some examples include:

(a) In 2003, defendant Rick Schaden threatened a nationwide food supplier with a lawsuit when Quiznos came to learn that the vendor had been supplying information on certain products to inquisitive franchisees.

(b) In a November 3, 2003 letter addressed to "Dear Quiznos Purveyor," Quiznos National Produce Manager (Walter Hillery) stated that Quiznos had selected Freshpack Produce, Inc. as the sole and exclusive provider of produce to the stores located in the Denver metropolitan area and ordered the letter's recipients to "not solicit nor accept any orders from stores that may call on you" for produce. Claiming that a "[f]ailure to comply will result in being removed as a potential future purveyor," Hillery asked that the letter's recipients advise what stores were seeking a third party arrangement for produce so that he could address the issue directly with the franchisees.

(c) In 2005, Quiznos threatened a nationwide service provider already under contract with Quiznos with tortious interference when it learned that the vendor had the audacity to offer price breaks to the franchisees without Quiznos' consent.

(d) In 2007, when uniform supplier Crest attempted to sell certain items of Quiznos-branded gear at prices that were approximately 40% less than what Kinetic Sourcing sought to charge for the same clothing, Quiznos interfered and instructed Crest to stop selling the uniforms even though Quiznos franchisees would have enjoyed cost savings.

**Quiznos' Second Approach to Obtaining Profits on Essential Goods**

159. Quiznos' second approach to using its captive consumers to make money on the sale of Essential Goods is its policy that independent suppliers, as a condition of becoming an approved source of products, services or materials to Quiznos franchisees, pay kickbacks to Quiznos. Defendants euphemistically call these kickbacks "rebates." Quiznos requires approved vendors/distributors to pass along the cost of the kickbacks to its franchisees, resulting in the franchisees' being required, once again, to pay prices for products, services and materials that are higher than franchisees could obtain from truly independent third-parties.

160. For example, in February 2005, Quiznos obtained a $27 million incentive payment from Pepsi (none of which it shared with the franchisees) to make the switch from Coca-Cola products to Pepsi products. In so doing, Quiznos obligated the franchisees to acquire new (and less reliable) fountain equipment at a cost to them and rejected Pepsi's proposal to provide free service calls on the equipment even though it was standard practice for Pepsi to provide such service. The soda and drink rebates alone are worth millions to Quiznos each year. Kickbacks like this are routine at Quiznos with the majority of the vendors, including ADP, Cintas, Horne Accounting, Terminix, Staples, Protection One Alarm Monitoring, and many others.

161. Through its "rebate" scheme, Quiznos and the companies and individuals affiliated with it reap substantial revenues and profits that come at the direct expense of its franchisees, creating an environment where franchisees and their invested capital are preyed upon as the most important, immediate and dependable source of revenue and cash flow for Quiznos. Ignoring its promises and contractual obligations, Quiznos shows no concern about whether franchisees can generate positive cash flow through the sale of food to the retail customer, even though those products are purported by Quiznos to be its primary business interest, but in fact are not. Moreover, once franchisees become aware of this fraudulent scheme, the sunk costs, onerous contractual provisions, and costs of switching to another brand make it economically prohibitive for franchisees to escape the 15-year franchise agreement.

162. As a continuing condition of franchisee ownership, Quiznos requires franchisees to sign supplemental contracts for franchisor-mandated services. These contracts are equally one-sided, favoring Quiznos, and designed to prevent the prospective franchisee from being able to comprehend the actual impact to the franchisee's bottom line. Quiznos promotes these mandated services as being critical to "the brand" when in fact they have no direct connection to the brand whatsoever, and no direct relation to quality standards. In fact, the true purpose of these mandated services is to provide further kickbacks to Quiznos.

163. In sum, defendants' practices of (a) knowingly overcharging franchisees through markups and sourcing fees; and (b) requiring kickbacks from approved vendors are directly contrary to Quiznos' false and deceptive representation to franchisees that "[w]e and our affiliates negotiate purchase agreements with suppliers for the benefit of Franchisees." The practices described herein are also directly contrary to false and deceptive statements routinely made by Quiznos' representatives to the effect that Quiznos uses its "buying power" created by

the size of its franchise system to negotiate volume discounts from suppliers and pass those discounts on to franchisees.

164. Despite its unlawful approach to increasing the cost of Essential Goods to plaintiffs and the Class, Quiznos has always taken care of its own. Non-party Quiz-DIA LLC is a company that owns and controls the two Quiznos restaurants at Denver International Airport. It is an affiliate of Quiznos and is controlled by the Schadens. While food and paper costs for the typical Quiznos franchisee have historically been between 30% and 40% of "Net 3" sales, the airport stores run average food and paper percentages of approximately 25%. In what defendant Rick Schaden admits is a "penny profit" business, percentage fluctuations at this level literally reflect the life and death of a restaurant. Whether compared to historical data from 2005 and 2006 or the goals sought to be achieved under Quiznos' new management (which purportedly strives for a food and paper percentage of 29%), the food and paper costs at the airport stores clearly reflect discounts not given to independent franchisees like the plaintiffs.

**The Brenneman Era: Acknowledgement of Past Injuries**

165. The conduct complained about in this Amended Complaint continues to this day; however, the infusion of J.P. Morgan's ownership interest has resulted in certain admissions of past misconduct during the Schaden and Shaffer Era. In January 2007, Quiznos hired Gregory D. Brenneman as Chief Executive Officer. In an interview with the New York Times on February 24, 2007, Brenneman admitted that franchisee profitability is a problem at Quiznos, claiming "it was clear [when he got involved with the company] that food costs, as a percent of revenue were, quite honestly out of line . . ." In a little over a year, Brenneman and his team have all but conceded the sins of the past in a manipulative effort to quell unrest in the system, while the fundamental changes necessary to alter the economic model remain largely unaddressed.

166. On August 19, 2008, Quiznos elevated Brenneman to Chairman and appointed David Deno Chief Executive Officer. Despite the involvement of new management since January 2007, Quiznos' business model remains unchanged and, in fact, has gotten worse due to Quiznos' July 2008 decision to impose maximum retail pricing on franchisees. This policy has had the effect of squeezing plaintiffs and the Class coming (in buying food from AFD and its distributors) and going (in selling food to the retail customers)—further hindering the ability of the franchisees to survive. Upon information and belief this is a deliberate strategy designed to force out more "mom and pop" owners to allow Quiznos to achieve its new goal of multi-unit ownership through "fire sale" prices.

**Abuse of the Advertising and Marketing Fund**

167. The franchise agreement signed by the representative plaintiffs obligated them to pay a "Marketing and Promotion Fee" of 1% of their gross weekly sales (e.g., what Quiznos calls "Net 3" sales) to fund marketing and advertising efforts. While the contract expressly disclaims that the fund is an asset of the franchisor, it gives Quiznos the right to administer and control its use on behalf of the franchisees. Plaintiffs' franchise agreement further obligates the franchisees to dedicate an additional 3% of their gross quarterly sales to "local advertising" and to account for all such expenditures with Quiznos on a quarterly basis. Finally, the parties contemplated at the time of signing that Quiznos could require the franchisees to pay an additional 1% of weekly gross sales in the event Quiznos were to create a "Regional Advertising Program." In sum, plaintiffs are obligated under the franchise agreement to spend no "more than a total of five percent (5%) of [their] Gross Sales, in the aggregate, for the Local Advertising Fee, Regional Advertising, and Marketing and Promotion Fee contributions, including Yellow Pages advertising."

168. Quiznos long ago abandoned the notion of having its franchisees control the 3% local advertising funds and today simply deducts that amount from the plaintiffs' bank accounts as part of its weekly draw from gross sales. Today, defendant QAFT controls what Quiznos calls the "National Marketing Fund Trust" and the "Regional Advertising Program Trust." In exercising administrative and financial oversight over these funds, QAFT serves as a fiduciary to the plaintiffs and the Class, who are the beneficiaries of the trusts.

169. The franchise agreement expressly limits the use of the advertising and marketing fund. It provides for those monies to be used "for production and placement of media advertising, direct response literature, direct mailings, brochures, collateral advertising material, surveys of advertising effectiveness, other advertising or public relations expenditures relating to advertising QUIZNO'S Restaurants services and products, providing professional services, materials, and personnel to support the marketing function, and creating, producing, and implementing websites for Franchisor and/or its franchisees." Plaintiffs reasonably expected and understood that the advertising and marketing fund's "primary purpose is to support sales by the entire QUIZNO'S System and to build brand identity." The UFOC specifically states: "We do not directly solicit Franchisees through the Marketing Fund."

170. QAFT and its predecessors have mismanaged the marketing and advertising trusts and stolen funds to pursue the illegal schemes alleged in this Amended Complaint. Quiznos has done so in bad faith to pursue its own self-interest. In this regard, Quiznos has used the trusts for such things as: (a) selling more franchises; (b) reimbursing vendors associated with Source One and AFD for contractual commitments; (c) flooding the market with coupon campaigns that Quiznos knew would not improve franchisee profitability; (d) purchasing advertising in unnecessary and ineffective ways; and (e) engaging in waste of fund assets by using the majority

of the trust assets annually for excessively-priced and ill-timed national television advertising that fails to accomplish a principal contractual purpose of the advertising fund—the growth of retail sales on a unit basis.

171. In addition, by failing to reimburse franchisees for the costs associated with Quiznos' historically excessive use of coupons, defendants have effectively increased the cost of marketing and advertising to the franchisee by an additional 6% of weekly sales (i.e., the average cost of discounts for the period 2000 to 2006) in direct contravention of Quiznos' contractual promise that plaintiffs' advertising and marketing expenses would not exceed 5%.

**LIMITATIONS ESTOPPEL**

172. Throughout the implementation of their fraud and continuing until the present day, defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing plaintiffs and the Class from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

173. In particular, various Quiznos representatives have consistently and routinely represented that the franchisees' concerns raised in this Amended Complaint and elsewhere were of the utmost importance to Quiznos and would be rectified, which have served the deliberate purpose of lulling plaintiffs into believing that Quiznos had their best interest at heart and that the pursuit of legal action was unnecessary. The following serve as examples:

(a) In late 2003 and early 2004 John Fitchett represented that Quiznos was "working to reduce food and paper costs" when, in actuality, Quiznos had intentionally set out at that time to continue its policy of raising its prices and thereby extracting unjustifiable profits from the franchisees.

(b) When Quiznos reached the milestone of having opened 1800 franchises in or about 2003, it falsely represented to its

franchisees that it constituted a "buying club" and that prices for food and supplies would be going down.

(c) In an Annual Meeting in 2005 in Dallas, Texas, Quiznos representatives falsely stated that food and supply pricing would be lowered and that Pepsi would be providing revenue for advertising.

(d) In regular meetings of the regionally-based Marketing Action Teams ("MATs"), Quiznos falsely implies to MAT members that Quiznos, including Chief Executive Officer Brenneman, is concerned about changes to help franchisees become profitable and deliberately requests members of the MAT team to contact store owners and advise of Quiznos intent to resolve the problems with the franchise system.

(e) In a videotaped presentation from 2005, Shaffer stated: "In 2005 franchise profitability is one of my top priorities. There are two ways for franchisees to make more money: 1. increase sales and 2. lower costs. We've made some strides by increasing sales and we've shown some improvement in lowering costs but discounts remain way too high. Rest assured, we will lower discount rates."

(f) In a July 6, 2005 "White Paper" authored by Shaffer and his team, Quiznos wrote to all franchisees in the system to make the case (fraudulently as it turned out) that the problems in the system related to food costs, abuse of the advertising fund, deflated AUVs and encroachment were not the result of Quiznos' conduct but of "misinformation" being distributed by individuals in the system, including the Toasted Subs Franchisee Association, Inc. ("TSFA"), an independent franchisee association.

(g) In August 2005, Shaffer and his management team sent a newsletter to the franchisees that mirrored the promises and commitments in the "White Paper" that Quiznos was working to achieve changes in the system to make franchisees more profitable.

(h) In a videotaped presentation from 2006, Shaffer claimed: "Our top priority for 2006 is to help you reduce your FLPDs (e.g. "food, labor, paper and discounts"). In 2005, our chain's FLPDs were around 59% and that is just too high."

(i) For the period 2000 to the present, Quiznos has used a "Franchise Advisory Council" to peddle platitudes to franchisees on how Quiznos had their best interest at heart and intended to take action

to address the matters outlined in this Amended Complaint when, in fact, the Franchise Advisory Council was a puppet organization that was paid lip service by management.

(j) When presented with Maximovich's rational and well-thought out critiques of the problems with costs in the system, Shaffer and Rick Schaden committed to taking action to addressing the problems but never followed through on those commitments.

(k) Despite acknowledging that food costs and store profitability were a problem, Shaffer learned about an internal corporate study done by Quiznos' Brian Smith that demonstrated for a fact that nearly 50% of all Quiznos franchises were not profitable and, when confronted with this information, Shaffer instructed Smith to destroy the report and not discuss it with anyone.

174. The purpose of these ongoing communications and actions was to dissuade franchisees from taking any action, legal or otherwise, to enforce their rights.

175. As alleged elsewhere in this Amended Complaint, defendants have also actively concealed information necessary for plaintiffs and the Class to discover the existence of their claims. Plaintiffs and the Class reasonably relied on the defendants' actions and/or omissions in failing to discover the factual and legal basis of their claims.

176. As a result of defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, plaintiffs and the Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims. Accordingly, defendants are estopped from raising affirmative defenses relying upon any statutes of limitations or contractual limitations periods otherwise applicable to the claims asserted herein by plaintiffs.

## CLASS ACTION ALLEGATIONS

177. Pursuant to Federal Rules of Civil Procedure 23(a) and (b), plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons defined as:

> All residents of the United States (including persons and business entities) that owned or own a Quiznos franchise during the longest

period permitted by the applicable statutes of limitations. Excluded from the Class are the officers, directors and employees of defendants and their respective legal representatives, heirs, successors and assigns.

**Rule 23(a)**

178. **Numerosity:** Members of the Class are so numerous that their individual joinder is impractical. The precise identities, number and addresses of members of the Class are unknown to plaintiffs, but may and should be known with proper and full discovery of defendants, third parties, and their respective records.

179. **Existence of Common Questions of Fact and Law:** There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class. The common questions of fact and law include but are not limited to:

(a) Whether and to what extent defendants' practices and conduct, and misrepresentations violate federal or state law.

(b) Whether defendants have engaged in mail and wire fraud.

(c) Whether defendants engaged in a pattern of racketeering activity.

(d) Whether the Quiznos franchise system is an enterprise within the meaning of 18 U.S.C. § 1961(4).

(e) Whether defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

(f) Whether defendants' overt and/or predicate acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to the plaintiffs' and class members' business or property.

(g) Whether, in connection with the filing, offering, or sale of the subject franchises, defendants directly or indirectly employed any devices, schemes, or artifices to defraud plaintiffs within the meaning of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101, *et. seq.*

(h) Whether, in connection with the filing, offering, or sale of the subject franchises, defendants directly or indirectly made any untrue statements of material fact or omitted certain material facts necessary in order to make the statement(s) made, in the light of the circumstances under which they are made, not misleading under the CCPA.

(i) Whether, in connection with the filing, offering, or sale of the subject franchises, defendants directly or indirectly engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, within the meaning of the CCPA.

(j) Whether defendants' affirmative statements and material omissions constitute intentional misrepresentation or promissory fraud.

(k) Whether plaintiffs sustained injury as a result of Quiznos' breaches of the franchise agreement and/or the implied covenant of good faith and fair dealing.

(l) Whether Quiznos' UFOC contained fraudulent misrepresentations and omissions.

(m) Whether Quiznos breached any representations set forth in the UFOCs.

(n) Whether plaintiffs sustained injury as a result of Quiznos' breaches of the franchise agreement.

(o) Whether QAFT or its predecessors engaged in systemic mismanagement of the marketing and advertising funds.

(p) Whether Quiznos systemic approach to obtaining releases from franchisees constitutes economic duress.

(q) Whether defendants have been unjustly enriched.

(r) Whether the franchise agreement is illusory and, thus, null and void.

(s) Whether the franchise agreement is unconscionable and, thus, null and void.

(t) Whether plaintiffs and Class members are entitled to recover compensatory, exemplary, trebled, statutory or punitive damages

based on defendants' fraudulent and illegal conduct or practices and/or otherwise.

(u) Whether defendants should be obligated to disgorge the illegal profits obtained by the schemes alleged herein.

(v) Whether plaintiffs and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

(w) Whether the franchise agreement should be rescinded.

(x) Whether defendants, jointly or severally, violated Colo.Rev.Stat. §18-4-405 ("Civil Theft"), such that they are obligated to pay plaintiffs three times the amount of their actual damages, plus reasonable attorneys' fees.

180. **Typicality:** Plaintiffs are members of the Class. Plaintiffs' claims have a common origin and share common bases. Their claims originate from the same illegal, fraudulent and confiscatory practices of the defendants, and the defendants act in the same way toward the plaintiffs and the Class members. If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

181. **Adequacy**: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

**Rule 23(b)(2) and (3)**

182. This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because plaintiffs and the Class seek declaratory and injunctive relief, and all of the above factors of numerosity, common questions of fact and law, typicality, and adequacy are present. Moreover, defendants have acted on grounds generally applicable to plaintiffs and

the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

183. This lawsuit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe defendants' conduct and practices (with expert witness fees alone running into 6-figures). Additionally, effective redress for each and every class member against defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes. Even if individual class members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against defendants.

## FIRST CLAIM FOR RELIEF
## CIVIL RICO (18 U.S.C. § 1962(C))
## FRAUDULENT SCHEME TO SELL ESSENTIAL GOODS AT INFLATED PRICES

***(As to Defendants QFII, QFA, TQFC, QF, TQSC II, TQM, The Cervantes Defendants, Rick Schaden, Dick Schaden and Meyers by All Plaintiffs)***

184. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

185. Defendants QFII, QFA, TQFC, QF, TQSC II, TQM, the Cervantes Defendants, Rick Schaden, Dick Schaden and Meyers have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

186. The Quiznos franchise system, which is comprised of defendants QFII, TQFC, QF, QFA, TQSC II, TQM, the Cervantes Defendants and their affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs. The structure of the enterprise is imposed by, among other things, the terms of the various franchise agreements upon which defendants rely in requiring plaintiffs, each of which is a legal entity separate from any defendant, to take certain actions and to refrain from taking other actions, and by the terms and conditions of the Quiznos' "Operations Manual" that purports to allow Quiznos as franchisor to dictate detailed aspects of store operations. The contractual rights exercised by Quiznos franchising entities under the franchise agreements and the Operations Manual allow the Quiznos' franchising entities to control the franchisees' actions in the manner of a classic top-down hierarchy, in which decisions are made by the franchising entities and then dictated to the franchisees, who have no choice but to follow the orders or risk termination. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by plaintiffs to members of the general public, the advertising of plaintiffs' stores and of Quiznos generally by both plaintiffs and by the Quiznos defendants themselves, the hiring of employees by franchisees, and many other day-to-day business activities that do not partake of criminality.

187. The defendants conduct the affairs of the enterprise, as opposed to merely their own affairs, by, among other things, invoking provisions of the franchise agreement and the Operations Manual to require the plaintiffs to take certain actions and to refrain from taking

certain actions, and in general by asserting control over the activities of franchisees in a hierarchical manner, as alleged in paragraph 186 of this Amended Complaint.

188. If it were not for the separate legal existence of the franchisees, the defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so as to defraud the plaintiffs of money and/or property. For example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos franchises can the defendants fraudulently induce such purchases. Similarly, if Quiznos operated only through company-owned stores, then Quiznos would not be able to create subsidiaries and affiliate supply companies that sold and provisioned food, services, and their products at highly inflated prices, because Quiznos would be charging those inflated prices to itself. This would be impossible if Quiznos operated exclusively through company-owned stores, and this, among other reasons, is why Quiznos divested itself of all corporate stores except two (those owned by Quiz-DIA LLC), having once owned 35 in their early growth years.

189. Defendant QFII participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the plaintiffs' purchase of products, services and materials by requiring the plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.
Defendants QFA, TQFC and QF participated in the conduct of the enterprise through the exercise of their control, granted to it by the franchise agreements, over the plaintiffs' purchase of products, services and materials by requiring the plaintiffs to purchase such products, services and materials at prices that were known to them to be higher than their fair market value and

greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

190. To the extent that rights to enforce and apply the franchise agreements of the plaintiffs have in fact been delegated to defendant TQSC II (or its predecessor), it has participated in the conduct of the enterprise through the exercise of their control, granted to it by the franchise agreements, over the plaintiffs' purchase of products, services and materials by requiring the plaintiffs to purchase such products, services and materials at prices that were known to defendants to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

191. The Cervantes Defendants have participated in the conduct of the enterprise by their provision of products and services to the plaintiffs through their affiliates.
Defendants Rick Schaden, Dick Schaden and Meyers have participated in the affairs of the enterprise because they personally either made or approved decisions to knowingly overcharge plaintiffs for products, services and materials which plaintiffs were required to buy in order to operate their franchises, and to require plaintiffs to purchase products, services and materials from approved vendors whose prices to franchisees were known by Dick Schaden, Rick Schaden and Meyers to be inflated beyond fair market value because of kickbacks that the approved vendors were required to pay one or more Quiznos entities in order to become approved vendors as well as markups and "sourcing fees" charged by the Quiznos affiliates.

192. The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by 18 U.S.C. § 1343.

193. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendant QFII devised and effected a scheme to defraud the plaintiffs, which scheme consisted of deliberately and knowingly overcharging the plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the plaintiffs to be overcharged (on purchases made from approved vendors required to pay kickbacks to Quiznos as a condition of becoming approved and on purchases made from approved distributors who passed along Quiznos' sourcing and mark up fees) for products, services and materials they are required to purchase in order to operate their franchises.

194. The execution of the scheme to defraud by defendant QFII involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant QFII.

195. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of QFII's fraudulent scheme are as follows: payments made by plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from plaintiffs' bank accounts through electronic funds transfers made using interstate wire; plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendants' fraudulent overcharging practices.

196. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendants QFA, TQFC and QF, devised and effected a scheme to defraud the plaintiffs that have franchise agreements

signed prior to February 2005, which scheme consisted of deliberately and knowingly overcharging the plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the plaintiffs to be overcharged (on purchases made from approved vendors required to pay kickbacks to Quiznos as a condition of becoming approved and on purchases made from approved distributors who passed along Quiznos' sourcing and mark up fees) for products, services and materials they are required to purchase in order to operate their franchises.

197. The execution of the scheme to defraud by defendants QFA, TQFC and QF involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by these defendants.

198. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of the fraudulent scheme of QFA, TQFC and QF are as follows: payments made by plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from plaintiffs' bank accounts through electronic funds transfers made using interstate wire; plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendants' fraudulent overcharging practices.

199. To the extent that the franchisor's rights under plaintiffs' franchise agreements have been delegated to defendant TQSC II (or its predecessor), defendant TQSC II devised and effected a scheme to defraud the plaintiffs in violation of 18 U.S.C. § 1341 and 18 U.S.C. §

1343, which scheme consisted of deliberately and knowingly overcharging the plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the plaintiffs to be overcharged (on purchases made from approved vendors required to pay kickbacks to Quiznos as a condition of becoming approved and on purchases made from approved distributors who passed along Quiznos' sourcing and mark up fees) for products, services and materials they are required to purchase in order to operate their franchises.

200. The execution of the scheme to defraud by defendant TQSC II involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant TQSC II.

201. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of TQSC II's fraudulent scheme are as follows: payments made by plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from plaintiffs' bank accounts through electronic funds transfers made using interstate wire; plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by defendants' fraudulent overcharging practices.

202. The predicate acts committed by defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

203. The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to

defraud the same victims of money each time a fraudulently inflated price is charged to the franchisee and received, in the form of a direct payment to Quiznos or a kickback paid to Quiznos by an approved supplier, by Quiznos or an affiliated entity. In addition, all of the Quiznos franchisees across the United States, current and past, have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

204. The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because the practice of fraudulently overcharging the Quiznos franchisees for products, services and materials they must purchase in order to operate their stores is a crucial means by which Quiznos maintains its high revenues and profits. Indeed, the scheme is likely to continue on its present course at least until Quiznos' existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer such as J.P. Morgan. As of the filing of this Amended Complaint, there is no way to know whether this goal will be achieved.

205. Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF
## CIVIL RICO (18 U.S.C. § 1962(c))
## (FRAUDULENT SCHEME TO SELL FRANCHISE AGREEMENTS)
***(As To Defendants QFII, QFA, TQFC, QF, TQSC II, TQM, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, and Shaffer By All Plaintiffs)***

206. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

207. Defendants QFII, QFA, TQFC, QF, TQSC II, TQM, the Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, and Shaffer, have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

208. The Quiznos franchise system, which is comprised of defendants QFII, QFA, TQFC, QF, TQSC II, TQM, the Cervantes Defendants and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs. The structure of the enterprise is imposed by, among other things, the terms of the various franchise agreements upon which defendants rely in requiring plaintiffs, each of which is a legal entity separate from any defendant, to take certain actions and to refrain from taking other actions, and by the terms and conditions of the Quiznos' "Operations Manual" that purports to allow Quiznos as franchisor to dictate detailed aspects of store operations. The contractual rights exercised by Quiznos franchising entities under the franchise agreements and the Operations Manual allow the Quiznos' franchising entities to control the franchisees' actions in the manner of a classic top-down hierarchy, in which decisions are made by the franchising entities and then dictated to the franchisees, who have no choice but to follow the orders or risk termination. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by plaintiffs to members of the general public, the advertising of plaintiffs' stores and of Quiznos generally by both plaintiffs and by the Quiznos defendants themselves, the hiring

of employees by franchisees, and many other day-to-day business activities that do not partake of criminality.

209. The defendants conduct the affairs of the enterprise, as opposed to merely their own affairs, by, among other things, invoking provisions of the franchise agreement and the Operations Manual to require the plaintiffs to take certain actions and to refrain from taking certain actions, and in general by asserting control over the activities of franchisees in a hierarchical manner as alleged in paragraph 208 of this Amended Complaint.

210. If it were not for the separate legal existence of the franchisees, the defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so as to defraud the plaintiffs of money and/or property. For example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos franchisees can the defendants fraudulently induce such purchases. This would be impossible if Quiznos operated exclusively through company-owned stores.

211. Defendant QFII participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, and about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

212. Defendants QFA, TQFC and QF participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, and about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

213. Defendant TQSC II participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, and about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

214. The Cervantes Defendants participated in the conduct of the enterprise by their provision of management services to the defendants, which managers either approved or made decisions to knowingly induce franchise sales through misrepresentation and deceit. Defendants Rick Schaden, Dick Schaden, Meyers and Shaffer have participated in the affairs of the enterprise because they personally either made or approved decisions to knowingly induce franchise sales through misrepresentation and deceit.

215. The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by U.S.C. § 1343.

216. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendants devised and effected a scheme to defraud prospective franchisees by knowingly and deliberately making false representations of fact, and/or omitting material true facts, to prospective franchises in order to induce them to purchase a Quiznos franchise.

217. The execution of the scheme to defraud by defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendants.

218. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendants' fraudulent scheme are as follows: UFOCs, FDDs, and

franchise agreements were distributed using the United States mails; agents of the corporate defendants named in this Amended Complaint, including, without limitation, such individuals as: Anthony Kruse, Don Lauria, Mike Wotten, Charlotte Russell, Larry McAllister, Scott Warren, Andy Klie, David Garagozzo, Charlie Riley, Justin Rokocki, Michael Newman, John Teza, Josh Beyer, Sue Schaeffer, Rob Schmidt, Kyle Gjersee, Dianne Moreland, Kevin Casey, Bill Alley, John Lubarsky, Jeff Humphrey, David Bloom, Randy Trotter, Tom Sturkie, Larry Sapp, Steve Rodgers, Dave Wagner, John Hajj, and the agents and representatives of Quiznos identified in paragraphs 19, 75-78, and 84 of this Amended Complaint, who made and received telephone calls to and from prospective franchisees in which further fraudulent representations and omissions were made in order to induce entry into franchise agreements, and franchisees used the mail to send their franchisee fee payments to Quiznos.

219. The fraudulent representations and omissions giving rise to this and other related claims are stated with particularity in the "General Allegations" section in paragraphs 92-138, 143-145, and 165-176 of this Amended Complaint.

220. The predicate acts committed by defendants as alleged in this Amended Complaint constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

221. The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the franchisees through their payment of the initial franchise fee, as well as other future payments to be received by Quiznos, such as for overpriced products, services, materials and the like. In addition, all of the Quiznos franchisees across the United States have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

222. The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because Quiznos' business model is built upon continually increasing the number of new franchises coming into the system. Despite the introduction of new management in January 2007, Quiznos continues to sell new franchises in the United States using deceptive practices. Indeed, the scheme is likely to continue on its present course at least until Quiznos' existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

223. Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein, specifically through the payment by plaintiffs of franchise fees or other payments using the United States mail or wire transfers.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**
***(As To All Defendants By All Plaintiffs)***

224. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

225. As alleged with specificity in this Amended Complaint, defendants engaged in unfair and deceptive trade practices in their relationship with plaintiffs and the Class.

226. Along with others known and unknown, the Schaden Defendants, Shaffer, Meyers, and others known and unknown (including those identified in paragraph 84 of this Amended Complaint) caused Quiznos to engage in deceptive trade practices. Upon information and belief, they participated in the deceptive practices alleged in this Amended Complaint by overseeing, directing and otherwise ratifying the action of the corporations they control.

227. The deceptive trade practices described in this Amended Complaint occurred in the course of defendants' business and, in the case of the Schaden Defendants, Shaffer, Meyers and those identified in paragraph 84 of this Amended Complaint, as part of their occupation as officers and directors of the various corporate defendants.

228. The deceptive trade practices alleged in this Amended Complaint significantly impacted the public as actual or potential consumers of the defendants' goods and services. This class action seeks redress for more than 5,000 Quiznos franchisees located throughout the United States. Quiznos' conduct in selling franchises and in its relationship with franchisees subsequent to entry of the franchise agreements resulted in a significant and detrimental impact on members of the public. The CCPA provides protection to those affected by pre- and post-sale deceptions in consumer relationships.

229. Plaintiffs and the Class were actual consumers of the defendants' goods and services and were injured in the course of their business and occupation as a result of defendants' deceptive trade practices and their violation of the CCPA.

## FOURTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
***(As To All Parties Who Signed Franchise Agreements Or Obtained Rights To Them By Assignment)***

230. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

231. Each franchise agreement alleged to have been executed in this Amended Complaint constitutes a contract binding on the defendants. Quiznos expressly incorporates its UFOC into the franchise agreement and thereby binds itself to its terms. In each franchise agreement alleged to exist in this case, the parties agreed as follows:

> (C) NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, ***EXCEPT AS SET FORTH IN THIS DOCUMENT AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE,*** IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

(Franchise agreement, ¶ 23.12(C).) (Emphasis added.)

232. The UFOCs presented to each plaintiff provide that Quiznos would "negotiate purchase agreements with suppliers ***for the benefit of Franchisees, which often include volume discounts.***" (Emphasis added.) By using its control over the suppliers from whom Quiznos allows franchisees to purchase the Essential Goods improperly, defendants failed to use their "buying power" (due to volume purchases) for the benefit of franchisees. Defendants breached their contractual obligation to negotiate with suppliers for the benefit of franchisees.

233. Defendants have further breached their contractual obligations to plaintiffs and the Class by, among other things: (a) failing to provide promised support and assistance in operating franchises; (b) failing to properly appropriate and apply advertising and marketing funds as required by the franchise agreement; and (c) indirectly increasing the cost of the fees paid to the marketing and advertising fund by imposition of coupons in the public market and not reimbursing plaintiffs for the costs associated with honoring those coupons. The breaches of contract alleged herein were a substantial factor causing plaintiffs harm. By reason of defendants' breaches as alleged herein, plaintiffs and the Class have been damaged in amounts to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
***(As To All Parties Who Signed Franchise Agreements Or Obtained Rights To Them By Assignment)***

234. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

235. Each franchise agreement between plaintiffs and defendants includes not only express written provisions, but also those terms and conditions, which although not formally expressed, are implied by law. Such implied terms are as binding as the terms that are actually written into the agreement.

236. Inherent in all contracts is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take any action that will injure the other party or compromise his benefit of the contract.

237. The obligations of Quiznos to abide by the implied covenant of good faith and fair dealing are heightened by the substantial imbalance of power between Quiznos and plaintiffs, which imbalance allows Quiznos to implement the business scheme described in detail in this Amended Complaint and incorporated by reference. Quiznos maintains near unilateral discretion in the implementation and enforcement of its franchise agreements, UFOCs and FDDs.

238. Quiznos has breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by acts independent of the deceptive practices. Quiznos has denied plaintiffs the ability to achieve their reasonable expectations in entering into the franchise relationship, which includes without limitation the reasonable expectation that Quiznos would negotiate prices for the benefit of the franchisees.

239. Defendants' breach of the implied covenant of good faith and fair dealing was a substantial factor causing plaintiffs and the Class damage.

**SIXTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
***(As To All Parties Not Signatories To or Bound by a Franchise Agreement)***

240. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

241. By paying supra-competitive prices for the Essential Goods, plaintiffs conferred benefits upon the defendants that defendants received solely by virtue of Quiznos' failure to fulfill its promise to negotiate prices for the benefits of the franchisees.

242. The defendants maintain knowledge and appreciation of the benefits conferred upon them by plaintiffs and the Class.

243. Under the circumstances alleged in this Amended Complaint, it would be inequitable for defendants to accept and retain these benefits without paying the value thereof. The benefits provided include money paid directly to defendants and to others on defendants' behalf.

**SEVENTH CLAIM FOR RELIEF**
**INTENTIONAL MISREPRESENTATION**
**("FRAUD IN THE INDUCEMENT")**
***(As to All Defendants By All Plaintiffs)***

244. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

245. As alleged with specificity in this Amended Complaint in paragraphs 92-138, 143-145 and 165-176, defendants knowingly made false statements of past and present fact to, and omitted or concealed true statements of fact from, the plaintiffs. Defendants' false statements created an untrue and misleading impression in the mind of plaintiffs. With respect to

each such true statement alleged to have been omitted or concealed by the defendants, the defendants owed each plaintiff a duty to disclose the truth of such omitted or concealed fact. These facts were material in plaintiffs' decision to acquire a Quiznos franchise because a reasonable person under the circumstances would regard the facts misrepresented and otherwise omitted as important in deciding to purchase a Quiznos franchise. Defendants knew that plaintiffs would find the misrepresented and omitted facts to be important in deciding how to proceed.

246. Defendants concealed these facts with the intent of creating a false impression of the actual facts in plaintiffs' mind and knowing plaintiffs would not have taken the course of action they did had they been told all of the facts.

247. The statements and omissions of the defendants as alleged herein were untrue. Defendants knew or should have known at the time they made the representations and omissions that their affirmative statements as alleged herein were false, and that their omissions or concealments were deceptive by virtue of being incomplete.

248. The defendants made the false statements, and engaged in the omissions and concealments, with the intent to defraud the plaintiffs and in order to induce the plaintiffs to rely on the statements, omissions and concealments.

249. Each plaintiff believed the false statements made to him or her, or believed that no facts existed inconsistent with defendants' omissions and concealments, and reasonably acted in reliance upon those beliefs to his or her detriment.

250. As a result of their detrimental reliance on defendants' fraudulent statements and omissions, plaintiffs and the Class have been damaged in the future in an amount to be proven at trial.

**<u>EIGHTH CLAIM FOR RELIEF</u>**
**PROMISSORY FRAUD**
***(As to All Defendants by All Plaintiffs)***

251. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

252. The representation that Quiznos would negotiate prices on Essential Goods for the benefit of franchisees made to plaintiffs at or before the time defendants sold the franchises plaintiffs was false. At the time defendants made the representation, defendants had the intention not to perform the act promised and, in fact, fully intended to negotiate prices in a manner that ensured that defendants and their affiliates were the sole beneficiaries of the negotiations, at the expense of the plaintiffs. Defendants knew at the time of making the representations that the representation in the UFOC was false.

253. Defendants intended to deceive plaintiffs into believing that a nationwide franchise system like Quiznos would exercise its "buying power" to ensure volume discounts in the acquisition of the Essential Goods. The intent of making the representation was to induce plaintiffs' reliance on this common sense proposition and to obtain plaintiffs' assent to the franchise agreements.

254. Plaintiffs reasonably relied on the UFOC and the other representations set forth in this Amended Complaint in choosing to purchase a Quiznos franchise. In so doing, plaintiffs suffered damages.

**<u>NINTH CLAIM FOR RELIEF</u>**
**ECONOMIC DURESS**
***(As To All Defendants By Plaintiffs McCarthy, Sequeria, McJon, BN&N, the Merry Plaintiffs, Msquared, Hampshire, and Two Wisconsin Boys)***

255. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

256. On or about July 18, 2005, McCarthy-Sequeria and McJon, on the one hand, and defendant TQSCII, on the other hand, entered into what Quiznos designated a "Financial Assistance Agreement." By this time, McJon was struggling financially due to the economic schemes alleged herein and Quiznos agreed to extend $2,918.58 to McJon to allow it to pay its lender a sum due. Despite obtaining McJon's commitment to repay the sum, TQSCII also extracted what purports to be a general release providing as follows:

> 4. RELEASE
>
> Franchise Owner and its affiliates, and their respective officers, directors, owners (including Guarantor), principals, employees, representatives, heirs, agents, administrators, successors and assigns hereby release Quiznos, Franchisor and their respective affiliates, and each of their respective current and former officers, directors, owners, principals, employees, representatives, agents, successors and assigns (the "Quiznos Parties") from any and all claims, demands, obligations, actions, liabilities, defenses or damages of every kind and nature whatsoever, in law or in equity, whether known or unknown (collectively, the "Claims"), which may hereafter be discovered, in connection with, as a result of, or in any way arising from, any relationship or transaction with any of the Quiznos Parties, however characterized or described, from the beginning of time until the date of this Agreement. Franchise Owner and Guarantor represents and warrants that they have not assigned or otherwise transferred any Claims released by this paragraph.

257. Quiznos' conduct as described herein placed McJon in the financial position it found itself on July 18, 2005, namely having to borrow funds from Quiznos to maintain the ongoing viability of its restaurant. Quiznos improperly used its economic power to extract a "release" from McJon and McCarthy-Sequeria. Certain members of the Class have signed a "Financial Assistance Agreement" similar in form to the one signed by McJon and McCarthy-Sequeria.

258. On or about November 10, 2005, BN&N Enterprises executed an "Asset Purchase Agreement" with third-party Bouchillon Development Westport LLC ("Bouchillon"), which effectuated the sale of the store owned by Curl and BN&N to Bouchillon. In order for Curl and BN&N to be able to sell their operation, Quiznos used its economic power to require them to sign what purports to be a general release providing as follows:

> **9.6 <u>Release of Quizno's</u>**. Seller, the Seller Guarantors (as set forth on the signature pages below) and Buyer, and each of them, for themselves and their affiliates, employees, officers, directors, successors, assigns, and other representatives, fully and forever unconditionally release and discharge Franchisor, and its affiliates, parents, subsidiaries, and their respective employees, officers, directors, successors, assigns, guarantors and other representatives (the "Released Parties"), from any and all claims, demands, obligations, actions, liabilities and damages of every kind or nature whatsoever, in law or in equity, whether known or unknown to them, which they may have against the Released Parties as of the execution by Franchisor of the Consent (or, solely with respect to Seller and the Seller Guarantors, which may thereafter be discovered, accrued, or sustained), in connection with, as a result of, or in any way arising from, any relations or transactions with the Released Parties, however characterized or described, including but not limited to, any claims arising from the Seller Franchise Agreement, the Buyer Franchise Agreement, this Agreement, the Franchisor's Consent or the transactions described herein.
>
> If the Restaurant is located in the State of California, the following provisions are applicable to Seller, the Seller Guarantors and Buyer. If the Restaurant is not located in the State of California, the following provisions are applicable only with respect to any of Seller, the Seller Guarantors or Buyer who are residents of the State of California. It is the intention of Seller, Buyer and the Seller Guarantors in executing this Agreement that this instrument be and is a general release which shall be effective as a bar to each and every claim, demand or cause of action, released by the executing parties. Each of Seller, Buyer and the Seller Guarantors recognize that he, she or it may have some claim, demand or cause of action against the Released Parties of which he, she, or it is totally unaware and unsuspecting, which he, she or it is giving up by executing this Agreement. It is their expressed understanding that executing this instrument will deprive him, her or it of each

such claim, demand or cause of action and prevent him, her or it from asserting it against the Released Parties. In furtherance of this intention, each of Seller, the Seller Guarantors and Buyer expressly waive any rights or benefits conferred by the provisions of Section 1542 of the California Civil Code, which provides as follow:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Seller, the Seller Guarantors and Buyer acknowledge and represent that he, she, or it has consulted with legal counsel before executing this Agreement and the he, she, or it understands its meaning, including the effect of Section 1542 of the California Civil Code, and expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands and causes of action.

259. Certain members of the Class have signed a general release in the context of getting Quiznos' consent to sell their stores similar in form to the one signed by Curl and BN&N. On or about June 12, 2006, the Merry Plaintiffs and Msquared executed an "Asset Purchase Agreement' with third-party Ruchi Dinan d/b/a Ruchi, Inc. ("Ruchi"). In late 2005 or early 2006, prior to having secured a buyer, John Merry spoke to Quiznos representative Gjersee to advise that the Merry Plaintiffs had been unable to find a buyer for their store and that they were contemplating closing it. Gjersee stated words to the effect, that "simply closing the store would result in Quiznos suing them." This was a threat designed to have the Merry Plaintiffs continue to search for a buyer and thereafter obtain a release.

260. In order for the Merry Plaintiffs and Msquared to be able to sell their operation for $1, Quiznos used its economic power to require them to sign what purports to be a general release similar in form to the one signed by Curl and BN&N except further releasing Quiznos' "area directors."

261. Certain members of the Class have signed a general release in the context of getting Quiznos' consent to sell their stores similar in form to the one signed by the Merry Plaintiffs and Msquared.

262. On or about December 8, 2006, Hampshire and Two Wisconsin Boys, on the one hand, and QFA, QFII and third-party buyer CSL Enterprise LLC ("CSL"), on the other hand, executed an "Agreement and Conditional Consent to Transfer", which effectuated the sale of the store owned by Hampshire and Two Wisconsin Boys to CSL. This agreement itself effectuated a sales contract from August 7, 2006. In order for Hampshire and Two Wisconsin Boys to be able to sell their operation, Quiznos used its economic power to require them to sign what purports to be a general release providing as follows:

> 5. **Release of Franchisor.** Seller, the seller Guarantors and Buyer, and each of them, for themselves and their affiliates, employees, officers, directors, successors, assigns, and other representatives, hereby fully and forever unconditionally release and discharge Franchisor, and its affiliates, parents, subsidiaries, and their respective employees, officers, directors, successors, assigns, guarantors and other representatives (the "Released Parties"), from any and all claims, demands, obligations, actions, liabilities and damages of every kind or nature whatsoever, in law or inequity, whether known or unknown to them, which they may have against the Released Parties as of the date of this Agreement, or which may thereafter be discovered, accrued, or sustained, in connection with, as a result of, or in any way arising from, any relations or transactions with the Released Parties, however characterized or described, including but not limited to any claims arising from the Seller Franchise Agreement, the Buyer Franchise Agreement or the Purchase Agreement or the transactions described herein.
> If the Restaurant is located in California or if either Buyer or Seller is a resident of California, the following shall apply:
>
> **Section 1542 Acknowledgment**. It is the intention of Seller and the Seller Guarantors in executing this Agreement that this instrument be and is a general release which shall be effective as a bar to each and every claim, demand or cause of action released by Seller and the Seller Guarantors. Seller and the Seller Guarantors

recognize that he, she or it may have some claim, demand or cause of action against the Released Parties of which he, she, or it is totally unaware and unsuspecting, which he, she or it is giving up by executing this Agreement. It is the intention of Seller and the Seller Guarantors in executing this instrument that it will deprive him, her or it of each such claim, demand or cause of action and prevent him, her or it from asserting it against the Released Parties. In furtherance of this intention, Seller and the Seller Guarantors expressly waive any rights or benefits conferred by the provisions of Section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

Seller and the Seller Guarantors acknowledge and represent that he, she, or it has consulted with legal counsel before executing this Agreement and that he, she, or it understands its meaning, including the effect of Section 1542 of the California Civil Code, and expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands and causes of action.

263. On their face, the "releases" identified above purport to exculpate defendants, their affiliates and representatives from liability with respect to claims against them. These "releases", and any like them, were improperly compelled and obtained through economic duress. It would be unfair and inequitable to uphold the release due to the unequal bargaining power between defendants, plaintiffs and the Class. In addition, it would be inequitable to allow Quiznos to benefit from releases obtained due to circumstances caused by Quiznos (e.g., the sale of a Quiznos store and the need for short-term financial assistance).

264. Plaintiffs and those similarly situated that were coerced to sign any of the identified release documents were under the domination of Quiznos when compelled to sign them. In requiring the execution of the releases, Quiznos obtained signatures that manifested a

nonexistent assent on the part of the signing franchisees. The resulting exchange (the release of the parties responsible for the economic ruin visited upon them by their association with Quiznos) is not fair on its terms and the effectiveness of the threat in inducing plaintiffs' manifestation of assent was increased by Quiznos' prior unfair dealing. In addition, Quiznos' efforts to extract a release constituted a use of power for illegitimate ends.

265. The releases obtained by Quiznos and all similar releases are voidable on the grounds of duress as the result of an improper threat to which plaintiffs had no reasonable alternative other than to sign the release. In particular, plaintiffs knew that franchisees who simply go out of business are often sued by Quiznos, and that Quiznos demands in such suits the present value of royalties that Quiznos claims would have been owed for the unexpired term of the Franchise Agreement. This effectively left plaintiffs with no choice but to sign the offered releases under duress.

266. All non-parties who seek to take advantage of the release knew of the economic duress that gave rise to the release and therefore are prohibited from taking advantage of their terms.

## TENTH CLAIM FOR RELIEF
## ILLUSORY CONTRACT
***(As To All Parties Who Signed Franchise Agreements Or Obtained Rights to Them By Assignment)***

267. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

268. The franchise agreement purports to limit plaintiffs' damages to an amount equal to each plaintiffs' profits from the year prior to any breach of the agreement. Plaintiffs earned no profits. Quiznos knew at the time it executed each franchise agreement that the Quiznos' economic model effectively precluded plaintiffs from ever operating at a profit. Due to the way

Quiznos has structured the franchise relationship, franchisee profitability is an event wholly under the control and discretion of the defendants.

The promise to provide damages to plaintiffs in the event of breach is therefore illusory.

The franchise agreement is null and void.

**ELEVENTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY**
***(As To QAFT and Its Predecessor Trustees By All Plaintiffs)***

269. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

270. QAFT and its predecessors served as trustees of the advertising and marketing funds established by plaintiffs.

271. QAFT breached its fiduciary duty to plaintiffs by choosing to misappropriate funds from the marketing and advertising accounts for its own use or that of one of its affiliates. Plaintiffs have been damaged by virtue of QAFT's breach of its fiduciary duties and will continue to be damaged in the future.

**TWELFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
***(As To All Defendants by All Plaintiffs)***

272. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

273. An actual and justifiable controversy exists between defendants and plaintiffs concerning the parties' respective rights and obligations under the franchise agreements and UFOCs, and whether Quiznos should be held liable for alleged misconduct during the relationship between the parties.

274. In addition to the extremely one-sided operational and approval terms included in the adhesive form franchise agreements, Quiznos has included unconscionable procedural obstacles, which intend to discourage claims against it and/or attempt to shield it from any liability.

275. These unconscionable provisions from the franchise agreements, among others, are unenforceable as a matter of Colorado Law:

(a) Unreasonably truncate any statutes of limitation that may apply to franchisees' legal claims.

(b) Disclaim any responsibility for the effect of Quiznos' decisions and actions on the franchisees' viability.

(c) Restrict the ability of franchisees to litigate in their home states and require litigation in Denver, Colorado.

(d) Prohibit consolidation with other franchisees to press similar claims.

(e) Bar franchisees from bringing a class action.

(f) Deprive plaintiffs' of their constitutionally-guaranteed right to a jury trial.

(g) Prohibit plaintiffs from suing Quiznos for violating the implied covenant of good faith and fair dealing that Colorado law injects into every contract.

(h) Prohibit claims against any affiliate, employee, director or officer of the franchisor even where those parties have engaged in illegal conduct.

(i) Impose the application of Colorado Law in all circumstances, no matter the locale of the franchisee or the nature of the alleged wrongdoing at issue between the parties.

(j) Unilaterally limit a franchisee's damages "in a maximum amount equal to the net profits of the Restaurant for the year prior" (typically zero profits, so altogether eliminating any contractual right to claim damages).

(k) Reserve for itself the right to sue the franchisee for 15 years' worth of lost royalties and marketing fees after the franchise fails.

(l) Prohibit the recovery of punitive or exemplary damages.

(m) Prohibit the use of "course of dealing" evidence to "explain, modify or contradict" the franchise agreement.

276. The collective inclusion of all of these onerous provisions in the adhesive form franchise agreement violates public policy.

277. Plaintiffs are therefore entitled to a declaration from the Court that these provisions of the Quiznos franchise agreements signed by plaintiffs, and others similarly situated, are void and unenforceable.

## THIRTEENTH CLAIM FOR RELIEF
## VIOLATIONS OF COLORADO'S CIVIL THEFT ACT
***(As to All Defendants By All Plaintiffs)***

278. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Amended Complaint as if set forth in full.

279. In perpetrating the schemes alleged in this Amended Complaint, defendants obtained property of the plaintiffs by theft. Plaintiffs have been damaged by that theft.

280. Said property shall be restored to the rightful owners, namely plaintiffs and the Class. To the extent defendants engaged in any subsequent transfer of the illegally obtained property to third parties, said transfer cannot divest plaintiffs of their right to the return of such property. Any such transfer by defendants was done in bad faith and with express knowledge of the recipient of the illegal source of the property.

281. Pursuant to Colo. Rev. Stat. § 18-4-405, plaintiffs are entitled to recover damages of three times the amount of the actual damages sustained by them as well as reasonable attorneys' fees incurred in obtaining relief from defendants.

WHEREFORE, plaintiffs, individually and on behalf of all others similarly situated, seek the following relief:

(a) An Order certifying the proposed Class herein and appointing plaintiffs and the undersigned counsel of record to represent the Class.

(b) An Order issuing a preliminary injunction enjoining defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Amended Complaint.

(c) An Order issuing a permanent injunction enjoining defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Amended Complaint.

(d) An Order declaring the above-referenced provisions of the franchise agreements of each and every plaintiff and member of the Class unconscionable and, therefore, unenforceable.

(e) An Order declaring the franchise agreement illusory.

(f) A Judgment awarding plaintiffs and the Class compensatory, consequential, and statutory damages, including, without limitation, their loss of investment capital, loss of income, loss of assets and savings, pre-judgment interest and post-judgment interest.

(g) A Judgment ordering defendants to disgorge their illegally-obtained profits.

(h) A Judgment awarding plaintiffs and the Class exemplary and punitive damages.

(i) A Judgment awarding plaintiffs and the Class attorneys fees and costs.

(j) An Order rescinding the franchise agreement.

(k) Such other relief as the Court finds just and proper.

Dated this 12th day of September, 2008.

KRAVIT HOVEL & KRAWCZYK S.C.

s/ Mark M. Leitner

Joseph S. Goode, Esq.
Mark M. Leitner, Esq.
825 North Jefferson Street
Milwaukee, Wisconsin 53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135
Attorneys for Plaintiffs

Justin M. Klein, Esq.
David S. Paris, Esq.
Marks & Klein, LLP
63 Riverside Avenue
Red Bank, New Jersey 07701
Telephone: (732) 747-7100
Facsimile: (732) 219-0625

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**